UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| NDN COLLECTIVE, individually and on behalf of all others similarly situated, SUNNY RED BEAR, individually and on behalf of all others similarly situated, and GEORGE BETTELYOUN, individually and on behalf of all others similarly situated, | Civ. No. 5:22-cv-05027-LLP |
| Plaintiffs, | |
| v. | **DEFENDANTS' RESPONSES TO PLAINTIFFS' MOTIONS *IN LIMINE*** |
| RETSEL CORPORATION, d/b/a GRAND GATEWAY HOTEL and d/b/a CHEERS SPORTS LOUNGE AND CASINO, CONNIE UHRE, and NICHOLAS UHRE, | |
| Defendants, | |
| and | |
| RETSEL CORPORATION, d/b/a GRAND GATEWAY HOTEL and d/b/a CHEERS SPORTS LOUNGE AND CASINO, | |
| Third-Party Plaintiff, | |
| v. | |
| JOHN DOES 1 through 20, JANE DOES 1 through 20, and ABC CORPORATIONS 1 through 20, | |
| Third-Party Defendants. | |

1

Defendants Retsel Corporation, d/b/a Grand Gateway Hotel and d/b/a Cheers Sports Lounge and Casino ("Retsel"), Connie Uhre, and Nicholas Uhre (collectively, "Defendants"), by and through their undersigned counsel, respectfully respond to Plaintiffs' Motions *in Limine*, stating as follows:

## INTRODUCTION

This case arises from Defendants' alleged refusal to rent rooms to Plaintiffs or their agents on three occasions and Plaintiffs' response to perceived discrimination. As currently postured, the jury will be asked to decide the following questions: (1) Did Defendants discriminate against Plaintiffs in violation of 42 U.S.C. § 1981 on one or more of three occasions? (2) Did Connie Uhre commit the intentional tort of battery against Sunny Red Bear and what damages if any should be awarded for assault or battery?  (4) Is Retsel vicariously liable for any assault or battery? (5) Did NDN Collective commit acts constituting a nuisance following the perceived discrimination? (6) Did NDN Collective or others defame Retsel and Nick Uhre when they posted doctored images purporting to attribute statements to Nick Uhre that he did not make?

The majority of Plaintiffs' motions *in limine* seek to preclude evidence that is relevant, not unfairly prejudicial, and admissible under the Federal Rules of Evidence. Further, many of Plaintiffs' motions *in limine* seek blanket exclusions of categories of evidence which can only be decided once a specific piece of evidence or testimony is introduced and the Court has the necessary context to determine admissibility. The Court

2

should therefore deny the motions identified as "opposed" and grant such other relief as is requested in this omnibus response.

## LEGAL AUTHORITY

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." F.R.E. 401. Relevant evidence may be excluded if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." F.R.E. 403. Within the context of Rule 403, unfair prejudice means a tendency to suggest a decision on an improper basis, often an emotional one. *Id.* Committee Notes. "Confusion of the issues warrants exclusion of relevant evidence if admission of the evidence would lead to litigation of collateral issues." *Firemen's Fund Ins. Co. v. Thien*, 63 F.3d 754, 758 (8th Cir. 1995).

"Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." F.R.E. 404(a)(1). Per the 2006 Committee Notes on Amendment, Rule 404 "has been amended to clarify that in a civil case evidence of a person's character is never admissible to prove that the person acted in conformity with the character trait." To the extent evidence of crimes, wrongs, or other acts is introduced for a purpose other than proving conformity with the person's character, the evidence must also be evaluated under the balancing test

3

prescribed by F.R.E. 403. *Firemen's Fund Ins. Co.*, 63 F.3d at 759. Further, the evidence of other acts must be analogous to the facts at issue in the instant case and "must assist in the development of a reasonable inference of discrimination within the context of each case's respective facts." *Bradford v. Norfolk S. Corp.*, 54 F.3d 1412, 1419 (8th Cir. 1995).

## RESPONSES TO PLAINTIFFS' MOTIONS *IN LIMINE*

## I.    Motion to exclude settlement offers – PARTIALLY OPPOSED

Defendants agree that evidence of settlement offers and statements made during compromise negotiations are inadmissible to prove the validity or amount of a disputed claim. However, offers of compromise and statements made during negotiations may be admitted for another purpose, including proving bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. F.R.E. 408(b). Defendants do not anticipate using the parties' past settlement discussions for any purpose and will approach the bench if they believe the door is opened because of the testimony of an adverse witness.

Defendants respectfully submit that Plaintiffs' attempt to distinguish the Consent Decree from other settlements should be rejected. Rule 408 does not differentiate between confidential settlements and those which are subject to public disclosure. As the Court is aware, parties may settle disputed claims for many reasons, including "a desire for peace rather than from any concession of weakness of position." F.R.E. 408, Advisory

4

Committee Notes – 1972. Further, the rule promotes "the public policy favoring the compromise and settlement of disputes." *Id*. Notably, the Consent Decree explicitly provides as follows:

> Except as stated in the Recitals below, Defendant deny the allegations in the lawsuit and in the Complaint, deny that they implemented any policy to deprive Native Americans from use of or access to accommodations owned by Defendant Retsel Corporation, and deny that they engaged in, or attempted to engage in, discriminatory conduct. However, Defendants are entering into this Consent Decree in the spirit of cooperation with the United States and to memorialize Defendants' commitment to compliance with applicable laws prohibiting discrimination.

Stern Decl., Exh. 8 [Consent Decree] at ¶ 4. The Recitals section sets forth Ms. Uhre's social media posts and then notes that Defendants deny those statements "contain an accurate statement of the policies of Grand Gateway Hotel and Cheers Sports Lounge. *Id.* at ¶¶ 9-12.

Given the lack of any admission of discrimination and the public policy in favor of compromises, the Court should exclude the Consent Decree as irrelevant, unfairly prejudicial because of the substantial risk the jury will give it undue weight, and barred pursuant to F.R.E. 404(a)(1) and F.R.E. 408(a). Accordingly, Defendants oppose the portion of Plaintiff's first motion *in limine* which attempts to carve out the Consent Decree from the broad prohibition of settlements and offers to compromise. The consent decree is also inadmissible for the reasons explained in Defendants' Motion *in Limine* No. 6. (*See* Doc. 192 at 15–17.)

**II.     Motion to exclude medical evidence – OPPOSED**

In their second motion *in limine*, Plaintiffs seek an order excluding "any of Plaintiffs' medical records" based on the notion that their medical records lack relevance, and these records would be unduly prejudicial, harassing or embarrassing. Plaintiffs' second motion *in limine* should be denied.

All six of the individual plaintiffs in this case are seeking emotional distress damages. Indeed, emotional distress damages are the only compensatory damages sought by the Section 1981 claim plaintiffs. Additionally, Sunny Red Bear seeks emotional distress damages for her assault and battery claims. Plaintiff George Bettelyoun pleads he "has been diagnosed with PTSD", that he "lives with HIV," and that he "felt he had been exposed to COVID". TAC ¶¶ 37-40.

By seeking emotional distress damages, Plaintiffs have placed their medical condition squarely at issue in this case. *Schoffstall v. Henderson*, 223 F.3d 818, 823 (8th Cir. 2000). *See also Batiste-Davis v. Lincare, Inc*., 526 F.3d 377, 381 (8th Cir. 2008) ("Because Davis's mental condition was at issue, it was proper to admit evidence of her prior mental condition and treatment.").

By pleading a medical diagnosis of "PTSD" and "HIV" and damages from exposure to COVID, George Bettelyoun has also placed his medical history, records, diagnoses, and treatment squarely at issue in this case.

As such, Plaintiffs' medical records are plainly relevant as a matter of law. For example, among other things, a plaintiff's medical records, or lack thereof, can establish

6

other conditions that are alternative stressors contributing to Plaintiffs' alleged emotional distress; cast doubt on the claimed nature and severity of harm; cast doubt on alleged causation; and/or cast doubt on any claim that any emotional distress aggravated any other condition. *See, e.g., Owens v. Sprint/United Mgmt. Co*., 221 F.R.D. 657, 660 (D. Kan. 2004) (finding that records relating to plaintiff's medical care, treatment, and counseling were relevant to claim for "garden-variety" emotional damages under Title VII as well as to defenses against emotional distress damages claims because the records could reveal unrelated stressors that could have affected her emotional well-being); *Posey v. Calvert Cnty. Bd. of Educ*., No. CIV.A. WMN-02-2130, 2003 WL 21516194, at *1 (D. Md. Mar. 27, 2003) (denying plaintiff's motion for a protective order of her medical records where plaintiff testified to prior use of antidepressants, "a history of an abusive relationship with her alcoholic ex-husband and counseling involving her son and daughters"); *Walker v. Nw. Airlines Corp*., No. Civ. 00-2604 MJD/JGL, 2002 WL 32539635, at *4 (D. Minn. Oct. 28, 2002) (using Rule 26 and stating, "regardless of whether Plaintiff intends to introduce his medical records or offer medical testimony to prove his alleged emotional distress, [Defendant] is entitled to determine whether Plaintiff's relevant medical history indicates that his alleged emotional distress was caused in part by events and circumstances independent of [Defendant's] allegedly adverse employment action"); *Garrett v. Sprint PCS*, No. 00-2583-KHV, 2002 WL 181364, at *2 (D. Kan. Jan. 31, 2002) (finding that plaintiff's intent not to present expert

testimony in support of her emotional distress claim did not make medical records and information any less relevant); *LeFave v. Symbios, Inc*., No. CIV.A. 99-Z-1217, 2000 WL 1644154, at \*2 (D. Colo. Apr. 14, 2000) (finding that medical records were relevant to claim for emotional distress damages and to defenses against emotional distress damages claims because they could reveal unrelated stressors); *Ziemann v. Burlington Cnty. Bridge Comm'n*, 155 F.R.D. 497, 506-07 (D. N.J. 1994) (requiring disclosure of plaintiff's marriage counseling records where plaintiff's expert indicated that "current mental condition is due, in part, to the experiences of" that marriage); *Bridges v. Eastman Kodak Co.*, 850 F. Supp. 216, 223 (S.D.N.Y. 1994) (holding that, where sexual harassment plaintiffs claimed emotional distress damages, the employer is entitled "to inquire into plaintiffs' pasts for the purpose of showing that their emotional distress was caused at least in part by events and circumstances that were not job related").

Plaintiffs argue that the records are embarrassing or prejudicial but do not provide any specific examples and in any event, whether embarrassing or prejudicial, these records are directly probative to matters plainly at issue in this case: namely, Plaintiffs' own damages assertions and Bettelyoun's own allegations about his medical history and status. There is no basis factually or legally to find that there is a "substantial" outweighing here of relevance to justify excluding the entire category of Plaintiffs' medical records wholesale. F.R.E. 403.

Defendants further note that Plaintiffs' motion *in limine* is overbroad and one-sided, in that, while it seeks to exclude records, it does not seek to exclude testimony. Thus it appears that Plaintiffs seek the desire to testify freely, while the defense is hamstrung by an inability to introduce medical records probative to questioning such claims.  Such an order would unfairly prejudice the defense in this case.

### III.    Motion to exclude references to Nick Tilsen's protective orders, Facebook posts, and the charge against Brandon Ferguson - OPPOSED

Plaintiffs' request to exclude Nick Tilsen's Facebook posts should be denied as vague and unsupported as well as contrary to their own positions in this case. Plaintiffs do not describe which Facebook posts of Nick Tilsen they wish to exclude, but notably, they identified 27 Facebook posts made by various members of the Uhre family and others as their own trial exhibits. (*See* Doc. 188.)  Plaintiffs thus should not be able to argue there is a "per se" exclusion here. Plaintiffs argue that Nick Tilsen's Facebook posts and protective orders concern his "personal life" which is "irrelevant" but do not provide even a single example, and their position is directly contrary to their own position that Connie Uhre's Facebook posts and criminal conviction, and Nicholas Uhre's Facebook posts criticizing the Mayor and others, are supposedly not just relevant but binding on Retsel Corp.  Plaintiffs' sought-after double-standard has no basis in law.  In any event, without knowing which posts Plaintiffs seek to exclude Defendants cannot

9

state whether they object to their exclusion and the Court should therefore deny the motion.

With respect to Mr. Ferguson, Plaintiffs have listed him as witness, stating that they believe him to be "a former contractor or employee" of Retsel who "will testify regarding acts of discrimination and discriminatory intent exhibited by Retsel Corporation." (*See* Doc. 186 at p. 3, ¶ 13.)  Mr. Ferguson is not a former contractor or employee of Retsel.  But, in any event, if Mr. Ferguson is called to give testimony against Retsel, Retsel should be allowed to cross-examine Mr. Ferguson as to matters pertaining to his credibility.  A relevant matter to such cross-examination is the fact that on July 31, 2023, Mr. Ferguson received a protective order against Mr. Tilsen because Mr. Tilsen threatened to kill him as part of an intimidation campaign to try to get Mr. Ferguson to stop publicly supporting a local political candidate who was running for a political office against Mr. Tilsen's sister.  At Court, Mr. Ferguson played an audio recording of Mr. Tilsen, leading the Court to make the following findings:

> "Of course, we all heard that fairly disturbing phone call and what's -- I appreciate Mr. Tilsen being credible enough to say that he was – he kept saying, *I was activated*. And that to the point it appears that, while Dr. Big Eagle could self-regulate enough to address this in an appropriate way, Mr. Tilsen, through an episode that he wasn't even present for, would call and

10

threaten Mr. Ferguson to the extent that he was going to, quote, fuck you up.

And the demeaning way in which Mr. Tilsen speaks -- and clearly it was done -- designed to figure out a way to make Mr. Ferguson afraid because, you know, you have to meet with me and Where are you at, Mother F'er? And calling him a, quote, Bitch Ass, Fucking Uncle Tom, Fucking Bitch Ass Mother Fucker. Hang around the fort, fucking bow your fucking head down to the fucking white people. That's how you are.

All of that, in the view of the Court, was designed -- particularly with the threat to "fuck you up," was designed to inflict fear of bodily harm. It's especially disturbing given Mr. Tilsen wasn't present, didn't see it, he wasn't injured. And to the point that Dr. Big Eagle didn't call him and she didn't -- she didn't react in that way, and so I do find that under the circumstances the Court will grant an order of protection for Mr. Ferguson.

So the Court is going to grant the order of protection. I am going to grant it for six months. I believe that will be sufficient time for the matter to calm down. The -- you may not come within 100 yards of Mr. Ferguson. You may not have direct or indirect contact with him. That means not having third parties do something you cannot do."

Stern Decl., Exh. 9 [Transcript] at pp. 90-92.

11

Mr. Tilsen does not deny that he threatened Mr. Ferguson.  Instead, his testimony was that "I responded because a native woman was being intimidated by him and I lost my cool. And that's the truth. That's the reason why, that's the reason why I said what I said in the recording. That's the reason why I'm here today is because I was standing up for somebody in our community who was getting verbally harassed at that time." *Id*. at p. 37.

The legitimate fear of bodily harm that led Mr. Ferguson to obtain a protective order against Mr. Tilsen is relevant to his credibility because the jury could conclude that his current testimony is motivated by self-preservation.

The Court should therefore deny Plaintiffs' third motion *in limine*.

## IV.    Motion to exclude evidence of Sunny Red Bear's protective orders and divorce – OPPOSED

In Plaintiffs' fourth motion *in limine*, Sunny Red Bear seeks to exclude "any reference of any kind to Ms. Red Bear's personal life, including protective orders against her or her divorce."

This vague and overbroad motion *in limine* should be denied.  Ms. Red Bear is seeking emotional distress damages.  Alternate stressors in her life, including her 2023 divorce following at least four years of acrimony, stalking orders brought against her, and protective orders entered against her in her personal life, are directly at issue in this case because she is seeking emotional distress and these concern other potential sources of emotional distress.  *Bunda v. Potter*, No. C 03-3102-MWB, 2005 WL 8174569, at \*7

(N.D. Iowa Oct. 24, 2005) (denying motion in limine to preclude evidence of plaintiff's divorce, noting that "other potential sources of emotional distress are relevant to Bunda's claim that she suffered emotional distress as the result of work place harassment and retaliation").  In addition, at issue in this case is the vicarious liability of NDN Collective, Inc. for the torts of Sunny Red Bear who was involved in spreading the defamatory material about Nick Uhre and Retsel, as well as the nuisance activity, and whether NDN Collective, Inc. negligently employed and failed to screen and failed to supervise Sunny Red Bear (among others).  Protective orders entered against Sunny Red Bear for harassment of others are relevant to this issue as well because they show the type of dangerous propensity that justify a finding of negligent hiring, training, and/or supervision.

Moreover, broadly excluding any reference of any kind to Ms. Red Bear's "personal life" is overbroad and lacks sufficient information to understand relevance or prejudice or why an order should be entered, or frankly how counsel or witnesses can comply with it, and should be denied on this basis.  *Magelky v. BNSF Ry. Co.*, No. 1:06-CV-025, 2008 WL 238451, at *3 (D.N.D. Jan. 28, 2008) ("Magelky has not provided the Court with sufficient information at this stage of 'all of the other personal disputes' in her life in order for the Court to determine whether such evidence may be relevant," and denying the motion on this ground).  There are aspects of Red Bear's "personal life" directly relevant here, including her relationship with NDN employee Hermus Bettelyoun

13

and her actions renting a hotel room at the Grand Gateway Hotel "for Hermus" on several different occasions before March of 2022, which show (1) no racial bias of the Grand Gateway Hotel, and (2) instead, the development of a personal animus and malice by Sunny Red Bear and Hermus Bettelyoun against the Grand Gateway Hotel prior to March of 2022, having nothing to do with race.

For these reasons, this motion *in limine* should be denied.

## V. Motion to prevent testimony related to dismissed counterclaims – OPPOSED

Defendants' amended counterclaims as to defamation and nuisance are part of the case and evidence which makes the validity or value of the counterclaims more or less likely is clearly relevant under F.R.E. 401. Plaintiffs' motion seeks to preclude testimony "related" to dismissed counterclaims but does not identify which pieces of evidence or testimony should be excluded, thus requiring Defendants to speculate as to Plaintiffs' requested relief. This is particularly problematic here since evidence or testimony may be related to various claims and counterclaims. For example, a recorded interaction between the parties could be related to Plaintiffs' discrimination claim, Ms. Red Bear's assault claim, and Defendants' defamation and nuisance claims. Plaintiffs should be required to identify specifically the evidence or testimony they want precluded so Defendants and the Court have enough information to evaluate the motion and determine whether the evidence or testimony is nonetheless admissible under the Federal Rules of Evidence. The Court should therefore deny Plaintiff's fifth motion *in limine*.

14

**VI.    Motion to prevent questions to NDN Collective witnesses related to salary – OPPOSED**

Evidence of NDN Collective's payment of wages, salary, and/or compensation to witnesses is relevant to multiple disputed issues and does not create any unfair prejudice or confusion at trial. As an initial matter, a witness's credibility is always at issue and the jury is expressly directed to consider "any reasons a witness might have for testifying a certain way." (Doc. 190, p. 20, Eighth Circuit Model Civil Jury Instruction 3.03). The fact that Plaintiff NDN Collective paid compensation to a witness, the amount of compensation, the frequency of compensation, and the duties for which compensation was paid are all relevant to the witnesses' credibility. This evidence does not unfairly prejudice Plaintiffs because it would not suggest a decision on an improper, emotional basis.

In addition to credibility, evidence of compensation paid to witnesses is relevant to a disputed element of Defendants' counterclaims: vicarious liability of NDN Collective. Specifically, NDN Collective denies it is liable for the acts and omissions of individuals who defamed Nick Uhre and Retsel, including Hermus Bettelyoun who was paid a salary by NDN Collective. The jury will be tasked with determining which individuals were acting within the course and scope of their employment or agency with NDN Collective, and evidence of compensation is one factor the jury may consider in deciding this question. The evidence related to compensation is therefore relevant to the disputed issues in the case and admissible.

15

Lastly, evidence of Hermus Bettelyoun's compensation from NDN Collective is relevant to both his own credibility and that of Plaintiff Sunny Red Bear. During discovery, Ms. Red Bear claimed she had rented rooms for Hermus Bettelyoun because he was "unhoused" and needed a place to stay along with his children. However, NDN Collective was paying Mr. Bettelyoun over $70,000 per year during the relevant time period. Despite this, Mr. Bettelyoun could not articulate his job duties for NDN Collective when asked at deposition. Evidence of Mr. Bettelyoun's salary is relevant to both his own credibility as a witness called on behalf of the Plaintiff and Ms. Red Bear's credibility.

Evidence of witness compensation will not be used to argue that Plaintiffs are not entitled to damages because they earn money from NDN Collective. Accordingly, Plaintiffs cannot demonstrate any unfair prejudice arising from evidence or testimony about compensation paid to witnesses by NDN Collective. In contrast, excluding this evidence would unfairly prejudice Defendants by preventing them from offering relevant information that speaks directly to witnesses' credibility and disputed legal issues. The Court should therefore deny Plaintiffs' sixth motion *in limine*.

## VII. Motion to prevent evidence and argument regarding NDN Collective's fundraising – OPPOSED

Plaintiff NDN Collective is an organization that fundraises to support its professed mission of building "Indigenous power." One of the ways it fundraises is by using "tactical media" strategies designed to draw attention to the organization's campaigns.

Here, NDN Collective denies it is vicariously liable for the alleged torts committed by its employees and agents. However, it then used the doctored images of a purported email by Nick Uhre to push a social media smear of Nick Uhre and the hotel and used videos of its nuisance activity on its website and other media to raise its public profile and fundraise. Evidence that NDN Collective is engaged in fundraising and activism and used the events at issue to further its work is relevant to the claims in this case, including both the discrimination claim and Defendants' counterclaims. Further, evidence of fundraising is relevant to the credibility of witnesses who are affiliated with NDN Collective, which the jury should have when evaluating their testimony. Specifically, the jury should know that a witness recounting their observations is working for an organization which is a named party and which will receive damages if the jury believes those witnesses' testimony over that of the defense witnesses. The jury should also know that a witness recounting their observations works for an organization which will receive other benefits such as higher media profile and an ability to fundraise off such a profile, if the jury believes those witnesses' testimony over that of the defense witnesses. This evidence and testimony does not create unfair prejudice, and certainly not sufficient prejudice to substantially outweigh its probative value. The Court should therefore deny Plaintiffs' seventh motion *in limine*.

## VIII. Motion to prevent references to Land Back, Mount Rushmore protests of President Trump, or Nick Tilsen's arrest there – OPPOSED

In their eighth motion *in limine*, Plaintiffs move the Court to exclude from trial "any reference to 'Land Back' (a movement to return stolen lands to indigenous people, the Mount Rushmore protects of President Donald Trump in 2020, or Nick Tilsen's arrest at the Mount Rushmore protests in 2020". The Court should deny this motion.

A key issue in this case is whether Nicholas Uhre and Retsel Corp. acted with discriminatory intent when Mr. Uhre asked five individuals wearing NDN Collective attire, who all stated they were with NDN Collective, to leave the hotel on March 22, 2022. Mr. Uhre will testify that he had no such discriminatory intent and that instead, his intent was to exclude NDN Collective because NDN Collective was making specific threats to himself, the hotel, and his family, that led him to act of fear and protection of himself, those others to whom he owed duties, and his property. He will testify that he believed NDN Collective's threats to be credible not only because of the words that were being used and the circumstances at the time his mother's social media post went viral and the reaction to that post, but also because of his own past history with NDN Collective and its employees and agents and his knowledge through his own community involvement of Nick Tilsen's Mount Rushmore protest and arrest. As was widely reported in the press at the time, Mr. Tilsen led protestors against Trump in 2020 and was involved in a confrontation with police, following which he was criminally charged with using "physical menace or credible threat" to put the officers "in fear of imminent bodily harm." As Mr. Uhre's state of mind is at issue in this case, Mr. Uhre should be allowed

18

to testify as to what he recalled about that incident and why it led him to take seriously the threats by NDN Collective and why he believed NDN Collective was and is an activist movement that seeks unlawful, criminal and tortious confrontation with others posing threats to safety and property.

The direct activism of NDN Collective, including on matters like "Land Back" and the Mount Rushmore protests, is also relevant to NDN Collective's policies and procedures and its vicarious liability. NDN Collective seeks to argue it is not responsible vicariously for torts committed by its employes like Sunny Red Bear and Hermus Bettelyoun because they were acting outside the scope of employment, but as can be seen from the other activism of NDN Collective and the conduct of its own executive director Nick Tilsen, NDN Collective actually as a matter of policy and procedure seeks confrontation with others and does not discourage its employees and agents from committing tortious acts nor does it punish its employees and agents for such acts. In fact, it benefits from the elevated exposure generated by such acts. These instances of past conduct are appropriate under the 404(b)(2) exceptions such as motive and intent.

NDN Collective's direct activism conduct is also related to NDN Collective's own intent here in this case. An important issue is whether NDN Collective truly had a genuine intent to contract with the hotel or was merely "testing" and confronting the hotel to push its own narrative. Another important issue is whether NDN Collective has standing to bring a Section 1981 claim based on its alleged non-profit status as an

19

organization that is a member of the protected class of "Native American" for purposes of Section 1981.  The object of NDN Collective as an organization and the full and entire scope of its advocacy and work in all respects is directly at issue in this case.

The "Land Back" movement is also relevant to credibility and bias.  In the words of Nick Tilsen, "Rapid City exists on stolen land."  (See https://ndncollective.org/nick-tilsen-statement-on-interaction-with-police-at-ndn-collective-headquarters/) The evidence will show that NDN Collective engaged in a campaign of defamation and nuisance targeting the hotel and the Uhre family that was intended, in the words of Hermus Bettelyoun, to put the hotel out of business.  If NDN Collective intends to defend the counter claims by arguing that Hermus Bettelyoun was not acting within the scope of his employment to try to put the hotel out of business, NDN Collective's own declared mission to take "land back" is fair game to undermine NDN Collective's credibility on this point.

Additionally, a key issue in this case is whether certain individuals, some of whom are masked, some of whose names are not known because witnesses would not identify them or claimed to not know their names, were employees or contractors or agents of NDN Collective.  Some of the videos show individuals in tee shirts/attire emblazoned with "Land Back" slogans that match the marketing of NDN Collective on its own website, see https://ndncollective.org/landback/, raising important issues about the relationship of these individuals to NDN Collective.

For all of these reasons, the motion should be denied.

**IX.    Motion to prevent testimony related to a minor related to Nick Tilson (sic) being present at the shooting at Grand Gateway Hotel – UNOPPOSED**

Defendants do not oppose this motion. To the extent this evidence or testimony becomes relevant at any point, the parties should raise it outside the presence of the jury.

**X.    Motion to prevent testimony or the video of an incident where Nick Tilsen asked police to leave the NDN Collective headquarters.**

In this motion *in limine*, Plaintiffs seek to exclude evidence of a widely publicized 2021 incident where Nick Tilsen demanded that police officers leave NDN Collective property because they were trespassing.  This motion *in limine* should be denied.

Among other things, this 2021 incident, which was widely publicized, again relates to Mr. Uhre's mindset when he excluded NDN Collective from the hotel on March 22, 2022.  As Mr. Uhre will testify, the exclusion had nothing to do with race, but instead was the result of specific threats to himself, his staff, the hotel, and his family, that he believed were credible because of NDN Collective's own reputation in the community based on incidents that include this 2021 incident. *See* F.R.E. 404(b)(2) (allowing evidence of prior acts to show motive, intent, lack of mistake, and others).

This 2021 incident further concerns the credibility of witnesses.  According to Plaintiffs' witness list, they intend to call the Chief of Police.  Of note, following the 2021 incident (as well as prior to), Nick Tilsen was vocally critical of the police department, issuing a public statement for example that: "It's no secret that Indigenous

21

people are disproportionately targeted by the police, both in Rapid City and across the United States. In fact, Indigenous people are killed in police encounters more than any other ethnic group. I move through life with this knowledge in my gut, doing everything I can to help dismantle the systems that continue to brutalize and scare my people." (See https://ndncollective.org/nick-tilsen-statement-on-interaction-with-police-at-ndn-collective-headquarters/) This kind of vocal criticism and the desire of a witness to avoid such vocal criticism is an issue for credibility of any witness called from the police department, but it is especially an issue for exploration of the biases and motivations of someone like the Chief of Police who otherwise had no percipient involvement in any of the underlying events here. The political motivations of the Chief of Police, as a witness, to avoid further criticism by Mr. Tilsen of his department, is an issue of credibility at trial that Defendants anticipate may need to be explored, depending on the substance of the Chief's testimony. (The Chief was not deposed in this matter and the substance of that testimony is not known.)

For these reasons, the motion should be denied.

## XI.    Motion to prevent references to the Pledge Connie Uhre sprayed at Sunny Red Bear as "organic" or "water-based".

As an initial matter, Ms. Uhre uses this product frequently, has personal knowledge of the product, and can testify to her understanding that this is a water-based product pursuant to F.R.E. 602. Further, Plaintiffs included a photograph of the moment Ms. Uhre sprayed the Pledge toward Ms. Red Bear in their Complaint and they therefore

22

have evidence of exactly what product was used. (Doc. 84, p. 16). To the extent the spray was something other than what Ms. Uhre says, Plaintiffs had ample opportunity to submit evidence to contradict her testimony, yet failed to do so.

Further, Ms. Uhre's subjective belief about the product is relevant to Plaintiffs' assault and battery claims. To establish battery, Ms. Red Bear must prove that Ms. Uhre "intended to cause either a harmful or offensive physical contact with Red Bear, or an imminent apprehension of such contact." (Doc. 190, p. 39, South Dakota Civil Pattern Jury Instructions 20-160-20). The intent element is necessary, and is defined as follows:

> Conduct is intentional when one acts for the purpose of causing an invasion of the legally protected interest of another, or acts knowing that an invasion is substantially certain to occur, or in a way that law forbids. Intent requires more than the existence and appreciation of risk; it requires an intent to bring about an unlawful result. A hostile intent or a desire to do harm is not required. Rather, the intent required is an intent to bring about an unlawful result.

(Doc. 190, p. 41, South Dakota Civil Pattern Jury Instruction 20-50-30). Here, the jury could easily conclude that Ms. Uhre sprayed Ms. Red Bear's phone with an organic, water-based dust spray and did not intend to bring about an unlawful result in doing so. One of the facts that may impact the "unlawful result" determination is whether Ms. Uhre was using a harmless household cleaner versus an unknown spray she was unfamiliar with. Her subjective understanding is therefore relevant and the Court should deny Plaintiff's eleventh motion *in limine*.

## XII.   Motion to prevent identification of previously undisclosed individuals who Defendants think harmed the hotel and to prevent the introduction of

23

**evidence about any unidentified non-party (or non-party actions) Defendants think harmed the hotel.**

In Motion *in Limine* number 12, Plaintiffs argue that Retsel should be "prevent[ed] . . . from introducing evidence that unidentified third parties allegedly took actions that harmed the hotel or caused damage". This should be denied.

There is no principle of law that requires a party to know the name of the employee in order to hold the employer responsible, when all of the other facts and circumstances show that that individual was working for that employer. As the evidence will show here, the "unknown" individuals involved in many of the tortious acts were acting to benefit NDN, were wearing NDN attire, were in a group that included known employees of NDN, were supervised and directed by Sunny Red Bear and Hermus Bettelyoun (NDN employees), and were part of a formal campaign of NDN. Among other things, there is video footage of unidentified individuals *wearing NDN attire*, acting *to benefit NDN*, at the hotel with other known NDN employees and with NDN equipment and vehicles, acting to create footage and images that were then *used by NDN* on social media to push their narrative, raise their public profile, and promote their activism. Defendants have sought to identify these individuals but they are wearing masks and Plaintiffs' witnesses uniformly deny any knowledge in a fashion that lacks any credibility. Moreover, NDN Collective did not even produce its employee list in this case until after the discovery period closed. In any event, there is no legal support for the notion that unless Retsel can name them, there can be no evidence introduced regarding

24

their activities on behalf of NDN, to benefit NDN, under the supervision and direction of NDN, to support an NDN campaign, with other known employees of NDN.  Plaintiffs' argument that this is trial by "surprise" is totally disingenuous given the extensive discovery that has occurred here.

For these reasons, the motion should be denied.

Plaintiffs' unrelated request that "the Court should preclude Defendants from using other Retsel witnesses to offer testimony about Retsel" is overbroad and should be denied. Plaintiffs have raised no issue with the content and scope of Retsel's 30(b)(6) deposition. The fact that a witness's testimony may differ from a corporate deponent's does not make the testimony either irrelevant or unfairly prejudicial. Additionally, here, the corporate deponent was deposed at a time in this case when the amended counterclaims were not in the case, and moreover, when the 30(b)(6) deposition notice did not include any categories relating to those amended counterclaims.  Stern Decl., Exh. 1.  For this additional reason, this motion is unfounded, improper, prejudicial, and should be denied.  Any purported inconsistency, if any, should be addressed via cross-examination or contemporaneous objection at trial.

## XIII. Motion to preclude use of documents and statements produced on August 5, 6, and 8, 2024, and to preclude any testimony related to or relying on those documents

Plaintiffs' thirteenth motion *in limine* seeks to prevent "any attempt" by Defendants to "use evidence and offer testimony at trial" relating to "documents

produced on August 5, 6, and 8, 2024." Plaintiffs' MIL seeks a harsh and punitive penalty not appropriate to these circumstances, and must be denied.

As background, on December 7, 2023, the Court dismissed all of Defendants' counterclaims except for nuisance grounded in intimidation of employees and guests. (Doc. 76). At the time of the dismissal, Defendants had not responded to the discovery requests referenced in Plaintiff's motion *in limine*. Plaintiffs' took Mr. Uhre's individual deposition on March 29, 2024 and Retsel's Rule 30(b)(6) deposition on April 19, 2024, where Nicholas Uhre served as the corporate representative. Though the vast majority of the counterclaims had been dismissed at the time of both depositions, Mr. Uhre nevertheless testified that Retsel had been damaged by Plaintiffs' actions, estimated the damages, and referred counsel to several documents that would show evidence of the damages, subject to counsel's objection that this was all outside the scope.[1] (Stern Decl., Exh. 1 Retsel Dep. at 37:6-60:15). In the course of responding to the questions on damages, Mr. Uhre specifically referenced the STR report and advised he would need to review documents to provide a specific estimate of the claimed damages. (*Id*. at 42:11-48:1). Despite stating that he would need to rely on documents to respond to the questions, the documents were not provided, but at that time, the vast majority of the

---

[1] For example, when asked about damages for defamation, counsel objected: "I'll object. It's outside the scope of the deposition, and defamation is not an active claim in the litigation." (See Exh. 1 at 58:12-16.) While counsel allowed the deponent to answer a long series of questions that followed regarding the company's contentions on damages, counsel preserved the objection that the questioning was outside the scope at this point and in other instances reflected in the transcript. (See Exh. 1 at 58:21-59:1, 78:9-10, 79:15-17.)

counterclaims had been dismissed and the deposition notice itself did not require documents to be produced.  (See Stern Decl. Exh. 1, which includes a copy of the deposition notice.)

On April 30, 2024, the Court granted Defendants leave to amend their counterclaims. (Doc. 127). On May 31, 2024, Defendants' former counsel served supplemental initial disclosures identifying lost profits and other categories of damages as additional damages and producing two STR reports.  (Prior document productions had included financial statements and tax returns as well, as discussed in the 30(b)(6) testimony.)    Shortly thereafter, Defendants' former counsel withdrew from the representation and undersigned counsel stepped in to represent Defendants. Plaintiffs then moved for partial summary judgment, arguing in relevant part that Defendants had not produced sufficient evidence to support its damages. Counsel prepared the response to Plaintiffs' motion for summary judgment and assisted Mr. Uhre in setting out in his declaration material in support of the response pursuant to Fed. R. Civ. P. 56(c)(1)(A). Mr. Uhre's declaration, filed August 5, 2024 and the subject of this motion in limine to "exclude" all of his testimony in this declaration, complies with Fed. R. Civ. P. 56(c)(4) because it is based on Mr. Uhre's personal knowledge, sets out facts that would be admissible in evidence, and shows that he is competent to testify on the matters stated. Mr. Uhre's declaration sets forth the following information on damages, all of which is the logical extension of the testimony he offered at deposition:

- Based on historical revenue data, Retsel lost $105,000 in revenue due to the 3-week hotel shutdown and a total of $534,000 in revenue during the protest period from March to June 2022. (Doc. 173, ¶ 16).

- Based on review of business records, Retsel paid $13,237.96 for concrete barriers around in parking lot from June 2022 through April 2023. (*Id*. at ¶ 25).

- Based on review of business records, Retsel paid $7,293.00 to repair windows damaged by rock throwing incidents. (*Id*. at ¶ 28).

- Based on historical revenue data, business records, and his role as manager of the hotel, Mr. Uhre calculated that Retsel's lost profits totaled $1,509,957 in 2022, $1,296,528 in 2023, and $956,125 through June 2024. (*Id*. at ¶ 38).

- Mr. Uhre did reference STR reports at the deposition and estimated his losses to the best of his ability without access to documents previously produced in the litigation. STR reports were previously produced on May 31, 2024, well within the window for production, and were supplemented with additional reports accompanying the declaration. (*Id*.)

Plaintiffs should not be rewarded for failing to ask follow-up questions, serve follow-up discovery, or otherwise raise any of these issues until now. And Defendants should not be prejudiced for providing specific figures in a declaration explaining prior testimony. Mr. Uhre's declaration is not a sham affidavit. As noted in Plaintiff's motion, "an affidavit is a sham affidavit if it <u>contradicts</u> prior testimony or is a 'sudden and

28

unexplained <u>revision</u> of testimony [that] creates an issue of fact where none existed before.'" *Button v. Dakota, Minn. & E. R.R. Corp.*, 963 F.3d 824, 830 (8th Cir. 2020) (quoting *Bass v. City of Sioux Falls*, 232 F.3d 615, 618 (8th Cir. 1999)) (emphasis added). Mr. Uhre's declaration does not contradict or revise the testimony he provided at Retsel's deposition. There, he testified that Plaintiffs damaged Retsel's business by their allegedly tortious conduct, that the losses could be determined by review of the company's financial documents, that the STR reports would further support this testimony, and that he would need to review documents to provide a more specific figure. The declaration is the logical extension of this testimony, which would have presented a genuine issue of material fact even if the declaration were never submitted.

Even if Mr. Uhre's testimony was contradictory, which it is not, the remedy is cross-examination.  There is no basis for an *in limine* order precluding him or any other witness from testifying inconsistently from his deposition. *R & B Appliance Parts, Inc. v. Amana Co., L.P.*, 258 F.3d 783, 786 (8th Cir. 2001). In *R & B Appliance Parts, Inc. v. Amana Co., L.P.*, it was argued a company was bound by its designated representative's deposition testimony. *Id*. The Eighth Circuit rejected this argument, explaining that "[a]lthough [the company] is certainly bound by [the representative's] testimony, it is <u>no more bound than any witness</u> is by his or her prior deposition testimony. <u>A witness is free to testify differently from the way he or she testified in a deposition</u>, albeit at the risk of

29

having his or her credibility impeached by introduction of the deposition." *Id*. (emphasis added); *see also* 8A Wright & Miller, *Federal Practice & Procedure* § 2103 (same).

As for the documents provided to counsel on August 6, 2024 and August 8, 2024, what is at issue is the following, all of which were produced more than 30 days prior to the trial date:

1. **82 pages of material produced on August 6, 2024:**

• IN-RETSEL 2633-2635, 2711-2713 Broken window repair invoices

• IN-RETSEL 2636-2638 Land title survey/map depicting boundaries of Retsel's property

• IN-RETSEL 2639-2644 Additional documents, in addition to materials previously produced, regarding guests who complained or cancelled reservations in May 2022

• IN-RETSEL 2645-2670 Rapid City Marshals booking cancellation documents

• IN-RETSEL 2671-2710 Additional STR reports obtained in late July from a third party vendor, similar to what was previously produced on May 31, 2024, referred to in Mr. Uhre's declaration

• IN-RETSEL 2714 Quickbooks entries for payments made for retaining walls

2. **12 pages of material produced on August 8, 2024:**

- IN-RETSEL 2715-2726  Perkins restaurant lease

Plaintiffs do not make a showing of any undue surprise or prejudice from receiving these 94 pages of material, nor can they, because when they took Mr. Uhre's deposition, twice, Mr. Uhre testified generally, at length, about the information that is reflected in this material.  Further, Defendants offered to reopen discovery, allow another deposition to take place, and/or continue trial, but Plaintiffs expressly declined any of those options.  They have now had these 94 pages for several weeks and by the time of trial will have had the documents for more than 30 days.  Moreover it appears they are now bringing another discovery motion (see Doc. 207) so they themselves seek to continue discovery.  They are not prejudiced.

Under this circumstances, the Court should not impose the "harsh penalty" of exclusion of this evidence.  *See, e.g., Dindinger v. Allsteel, Inc.*, No. 311CV00126SMRCFB, 2015 WL 11181335, at *7 (S.D. Iowa July 17, 2015) ("Trial here is still more than a week away. For these reasons, the Court concludes that, to the extent Plaintiffs failed to provide damages calculations for their alleged comparators, the failure was harmless. Defendants' request to exclude damages evidence of alleged comparators other than those identified in Plaintiffs' interrogatory answers is DENIED.").  *See also Gruttemeyer v. Transit Auth.*, 31 F.4th 638, 645 (8th Cir. 2022 (exclusion of evidence "is a harsh penalty and should be used sparingly); *Transclean Corp. v. Bridgewood Servs., Inc.*, 101 F. Supp. 2d 788, 795–96 (D. Minn. 2000) (noting exceptions from automatic

31

exclusion provisions of Rule 37(c)(1)); *Gonsalves v. City of New Bedford*, 168 F.R.D. 102, 110 (D. Mass. 1996) (the duty to supplement is excused "if the information at issue has 'already been revealed by a witness in a deposition or otherwise through formal discovery, or, alternatively, by providing the additional information in writing,'" quoting Wright & Miller).

Defendants further note that Plaintiffs are seeking punitive damages. Should Plaintiffs satisfy their prima facie showing, Defendants should be allowed to testify and otherwise present evidence of their financial condition in connection with this, as well.

For these reasons, Defendants respectfully request that the motion *in limine* be denied.

## XIV.  Motion to prevent undisclosed expert opinion - OPPOSED

As explained above, Mr. Uhre's declaration expounding upon Defendants' alleged damages is not a sham affidavit. Nor is it undisclosed expert testimony because Mr. Uhre is the manager of the hotel and may testify regarding his knowledge of an established business. *See, e.g., Tenn-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980); *Consolidated Rail Corp. v. Grand Trunk Western R. Co.*, 963 F.Supp.2d 722 (E.D. Mich. 2013), affirmed 607 Fed.Appx. 484; *Accurso v. Infra-Red Services, Inc.*, 169 F.Supp.3d 612 (E.D. Penn. 2016). Here, Retsel's ownership witnesses can testify at trial regarding the impact of Plaintiffs' conduct on their business. None of this testimony requires expert knowledge because it is based on historical revenue, income trends, and the witnesses'

firsthand knowledge of the events between 2022 and present. Further, and as discussed above, Plaintiffs were aware of the damages Defendants were claiming and the basis therefor via the testimony offered at Retsel's deposition. The Court should therefore deny Plaintiff's fourteenth motion *in limine*.

## XV.    Motion to prevent introduction of undisclosed documents and unidentified witnesses – PARTIALLY UNOPPOSED

Defendants agree that parties have an obligation to disclose witnesses and documents they intend to use to support their claims or defenses unless the evidence would solely be used for impeachment. Fed. R. Civ. P. 26(a)(1). At this time, Defendants do not know of any witnesses they intend to call who have not been disclosed, nor are they in possession of any documents they intend to introduce that have not been produced. However, Defendants object to Plaintiffs' motion to the extent it seeks to preclude witnesses or documents first discovered between now and trial which could not have been discovered using regular diligence. Notably, given the number of individuals involved in the protests and the anticipated publicity the trial will elicit, it is not unreasonable to think some witnesses may be identified after the close of discovery. If such witnesses or documents are identified between now and trial, they will be promptly disclosed so that Plaintiffs can make any record they deem necessary. If such witnesses or documents are identified at trial, Defendants will request to approach the bench to address the issue.

**XVI. Motion to prevent testimony or argument about ability to pay a judgment – OPPOSED**

Compensatory damages and punitive damages serve different purposes, with the former awarded to redress concrete loss and the latter awarded for deterrence and retribution. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). "[I]t is well established that there are procedural and substantive constitutional limitations on [punitive damages] awards. *Id*. While the *Campbell* Court noted that evidence of a defendant's net worth may be properly excluded to avoid "biases against big businesses," this rationale mandates a different result here. Rather than Plaintiffs using evidence to foster prejudice against Defendants, it is Defendants who should be entitled to use evidence to show that they are not a large corporation or wealthy family that needs a large punitive damage award to deter future conduct. Since punitive damages are not intended to compensate – but rather to punish and deter – any evidence relevant to the damages necessary to accomplish these goals should be allowed at trial notwithstanding how it might impact Plaintiffs' recovery.

Plaintiffs' attempt to analogize this evidence to collateral source evidence is without merit. As the Court is aware, the rationale behind barring collateral source evidence is that a party should not benefit by the opposing party's foresight in acquiring insurance to insulate itself against future claims. That rationale is not analogous here. Plaintiffs' comparison therefore fails and should be rejected.

Finally, Plaintiffs' requested relief is unwieldy and would result in exclusion of evidence that is clearly relevant and admissible. As discussed in greater detail above, Defendants have produced significant documentary and testamentary evidence regarding Retsel's historical revenue, how revenue was impacted by the events in 2022, and the losses it suffered because of Plaintiffs' alleged misconduct. This financial information speaks to Defendants' damages, but also speaks to their ability to pay a judgment. To the extent Plaintiffs believe any testimony or argument crosses the line, they should raise the issue contemporaneously so the Court can address it outside the jury's presence. Defendants accordingly request that the Court deny the sixteenth motion *in limine*.

## XVII. Motion to preclude Defendants from referring to any plaintiff at trial as a "tester" – OPPOSED

Plaintiffs' motion argues there is "no probative value to the label of 'tester'" because it suggests "that Plaintiffs need to prove something they do not – namely, that each Plaintiff would have personally stayed in the hotel room." (Doc. 189, p. 19). Plaintiffs further state that "[s]tanding is a legal conclusion for the Court, not an issue for the jury to resolve." (*Id.*).

However, per the Court's Order granting in part and denying in part Defendants' motion for partial summary judgment dated August 20, 2024: "The jury will determine whether the four individuals were solely testers or also people who were in the hotel lobby endeavoring to rent a room either for themselves or for people in need." (Doc. 206, p. 22) The Court further stated that there were questions of fact with respect to Ms. Red

Bear's § 1981 claim, including "whether she was solely a tester without standing or acted in a dual capacity as an individual seeking to rent a room, and whether the hotel's policy was used to discriminate against her." (*Id.* at p. 21).

Given the Court's unequivocal statement that the jury will decide whether the individual Plaintiffs were acting as testers or customers, Defendants must be able to use the term "tester" to explain the issue and make their argument as well as to impeach any witness that denies he or she is a tester, given that this word was used in the deposition testimony and adopted by the witnesses themselves. Given how the Court has ruled, the word "tester" is helpful to the jury and will assist their deliberations because it concisely packages many ideas incorporated in Section 1981, including the principle that in order to prove a Section 1981 claim, a Plaintiff must have intended to make a contract. Excluding this evidence would exclude key evidence on which the defense intends to rely.  The Court should therefore deny Plaintiffs' seventeenth motion *in limine*.

Respectfully Submitted,

Dated:  August 22, 2024

/s/ Haylee M. Culver
_____
Haylee M. Culver (SD Bar #4993)
Gordon Rees Scully Mansukhani
3523 45th Street South, Suite 100
Fargo, North Dakota 58104
Telephone: 701-300-3449
hculver@grsm.com
***Attorneys for Defendants***

And

Heather E. Stern (Admitted Pro Hac Vice)

36

Messner Reeves LLP
611 Anton Blvd., Suite 450
Costa Mesa, CA 92626
Telephone: 949.612.9128
hstern@messner.com
***Attorneys for Defendants***