UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

NDN COLLECTIVE, SUNNY RED
BEAR, ALBERTA EAGLE, NICK
COTTIER, BRE JACKSON, MARY
BOWMAN, and GEORGE
BETTELYOUN,
        Plaintiffs

vs.

RETSEL CORPORATION, d/b/a
GRAND GATEWAY HOTEL and
d/b/a CHEERS SPORTS LOUNGE
and CONNIE UHRE,
        Defendants

and

RETSEL CORPORATION, d/b/a
GRAND GATEWAY HOTEL and
d/b/a CHEERS SPORTS LOUNGE
and NICHOLAS UHRE,
        Counterclaimants,

vs.

NDN COLLECTIVE,
        Counterclaim
        Defendant

and

RETSEL CORPORATION, d/b/a
GRAND GATEWAY HOTEL, and
d/b/a CHEERS SPORTS LOUNGE
AND CASINO,

5:22-cv-5027

MEMORANDUM OPINION
AND ORDER

1

Third-Party Plaintiffs

vs.

JOHN DOES 1 through 20,
JANE DOES 1 through 20,
and ABC CORPORATIONS
1 through 20

---

On December 13, 2024, the Court held a status hearing following Defendants' dismissal of their bankruptcy case, *In re Retsel*, No. 24-50081 (Bankr. D.S.D. Nov. 26, 2024). The bankruptcy action was filed a day and a half prior to the commencement of the previously scheduled trial in this case, which was set for September 9, 2024. An automatic stay was imposed. Several weeks later, Defendants voluntarily dismissed the bankruptcy, thus removing the stay and allowing this case to proceed to trial.

During the December 13 hearing, the Court reminded the Parties that it had previously set the trial date for June 2, 2025. (Doc. 271). In addition, the Court determined that Kathy Carter of Messner Reeves, not the additional counsel recently admitted *pro hac vice*, would be lead trial counsel for Defendants.

The Court addressed several issues raised in its Order of December 11, 2024. (Doc. 268). First, the Court *sua sponte* requested additional argument and briefing on the standing of Plaintiffs Red Bear, Bowman, Jackson, Eagle, and Cottier. The Court previously had denied the Defendants' motion for summary judgment on the standing issue. (Doc. 206). Next, the Court clarified that Cheers Sports Lounge and Casino is no longer part of the case, as the Court resolved in its pretrial Order. (Doc. 229, PgID 6103). The Court then requested argument and briefing on the question whether the existence of the consent decree filed in *United States of America v. Retsel*, 5:22-cv-5086, obviates the need for the Court to issue

2

declaratory and injunctive relief pursuant to Count 2 and ¶ 142.d. of the Third Amended Complaint, (Doc. 84), if warranted, and whether Plaintiffs are seeking damages only for past harm. Finally, the Court briefly addressed a discovery issue which has been referred to Magistrate Judge Daneta Wollmann and is not part of the instant Order.

## BACKGROUND

General background information about this case has been presented in previous orders and the Court refers the reader to them. (Docs. 76, 85, 127, 206, 212). The Court hereby incorporates its previous Order's discussion of the standing issues, (Doc. 206), provides additional facts as needed for clarity, and adds the findings and analysis in this Order.

Given the limited scope of the instant Order, the Court supplies a brief summary of the background. Allegedly, following a fatal shooting in the Grand Gateway Hotel, Rapid City, SD, Connie Uhre, the then-owner of the hotel posted the following message on her social media account on March 20, 2022:

> Do to the killing that took place at the Grand Gateway Hotel on March 19 2022 at 4 am plus all the vandalism we had since the Mayor and Police Department are working with the non profit organization (Dark Money) . We will no long allow any Native American on property. Or in Cheers Sports Bar. Natives killing Natives. Rancher and Travelers will receive a very special rate of 59.00 a night. Book Direct.

Doc. 84, PgID 1006.

Subsequently, Ms. Uhre allegedly posted in an email chain distributed to hospitality management in Rapid City the following:

3

I really do not want to allow Natives on property. Every time we have problems I call the police with it, the first thing they ask is what nationality is he or she and 98% of the time I have to say native [sic], and we call at least once a week. They [sic] kill each other walk around with guns...The problem is we do not know the nice ones from the bad natives...so we just have to say no to them!

Id.

In response, on the following day Sunny Red Bear went to the Grand Gateway to rent a room and was denied the opportunity. Defendants claim the denial was based on a local identification policy. On the next day, Plaintiffs Bowman, Jackson, Eagle, and Cottier went to the Grand Gateway to attempt to rent rooms. They, too, were unsuccessful and were ordered to leave the hotel. Defendants claim this is because of Plaintiffs' affiliation with NDN Collective and threats from an individual associated with NDN.

Additional factual information about the Plaintiffs relevant to the issue of standing is supplied below.

## ISSUE I. STANDING

### A. LEGAL STANDARD

#### 1. General

The Court has set forth the governing law previously and will repeat pertinent authority here. (See Doc. 206). In *Uzuegbunam v. Preczewski*, the Supreme Court commented that, "At all stages of litigation, a plaintiff must maintain a personal interest in the dispute. ... To demonstrate standing, the plaintiff must not only establish an injury that is fairly traceable to the challenged conduct but must also seek a remedy that redresses that injury." 592 U.S. 279, 282-83 (2021). In addition, the "irreducible constitutional minimum of standing" is that a

plaintiff must have suffered an "injury in fact," meaning invasion of a legally protected interest; there is a "causal connection between the injury and the conduct complained of"; and the injury can be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (cleaned up). Standing must be established for each plaintiff and claim. *Murthy v. Missouri,* 603 U.S. 43, 61 (2024). Standing requirements seek to ensure that a litigant has a "sufficient stake in an otherwise justiciable controversy" to obtain judicial resolution of the controversy. *Sierra Club v. Morton*, 405 U.S. 727, 731-32 (1972). In this regard, several Justices have quoted the title of the late Justice Scalia's law review article, "What's it to you?" in capturing the gist of the standing inquiry. *See Acheson v. Laufer*, 601 U.S. 1, 26 (Thomas, J., concurring) (citing *"What's it to you?" The Doctrine of Standing as an Essential Element of the Separation of Powers,* 17 Suffolk U. L. Rev. 881, 882 (1983)); *Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 379 (2024); *TransUnion LLC v. Ramirez,* 594 U.S. 413, 423 (2021). *See also Jones v. Bloomingdales.com*, 124 F.4th 535, 538 (8th Cir. 2024); *Hekel v. Hunter Warfield, Inc.,* 118 F.4th 938, 942 (8th Cir. 2024).

In *TransUnion,* the Supreme Court discussed the requirements for standing under Article III of the U.S. Constitution, reiterating the need for "a concrete and particularized injury caused by the defendant and redressable by the court." 594 U.S. at 423. The Court emphasized the need for "a real controversy with real impact on real persons." *Id.* at 424 (quoting *American Legion v. American Humanist Assn.*, 588 U.S. 29, 87 (2019) (Gorsuch, J., concurring)). The injury claimed by the plaintiff must be "'concrete'—that is, 'real, and not abstract.'" *Id.* (quoting *Spokeo, Inc. v. Robins,* 578 U.S. 330, 340 (2016)). As *Lujan* explained, an injury in fact requires "invasion of a legally protected interest which is (a) concrete and particularized…and (b) 'actual or imminent' not 'conjectural' or 'hypothetical.'" 504 U.S. at 560. In analyzing whether an injury is "concrete" a

court must examine whether there is a "close relationship" to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as "physical harms," "monetary harms," or certain "intangible harms." *TransUnion*, 594 U.S. at 425. The Court also cited "discriminatory treatment" as a previously-recognized harm. *Id.* at 426 (citing *Allen v. Wright*, 468 U.S. 737, 757 n. 22 (1984)). The limit is that Congress may not "transform something that is not remotely harmful into something that is." *Id.* Furthermore, Article III requires a showing of standing even if a violation is established under a statute. *Id.*; *Spokeo*, 578 U.S. at 341. *TransUnion* plaintiffs who could show both misclassification under the Fair Credit Reporting Act (FCRA) as possible "terrorists, drug traffickers, or other serious criminals," 594 U.S. at 419, and dissemination of the materials, had standing because their injuries were concrete. *Id.* at 432. On the other hand, plaintiffs who were misclassified but whose information was not disseminated suffered no concrete harm and therefore, lacked standing under Article III. *Id.* at 437.

The Eighth Circuit has articulated the standards for Article III standing in numerous cases. The court has reinforced the requirement that a plaintiff must allege "a personal stake in the outcome of the case" that warrants "invocation of federal court jurisdiction" and justifies the court's exercise of remedial powers to vindicate the claim. *Glickert v. Loop Trolley Transp. Development Dist.*, 792 F.3d 876, 881 (8th Cir. 2015). *See generally F.B. v. Our Lady of Lourdes Parish and School*, 125 F.4th 898, 902-04 (8th Cir. 2025); *Arc of Iowa v. Reynolds,* 94 F. 4th 707, 710 (8th Cir. 2024); *L.H. v. Independence School District,* 111 F. 4th 886, 892 (8th Cir. 2024).

The Eighth Circuit has long required that a plaintiff set forth specific facts to establish standing and they will be taken as true for purposes of a summary judgment motion, as Defendants filed at Doc. 152. *National Wildlife Federation v.*

6

*Agricultural Stabilization and Conservation Service,* 901 F.2d 673, 677 (8th Cir. 1990) (quoting *Warth v. Seldin,* 422 U.S. 490, 501 (1975)); *National Federation of Blind of Missouri v. Cross,* 184 F.3d 973, 979 (8th Cir. 1999). *See also Animal Legal Defense Fund v. Reynolds*, 89 F.4th 1071, 1077 (8th Cir. 2024) (noting plaintiffs bear the burden to establish standing and must allege sufficient facts to support a "reasonable inference that they can satisfy the elements of standing") (cleaned up); *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 909 (8th Cir. 2016) (noting ultimate merits of case have no bearing on threshold issue of standing). If the court dismisses for failure to establish standing, the dismissal is based on lack of subject-matter jurisdiction. *Dalton v. NPC International, Inc.*, 932 F.3d 693, 696 (8th Cir. 2019).

### 2. Injury in fact

With respect to the issue of concrete harm to satisfy the requirement of injury in fact, the recent decision in *Ojogwu v. Rodenberg Law Firm* is pertinent. 26 F.4th 457 (8th Cir. 2022). *Ojogwu* addressed the issue of injury in fact of a plaintiff who alleged injury based upon his receipt in the mail of a copy of a garnishment summons served on a bank. *Id.* at 459. The mailing apparently violated the Fair Debt Collection Practices Act (FDCPA). Plaintiff alleged "fear of answering the telephone, nervousness, restlessness, irritability, amongst other negative emotions" as his injuries. *Id.* at 462. The Eighth Circuit found these insufficient to establish standing under Article III because they failed to satisfy the standard of concrete harm following *TransUnion* and fell short of "cognizable injury as a matter of general tort law." *Id.* at 463 (quoting *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 864 (6th Cir. 2020)). In a follow-up case, *Bassett v. Credit Bureau Services, Inc.,* plaintiff alleged she received a letter attempting to collect a medical debt, including interest which was arguably improper under

FDCPA. 60 F.4th 1132 (8th Cir. 2023). The court found she lacked standing, reiterating that the statutory violation alone was insufficient to confer it. *Id.* at 1136. The court recognized that the harm asserted by plaintiff could be analogous to "common-law fraudulent misrepresentation and conversion." *Id.* at 1136 n. 2. The court also supplied "infliction of emotional distress" and "intrusion upon seclusion" as possible common law analogues which could provide standing, *id.*, but plaintiff did not allege "any injury resembling these harms." *Id.* at 1137.

In a third recent FDCPA case, *Hekel v. Hunter Wakefield, Inc.*, the Eighth Circuit expanded its discussion of the types of injuries that would amount to a concrete injury sufficient to confer standing. 118 F.4th 938, 942 (8th Cir. 2024). In response to a letter she received endeavoring to collect past-due rent, plaintiff alleged a violation of her statutory rights, an "informational injury," possible future risk of harm, and emotional injuries such as "confusion," "worry," and "sleeplessness." *Id.* at 941. She also included "out-of-pocket costs" and the "loss of time and money" as possible injuries. The Eighth Circuit rejected this compilation of alleged injuries as sufficient to establish standing, reiterating that a statutory violation is insufficient alone to provide standing and an informational injury is insufficient without "some downstream consequence" from failing to receive accurate information. *Id.* at 942-43. The monetary injuries claimed by plaintiff were conclusory and insufficient for standing. *Id.* at 943. The court explained that "emotional injuries" such as "confusion," "worry," and "sleeplessness" get "closer but still fall short." *Id.* (citing *Ojogwu*, 26 F.4th at 463). The court added that emotional injuries might count, citing *Bassett*, 60 F.4th at 1136 n.2, but "conclusory allegations" do not, absent supporting facts. *Id.* at 943. *But see Ebaugh v. Medicredit, Inc.*, 2025 WL 1088077 (8th Cir. Apr. 11, 2025) (unpub.) (holding plaintiff alleged an injury sufficient for standing under

FDCPA when she purchased an envelope and postage to send the improper debt collection letter to counsel).

The Eighth Circuit's recent discussion in *Gallagher v. Santander Consumer USA, Inc.*, of the type of concrete injury needed to establish standing is illuminating. 125 F.4th 865 (8th Cir. 2025). Plaintiff filed a state-court lawsuit challenging a bank's policy of withholding car titles for 15 days, arguing it allegedly violated a state consumer protection law. *Id.* at 867. Defendant removed the case to federal court and prevailed on summary judgment. The Eighth Circuit held the court lacked jurisdiction and vacated the judgment with instructions to remand the case to state court. *Id.* at 870. Plaintiff had failed to establish jurisdiction given that a statutory violation alone was insufficient for standing. *Id.* Plaintiff failed to identify a monetary harm, such as impairment of his credit or inability to sell the car during the 15-day period, as opposed to the 5-day period dictated by statute. Possible clouding of the title or slander of title, analogous to common law claims, might suffice but only if monetary harm were alleged. *Id.* at 869-70. Absent that, the alleged statutory violation did not create concrete injury sufficient for standing. *Id.* at 870.

The facts of *Ojogwu, Bassett,* and *Hekel* contrast significantly with those of another post-*TransUnion* case, *Inner City Contracting, LLC v. Charter Township of Northville, Michigan,* which addressed injury in fact as part of its standing inquiry. 87 F.4th 743, 751-52 (6th Cir. 2023). There, plaintiffs brought suit under § 1981 in connection with the award of a contract to a rival bidder. In the court's view, plaintiff satisfied the injury in fact requirement for standing because it "suffered a cognizable injury when it lost a lucrative award and profits as a result of alleged racial discrimination." *Id.* Furthermore, "[i]ts injury was therefore, twofold: the dignity harm inherent in racial discrimination and the financial harm of the lost profit." *Id.* (citing *Smith v. City of Cleveland Heights,* 760 F.2d 720, 723-24 (6th

Cir. 1985), which recognized stigmatic injury as a result of town's racially discriminatory housing policy).  It is noteworthy that *TransUnion* itself has recognized that "discriminatory treatment," 594 U.S. at 426, is one of the harms Congress has elevated "to the status of legally cognizable injuries" recognizing it as one of the "concrete, de facto injuries that were previously inadequate in law." *Id.* at 425.

Additional cases on the question of injury in fact are helpful.  Prior to her appointment to the Supreme Court, Justice Barrett wrote for the court in *Gadelhak v. AT&T Services, Inc.,* which addressed the types of injuries in fact that would give rise to standing.  950 F.3d 458 (7th Cir. 2020).  An injury must be "concrete," and not simply based on a statute.  *Id.* at 461.  A court should assess whether the alleged harm "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts."  *Id.* at 462 (quoting *Spokeo*, 578 US. at 341).  The harm before the court—automated telemarketing calls made in violation of the Telephone Consumer Protection Act— implicated the common law tort of intrusion upon seclusion.  *Id.*  As such, the types of calls at issue gave rise to a sufficiently concrete harm to provide Article III standing.  *Id.* at 463.  *Accord Lupia v. Medicredit, Inc.*, 8 F.4th 1184 (10th Cir. 2021) (standing under FDCPA based on intrusion upon seclusion).  The conclusions in *Gadelhak* have not been universally embraced.  *See, e.g., Pucillo v. National Credit Systems, Inc.,* 66 F.4th 634, 639-40 (7th Cir. 2023) (finding plaintiff's confusion and fear resulting from FDCPA violation were insufficiently analogous to situations involving torts of invasion of privacy and intrusion upon seclusion, and distinguishing *Gadelhak*).

"Stigmatic injury" has been recognized in numerous cases.  In *Heckler v. Matthews,* the Supreme Court held that "discrimination…by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy

10

participants in the political community [citation omitted] can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." 465 U.S. 728, 739-40 (1984). In a case where plaintiffs had not adequately alleged stigmatic injury, the Court ruled in *Allen v. Wright* that plaintiffs did not have standing to challenge the award of tax-exempt status to racially discriminatory private schools and noted that any resulting stigmatic injury was not fairly traceable to the challenged IRS action. 468 U.S. 737, 754-55 and n. 20 (1984). Courts in the Eighth Circuit have recognized such injury as well. *See Parents, Families, and Friends of Lesbians and Gays, Inc. v. Camdenton R-III School Dist.*, 853 F.Supp.2d 888 (W.D. Mo. 2012).

Several district courts in the Eighth Circuit have analyzed the types of harm that qualify as "concrete" following *TransUnion*. In *Denmon v. Kansas Counselors, Inc.*, the court discussed concrete harm in light of *TransUnion*, *Spokeo* and *Ojogwu*. 661 F.Supp.3d 914 (W.D. Mo. 2023). Plaintiff alleged a violation of the Fair Debt Collection Practices Act based on defendant's contacts in connection with collection of a medical debt. The court determined that an intangible harm should bear a close relationship to "harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* at 918 (quoting *TransUnion*, 594 U.S. at 425). Harms such as invasion of privacy can satisfy the requirement, and the court found plaintiff's allegations of such a violation satisfied Article III. *Id.* at 920. Authority from the Tenth Circuit is in accordance. *See Leichliter v. Optio Solutions, LLC*, 672 F.Supp.3d 1165, 1169 (W.D. Okla. 2023) (concluding the record contained sufficient evidence to establish a tangible concrete harm and satisfy Article III's requirement of injury in fact where plaintiff experienced anger, anxiety, headaches, trouble sleeping, frustration and migraines in connection with defendants' communications in violation of the Fair Debt Collection Practices Act

and finding the harms analogous to the common law tort of intrusion upon seclusion).

In *Drechen v. Rodenburg, LLP*, plaintiff sued based on defendants' sending two letters in violation of the Fair Debt Collection Practices Act. 2022 WL 17543056 (D. Minn. Dec. 8, 2022). She claimed injury in fact based on "nervousness, fear of answering the door and telephone, embarrassment, depression, hopelessness," and physical symptoms including "headaches, digestive disorders, and chronic pain." *Id.* at *2. The court noted that harms can be tangible or intangible. *Id.* at *4 (citing *TransUnion,* 594 U.S. at 425). The court determined that the claimed headaches, digestive disorders, and chronic pain were physical manifestations giving rise to concrete harms, thus distinguishing the case from *Ojogwu*. Accord *Postl v. Diversified Recovery Bureau LLC*, 2024 WL 245643, *3 (E.D. Mo. Jan. 23, 2024) (concluding heart skipping a beat, heightened blood pressure and migraines went beyond general statements of anxiety and were sufficient to establish injury in fact for Article III).

In contrast, in *Hicks v. L.S. Richardson Revocable Living Trust*, Plaintiff asserted an Americans with Disabilities Act (ADA) violation when he entered a restaurant with his service dog and allegedly was refused service. 2025 WL 27916, *3 (W.D. Mo. Jan. 3, 2025). The evidence established he was given service and did eat at the restaurant, but perhaps was yelled at and told to leave. The court determined that, given that he had been served and had eaten, a violation of the ADA would not be established by the alleged yelling or being told to leave. Furthermore, these factors alone would not establish injury in fact for purposes of Article III. *Id.* at *3.

### 3. Prudential requirements for standing

12

In addition to satisfying the Article III requirements, a plaintiff must satisfy prudential requirements for standing. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982). This means a plaintiff must "assert his own legal rights and interests," not those of third parties. *Id.* at 475 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). A plaintiff cannot proceed merely by raising "generalized grievances" and the claims must fall within "the zone of interests to be protected by the statute or constitutional guarantee in question." *Id.* (quoting *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153 (1970)). Again, Justice Scalia's "What's it to you?" comes into play and must be answered by the plaintiff.

The Eighth Circuit has commented that, "in addition to constitutional requirements, standing also involves prudential limits on the exercise of federal jurisdiction." *Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1036 (8th Cir. 2002). The court continued with an explanation of prudential standing as follows: "Prudential limits require a plaintiff to show the grievance arguably falls within the zone of interests protected or regulated by the statutory provision invoked in the suit." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1997)). Of course, as the court has stated, "Even if a court has jurisdiction under Article III to decide a case, prudential concerns may militate against the use of judicial power" resulting in the court's treatment of the case as moot. *Ali v. Cangemi*, 419 F.3d 722, 724 (8th Cir. 2005) (quoting *United States v. (Under Seal)*, 757 F.2d 600, 603 (4th Cir. 1985)).

### 4. Allegation that Plaintiffs lack standing as "Testers"

*Havens Realty Corp. v. Coleman* is the starting point for analysis of the concept of "testers." 455 U.S. 363 (1982). In *Havens*, the Supreme Court defined the term as follows: "In the present context, 'testers' are individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for

the purpose of collecting evidence of unlawful steering practices." *Id.* at 373. In *Havens,* the setting was Defendants' providing false information to Black people in violation of the Fair Housing Act—that apartments were not available, when in fact, they were—and correct information to other potential renters. *Id.* at 366-68. The legal issue was whether Plaintiffs had shown sufficient injury in fact to meet the requirements for Article III standing. The Court determined the Black plaintiff had standing while an accompanying white person did not because the former suffered "specific injury" which met the Article III requirement of injury in fact. *Id.* at 374. The Court also relied on the provision of the Fair Housing Act which provided for standing based on false information having been given to prospective renters. *Id.* at 373-74.

In examining situations alleged to have been initiated by "testers" who lack standing, it is important to keep in mind the standard for establishing injury in fact for purposes of Article III articulated in *Lujan:* having a legally protected interest that is (a) "concrete and particularized" and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" 504 U.S. at 560.

Informative on the state of current "tester" cases is *Acheson Hotels, LLC v. Laufer* whose opening paragraph by Justice Barrett reads as follows:

> [Plaintiff] has sued hundreds of hotels whose websites failed to state whether they have rooms accessible to the disabled. As the sheer number of lawsuits suggests, she does not focus her efforts on hotels where she has any thought of staying, much less booking a room. Instead [she] systematically searches the web to find hotels that fail to provide accessibility information and sues to force compliance with the Americans with Disabilities Act (ADA). ... Ordinarily, the hotels settle her claims and pay her attorney's fees.... Only plaintiffs who allege a concrete injury have standing to sue in federal court. [Plaintiff], these hotels have argued, is suing to enforce the law rather than to remedy her own harms.

601 U.S. 1, 3 (2023).

Over the objections of concurring Justices Thomas and Jackson, the Court dismissed the case as moot once plaintiff dismissed her pending lawsuits. *Id.* at 5. The Court recognized the importance of the standing issue, which it noted is jurisdictional, but determined that resting the decision on mootness was appropriate. *Id.* at 4. Justice Thomas disagreed and thought the Court should have addressed the merits. *Id.* at 7 (Thomas, J., concurring). He accepted Laufer's status as a "self-described 'tester,'" *id.*, who resides in Florida and "scours the internet" for hotels whose websites fail to comply with ADA requirements. *Id.* Upon finding one, she sues, then settles for "corrective action" and attorney's fees. *Id.* She had filed over 600 lawsuits of this type. *Id.* The Justice then set forth pertinent standards: "To have standing, a plaintiff must assert a violation of his rights." *Id.* (quoting *Lujan*, 504 U.S. at 563). Furthermore, "the party seeking review [must] be himself among the injured." *Id.* (cleaned up). Justice Thomas would have ruled against Laufer on the standing question because not only did she fail to assert a violation of the ADA, she did not suffer discrimination based on disability. *Id.* He emphasized that her claim to a right to information was unfounded, given that she had no intent to travel to the hotel or to book a room elsewhere in the state of Maine. Invoking Justice Scalia's "What's it to you?" article as key to grasping the limits of standing, he would have denied standing to Laufer under Article III.

Plaintiff Laufer became notorious for the "tester" lawsuits she has filed. *See, e.g., Laufer v. Looper,* 22 F. 4th 871, 874 (10th Cir. 2022); *Laufer v. Mann Hospitality, LLC,* 996 F. 3d 269 (5th Cir. 2021). She is not the only plaintiff who falls into this category, however, and other cases are equally instructive. *See generally Harty v. West Point Realty*, 28 F.4th 435 (2d Cir. 2022) (self-described ADA "tester," who had no plans to visit defendant hotel or the surrounding area, did not suffer concrete injury under Article III based on website's noncompliance

with ADA); *Shumway v. Woodward Brown Ventures, LLC,* 2022 WL 891626, *2 (E.D. Mich. March 25, 2022). *See also DeBoard v. Ventry Apartments, LLC,* 2023 WL 4123310, *7 (N.D. Ind. June 22, 2023) (plaintiff who filed 60 lawsuits in the past 10 years alleging Fair Housing Act violations but did not intend to rent any of the units he saw lacked a concrete injury in relying only on the statutory violation).

A number of cases involving alleged "testers" have arisen in the context of 42 U.S.C. § 1981. In *Kyles v. J.K. Guardian Sec. Service, Inc.,* African American plaintiffs worked as employment testers for a legal services group. 222 F.3d 289 (7th Cir. 2000). The individuals posed as job applicants but would not have accepted an offer of employment if one was tendered. They alleged discrimination under § 1981, and the court ruled they lacked standing. *Id.* at 302. The rationale was that the plaintiffs had no intent to enter into a contract and "at most" were "seeking the opportunity to decline an offer of employment." *Id.* Such an interest "is not sufficient to confer standing to sue for asserted violations of § 1981." *Id.* Similarly, in *Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.,* Plaintiffs were an organization and two Black college students who worked specifically as "testers" for the organizational plaintiff. 28 F.3d 1268, 1270 (D.C. Cir. 1994). The individuals were found not to have standing under § 1981 because they used "fictitious credentials," had no intent to enter into a contract, and at best sought damages based on the lost opportunity to enter into a void contract. *Id.* at 1271. Further, depriving plaintiffs of the opportunity to refuse to accept the job purportedly sought did not rise to the level of a cognizable injury under § 1981. *Id. See also Smith v. Golden China of Red Wing, Inc.,* 987 F.3d 1205, 1209-10 (8th Cir. 2021) (concluding admitted "tester" who might return to restaurant "someday" did not allege sufficient injury to satisfy Article III).

On the other hand, in *Keck v. Graham Hotel Systems, Inc.,* an African American couple sought to rent a banquet room for their wedding reception. 566

F.3d 634, 637 (6th Cir. 2009). After several efforts to sign an agreement were
rebuffed, plaintiffs complained to the Fair Housing Center of Southeastern
Michigan. *Id.* at 638. The organization arranged for "testers" consisting of an
African American couple and a white couple to seek to rent banquet rooms; in
three of the four "tests" it appeared racial discrimination may have existed. Citing
their own and the testers' experiences, the plaintiffs sued under § 1981. As
pertinent to this case, the court determined that "the experiences of testers have
been held probative on the question of discriminatory intent." *Id.* at 642. There
was no question the plaintiffs had standing given their efforts to rent a banquet
room, and the testers' experiences served as support. Discriminatory intent on the
part of defendants was a jury question.

### 5. Allegation that Plaintiffs lack standing as representatives of NDN

The Court must also assess whether an individual acts in a representative
capacity and therefore lacks individual standing under § 1981. *Domino's Pizza v.
McDonald,* 546 U.S. 470 (2006). In *Domino's Pizza,* an individual who was the
sole shareholder of a company sued under § 1981, alleging defendants had broken
contracts with his company based on racial animus toward plaintiff. The Court
held plaintiff lacked standing because he had no rights under the contract, which
was between Domino's and his company, not plaintiff as an individual. In the
Court's words, the important factor is the "right" to "give and receive contractual
rights on one's own behalf." *Id.* at 475. As a result, a plaintiff alleging a violation
of § 1981 based on contract must "identify an impaired 'contractual relationship'"
"under which the plaintiff has rights." *Id.* at 476. This can include the "would-be
contractor along with those who already have made contracts." *Id.* A third-party
beneficiary also may have rights under a contract. *Id.* at n. 3. The Court rejected

the notions that a "target" theory should provide standing or that § 1981 should be employed broadly to combat "all racial injustice." *Id.* at 478-79.

A number of courts have addressed *Domino's Pizza's* requirements in resolving standing questions. *See Edwards v. Genesis Credit Union*, 2024 WL 1269748, *2 (E.D. Mich. Jan. 10, 2024) (dismissing § 1981 claim because pro se plaintiff sought to make a contract between his company and defendant but would have had no rights under the contract); *Varela v. Hill*, 2024 WL 1328265, *3 (E.D. Mich. March 28, 2024) (holding pro se plaintiffs had no rights under rental contract which would enable lawsuit against neighbor who threatened them); *Robinson v. Ashland Inc.*, 2024 WL 5158429, *6 (E.D. Texas Dec. 18, 2024) (concluding individual plaintiffs lacked standing under § 1981 because contracts were between defendant and their company, not plaintiffs as individuals); *Linda Construction, Inc. v. City of Chicago*, 2016 WL 1020747, *4 (N.D. Ill. March 15, 2016) (concluding plaintiffs who did not bid on contracts after alleged discrimination, had "no contractual interest in which defendants could interfere" and possible loss of future contracting opportunity is insufficient under § 1981). *Accord, Gregory v. Mitchell*, 634 F.2d 199, 202 (5th Cir. 1981) (holding stockholders lacked standing to sue on behalf of bank under § 1983).

On the other hand, *Prieto Automotive, Inc. v. Volvo Car USA, LLC,* addressed defendant's claim that plaintiffs lacked standing under § 1981 because they intended their business to contract with defendants. 2024 WL 3011170, *5 (E.D. Cal. June 14, 2024). The court rejected the argument and determined that because plaintiffs had signed the contract in their individual capacities, they had rights under the contract. *Id.* In addition, because their business was an intended third-party beneficiary under the contract, it had standing to sue. *Id.* (cleaned up). *See also Mamadou v. Cho*, 2023 WL 3909547, *4 (E.D. Va. May 11, 2023) (concluding individual plaintiff and her company would be parties to assignment of

lease and therefore, individual had standing in § 1981 case); *Kass-Hout v. Community Care Network Inc.*, 2022 WL 4016971 (N.D. Ind. Sept. 2, 2022) (concluding for purposes of § 1981 claim, plaintiff endovascular neurosurgeon was third-party beneficiary of contract between university medical center that employed him and community hospital operated by defendant).

### 6. Judicial admission

An additional issue raised in the context of Defendants' assertion that Plaintiffs lack individual standing is the matter of an alleged judicial admission. (Doc. 275, PgID 6724). The Eighth Circuit has defined a judicial admission as "a formal admission before a court that 'acts as a substitute for evidence in that it does away with the need for evidence in regard to the subject matter of the judicial admission.'" *Warner Bros. Entertainment, Inc. v. X One X Productions,* 840 F.3d 971, 978 (8th Cir. 2016). It has long been recognized that a judicial admission pertains to matters of fact which would have to be proved otherwise. *See State Farm Mutual Auto Ins. Co. v. Worthington,* 405 F.2d 683, 686 (8th Cir. 1968) (judicial admission is a substitute for evidence). For a statement to constitute a judicial admission, it must be "deliberate, clear, and unambiguous." *Acciona Windpower N. Am., LLC v. City of W. Branch, Iowa,* 847 F.3d 963, 968 (8th Cir. 2017). A "carelessly worded stipulation" generally should not be converted into a "dispositive admission." *Id. Accord Grandoe Corp. v. Gander Mountain Co.*, 761 F.3d 876, 885 (8th Cir. 2014) (carelessly worded stipulation that would have defeated plaintiff's case was not "deliberate, clear and unambiguous concession").

## B. FACTS PERTINENT TO STANDING

As noted above, this lawsuit grew out of social media posts by Connie Uhre, the then-owner of the Grand Gateway Hotel, Rapid City, S.D., quoted above. Five Plaintiffs who responded to the posts are the subject of this Order as a result of the Defendants' challenge to their standing. In this section of the Order, the Court will focus on the factors relevant to whether these Plaintiffs have standing under Article III and prudential standing, as well as any allegation they are "testers" or "agents" without standing.

The Court finds the following testimony has been given in depositions and considers it in evaluating whether Plaintiffs have supplied sufficient evidence of standing to avoid dismissal. As is required, the Court evaluates the circumstances of each Plaintiff individually:

--*Plaintiff Sunny Red Bear* is a Native American, and a member of the Oglala Sioux Tribe whose large Reservation is about a one-hour drive southeast of Rapid City and is called Pine Ridge Reservation. Plaintiff Red Bear resides in Rapid City and is an employee of NDN Collective. She is an organizer and sexual abuse advocate. (Doc. 152-3, PgID 2193-94, 2213-14).

As part of her duties, she tries to find emergency shelter for victims of domestic violence and for Native people who may not have homes. (Doc. 152-3, PgID 2230). She uses hotels in Rapid City for such purposes. She had tried to rent a room at the Grand Gateway in November 2020 for this reason. (Id., PgID 2209). She had rented rooms at the hotel previously and had shown her local identification. (Id., PgID 2212). She rented rooms at the Grand Gateway around January and February 2021. (Id., PgID 2213).

Plaintiff Red Bear's testimony at her deposition concerning her going to the Grand Gateway on March 21, 2022, at 10:30 PM can be summarized as follows: she was not told to go the Grand Gateway after she became aware of Connie

Uhre's posts. "It was a decision I made, like, for myself, like as an individual." (Doc. 152-3 PgID 2220-21; Doc. 274-1, PgID 6658). "I wasn't going there as NDN Collective, no." (Id.). She spoke to Hermus Bettelyoun and others before she went. The conversation was not about going to rent a room. It was about how the community was responding to the social media posts and not fully understanding how to support the community. Nick Tilsen, the Director of NDN, stated in his deposition that Red Bear did not go to the Grand Gateway on behalf of NDN and went as an individual. (Doc. 175-1, PgID 4041).

When Red Bear went to the Grand Gateway on March 21, 2022, she was accompanied by an individual, Muffie Mousseaux, and two employees of NDN, Felipa (last name not provided) and Hermus Bettelyoun. She asked to rent a room. When she showed her identification, the desk clerk said she could not rent because of her local identification and that it was a policy. (Doc. 152-3, PgID 2226-27). Red Bear left but then returned and asked for a copy of the policy. None was available. (Doc. 152-3, PgID 2227; Doc. 274-1, PgID 6658). She did not try to rent a room elsewhere that night. She intended to rent a room and had the means to pay for it. The room likely would not have been for her to occupy but probably would be used for a domestic violence victim or someone else in need of shelter. She made a recording of her interaction with the desk clerk.

In terms of motivation, "we were going in to see if what they said about not renting to Natives was true." (Doc. 161-5, PgID 2983). "Once I was denied I was completely shocked. Like, I was really hoping that it went a different way." (Doc. 169-15, PgID 3688; Doc. 274-1, PgID 6664). She said "yes" when asked whether she went to the hotel "for the purpose of testing whether or not they would rent to a Native American person." (Doc.152-3, PgId 2225; Doc. 175-2, PgID 4102).

With respect to Plaintiff Red Bear's damages, her answer to Interrogatory #9 states she "seeks damages for humiliation, embarrassment, and loss of federally

protected rights.... she also seeks damages for emotional distress." (Doc. 274-8, PgID 6700). Her supplemental answer to Interrogatory #9 states that she "seeks damages for the humiliation and embarrassment anyone would feel when subject to discrimination, and damages for the loss of federally protected rights." (Id.).

--*Plaintiff Mary Bowman* is a Native American, a member of the Standing Rock Sioux Tribe, and a resident of Rapid City. She is employed as the principal of Oceti Sakowin Community Academy in Rapid City. She is not an employee of NDN Collective and was not on March 22, 2022. At that time, she was given permission to use a table at the NDN building to prepare a grant application while she was a fellow for the NACA Inspired Schools Network (NISN), a collaboration between NISN and NDN. (Doc. 152-3, PgID 2355-56). She saw Connie Uhre's post about not renting to Native people, but did not know they were actually refusing to rent to Natives. (Id., PgID 2362). On March 22, 2022, her daughter, Bre Jackson, asked if she wanted to go to the Grand Gateway. There was no plan except to ask for rooms. Expedia showed that rooms were available. (Id., PgID 2366).

Bowman was in the lobby with Jackson, Eagle, and Cottier when Nick Uhre forcefully demanded they leave the hotel immediately. (Id., PgID 2364-66). When Nick Uhre screamed at them in the lobby, she was "shocked." (Id.). She stated she had not seen such explicit racism before Nick Uhre's refusal to rent them rooms. (Id., PgID 2370). She thinks of NDN Collective as separate from her identity as a Native woman.

Plaintiff Bowman testified as follows about her damages:

> So we all sat and waited in the lobby for the manager to come. And not long after that, a man came out, and I now know that was Nick Uhre, and he was very angry and he was yelling and screaming at us to get out of the hotel. And he said if we didn't leave, he would call the cops. Exactly what he was screaming and everything, I don't recall. It was just—I was just

shocked…. Just how that was a crazy interaction. In all my years of living in Rapid City and experiencing—the majority of the racism I experience is implicit, and that was very explicit.

(Doc. 274-5, PgID 6691-92).

--*Plaintiff Alberta Eagle* is a Native American, a member of the Oglala Sioux Tribe, and a resident of Rapid City. She is familiar with the Grand Gateway hotel in her community because she drives by it on several of her commutes. She is employed by NDN and as part of her duties as Director of Operations she obtains hotel rooms for those visiting Rapid City for activities with which NDN is associated. In addition, she helps to obtain hotel rooms for domestic violence victims and for others who do not have a home. She saw Connie Uhre's posts that "were flooding social media in the morning. I saw it that morning." (Doc.152-3, PgID 2254; Doc. 274-2, PgID 6667). When she went to the Grand Gateway, "I was just there to do a thing, right, and it was on my own behalf of wanting to see if this was real, if this would happen." (Doc. 175-3, PgID 4157). "Because of the Connie Uhre post we were all in disbelief and saying no way, this didn't happen. And I believe that was when you know, it was said, well Sunny went and they denied her a room." (Doc.152-3, PgID 2257; Doc. 175-3, PgID 4154). As the Director of Operations, she felt she should go to the hotel because she "has done this type of transaction numerous times." (Doc. 274-2, PgID 6667). She "asked the clerk if she could rent a few rooms." (Doc. 152-3, PgID 2261). The rooms would have been rented and used. (Doc. 274-2, PgID 6669). She thought the rooms would have been used for unhoused relatives, given that the "organization" has done that before. (Id.). When Nick Uhre came to the front desk, he "focused on Nick Cottier at that time," and Eagle told him Cottier was not Hermus Bettelyoun. (Doc. 152-3, PgID 2262). Uhre asked if they were NDN, she said yes,

23

and then he "continuously" told them to leave. (Doc. 152-3, PgID 2262, 2263).
Eagle described Uhre as "a tall—larger gentleman." (Doc. 152, PgID 2262).
Plaintiffs Jackson, Eagle, Bowman, and Cottier were wearing NDN shirts. (Doc.
152-3. PgID 2262-63). Nick Tilsen, Director of NDN, indicated that part of
NDN's work is to arrange for and pay for hotel rooms for women escaping
domestic violence or unsheltered relatives. (Doc. 274-6, PgID 6695).

Plaintiff Eagle was in the lobby of the hotel and spoke directly with Nick
Uhre. This was a person-to-person encounter in which Nick Uhre yelled at Eagle
and ejected her along with Bowman, Cottier, and Jackson.

In Eagle's view, being Native American and NDN are two different things,
although she works for NDN and it is a Native organization. (Doc. 175-3, PgID
4164).

With respect to her damages, Plaintiff Eagle said the following:

> As a Native person myself and having to have past experiences with
> racism, my family having past experiences with racism, it's in our face on a
> daily basis. The reason I work for NDN is that they advocate for Native
> people to be treated equitably. And I really believe in that. I believe that
> everybody should be treated exactly the same. I don't think that any one
> group should be superior. And this discrimination really frustrates me,
> because, again, when you see somebody of another race putting down your
> race specifically, it is hard to function in a world where you know it's not
> fair. You always have to be on the defensive, you always have to be the one
> that is speaking up. And nobody likes that.
> But what I'm getting at is I don't want my kids to have to fight this
> way also. My kids are going to have to deal with people like this. The
> people that put these posts out, the people that are engaging in that type of
> racist behavior, those are the people that my kids are going to have to
> encounter as well. I don't want that. And I'm sure any parent—any parent,
> no matter what race, would also feel the same way. There's no way that I
> would be okay with being treated less than, because I'm not less than. And
> that's exactly how we are made to feel on a constant basis.

(Doc. 274-2, PgID 6670-71).

--*Plaintiff Nick Cottier* is a Native American, a member of the Oglala Sioux tribe, a former police officer at the Pine Ridge and Cheyenne River Reservations, and a resident of Rapid City. He is an employee of NDN Collective, primarily engaged with logistics. He was aware of Connie Uhre's posts before he went to the Grand Gateway. (Doc. 152-3, PgID 2284). He did not know Sunny Red Bear had tried to rent a room before he went to the Grand Gateway. (Id., PgID 2286). He was not told to go to the hotel to strengthen a potential lawsuit. (Id., PgID 2288). His thought was "let's go up there and see if they'll deny us," (id., PgID 2287), although he did not expect to be denied a room. (Id., PgID 2292). He understood someone would have stayed in the rooms because he is aware NDN arranges for rooms for needy people. (Id., PgID 2291). He would not have stayed in the room he rented. He understood Plaintiff Eagle would have paid for the rooms. (Id., PgID 2292; Doc. 274-3, PgID 6677).

He was in the lobby of the hotel with Plaintiff Eagle when she asked to rent a room. He waited for Nick Uhre to come to speak to him along with Eagle, Bowman, and Jackson. He was personally present for the confrontation, which was partly directed at him, when a "bigger male" who was a "very irate" Nick Uhre called him Hermus Bettelyoun, and Cottier "tried to tell him I'm not Hermus." (Doc. 175-4, PgID 4187; Doc. 274-3, PgID 6675). Alberta Eagle stated that Nick Uhre yelled, "Bettelyoun get out," and that he "focused on Nick Cottier at that time." (Doc. 152-3, PgID 2262). The encounter escalated and resulted in Cottier, Eagle, Bowman, and Jackson being ejected from the hotel by Nick Uhre. (Doc. 175-4, PgID 4187; Doc. 274-3, PgID 6675)). Cottier thought Nick Uhre was refusing to rent rooms to the group "because of race" because "I just don't think

people deny people just for no reason." (Doc. 152-3, PgID 2294-95; Doc. 175-4, PgID 4192).

As a result of the encounter in the lobby of the Grand Gateway with Nick Uhre based on his belief that the denial of the room rental was motivated by Uhre's racism, Plaintiff Cottier identified "humiliation, embarrassment, general emotional distress, discrimination, and loss of federally protected rights" as his damages. (Doc. 274-10, PgID 6708).

In explaining further his damages for emotional distress, Plaintiff Cottier testified as follows:

> I mean, it's pretty embarrassing any time you're denied access or anything, you know. It don't feel good. Especially whenever your kids ask you about why you can't stay at places or why people are saying stuff like that. So, I mean it gets pretty emotional.

(Doc. 274-3, PgID 6678).

When asked about whether his kids asked about what happened, Cottier said:

> I just told them that sometimes in life, you know, we deal with people that don't like us for who we are, and we have to carry on and move on with it no matter how hard it is.

(Id., PgID 6678).

When asked to specify his damages, he said: "Just emotional and, you know, embarrassment." (Id., PgID 6679).

--*Plaintiff Brenna (Bre) Jackson* is a Native American, a member of the Oglala Sioux Tribe, and a resident of Rapid City. She is employed by NDN. As part of her duties, she has been involved in renting rooms for groups holding meetings. (Doc. 152-3, PgID 2330). She was not told by anyone to go to the Grand Gateway. She did not know that Sunny Red Bear had tried to rent a room the night before. (Id., PgID, 2322-23; Doc. 175-6, PgID 4219-20). Several people

"just decided let's go." (Id., PgID 2327; Doc. 274-4, PgID 6683). It was an "organic" decision. (Doc. 152-3, PgID 2327). All five members of the group wore NDN shirts.

Jackson wanted to see if she would be given a room because of "feelings and sentiments of wanting to see, like, if this is true, if this was real, if they would really do what they said they were going to do." (Doc. 152-3, PgID 2326). She would have paid for a room. She either would have stayed in it to provide a "staycation" for her sons, or the room would have been given to a needy person. (Doc. 152-3, PgID 2329; Doc. 274-4, PgID 6684).

She made a video of the encounter in the lobby with Nick Uhre when she and others "attempted to book rooms." (Doc. 161-6, PgID 3001). She was in the lobby and experienced Uhre's "coming out and yelling at us and pretty aggressively," (Doc. 152-3, PgID 2332; Doc. 274-4, PgID 6685), before she was told to leave the hotel by Nick Uhre.

After she testified that her experience at being ejected from the hotel was "traumatic," she described how she had felt "triggered" as follows:

> Just the same thing of having him come and yell--yell at us. I've never experienced that before, especially that aggressively. And so that's definitely not something that I would want to experience again or have my kids experience…. It was scary. I was scared. I was afraid.

(Doc. 274-4, PgID 6686).

The interrogatory answers for Red Bear, Bowman, Jackson, Eagle, and Cottier all allege that they seek damages for "humiliation, embarrassment, general emotional distress and loss of federally protected rights." (Doc. 273).

An additional fact must be addressed. As is evident, Plaintiffs Red Bear, Bowman, Eagle, Jackson, and Cottier did not enter into contracts with the Grand Gateway. Plaintiff Red Bear asserts she was prevented from doing so by a local

identification policy, as noted above.  Plaintiffs Bowman, Jackson, Eagle, and
Cottier assert they were prevented from entering into contracts because their effort
was thwarted by Defendant Nick Uhre.  The Court recognizes that Nick Uhre
testified at his deposition that "every single guest who checks into a hotel fills out a
registration.  That registration is a contract." (Doc. 169-11, PgID 3650-51).
For the purposes of this Order, the Court acknowledges that although the facts
surrounding the alleged effort to enter into a contract are contested, Plaintiffs have
averred sufficiently that they endeavored to make contracts with the Grand
Gateway and were thwarted.  In such a situation the provisions of § 1981 apply.

## C. ANALYSIS

### 1. Plaintiffs' Standing under Article III—In general, injury in fact, and prudential standing

As discussed previously, to satisfy the requirements of Article III, a plaintiff
must establish injury in fact, traceable to defendants' conduct, which is likely to be
redressed by a favorable decision.  In the case at bar, for the purposes of standing,
the third element is satisfied, given that a judgment in Plaintiffs' favor could result
in money damages if the jury feels they are warranted.  The second element
likewise is satisfied, given that Plaintiffs allege Defendants discriminated against
them in conjunction with an attempt to rent hotel rooms.  Injury in fact is the
matter most in contention.  Plaintiffs argue that the alleged discrimination itself is
the injury along with humiliation, embarrassment, general emotional distress and
loss of federally protected rights.

Defendants argue that Plaintiffs have not alleged sufficient injury in fact to
satisfy Article III, particularly in light of *TransUnion* and *Ojogwu*, discussed
above.  The Court recognizes that injury in fact must be concrete and not
hypothetical.  The Court also recognizes that Ojogwu's injuries did not include

Case 5:22-cv-05027-LLP    Document 279    Filed 04/17/25    Page 29 of 43 PageID #:
7093

physical manifestation and consisted of "fear of answering the telephone, nervousness, restlessness, irritability," and "other negative emotions" from opening a letter with a copy of a garnishment summons to a bank. The Court also notes *Trans Union's* references to "intangible harms," and to damages that include discriminatory treatment. 594 U.S. at 425-26.

Plaintiffs Red Bear, Bowman, Eagle, Cottier, and Jackson have alleged they endeavored to rent rooms at a hotel and were refused. Following the refusal, Plaintiffs Bowman, Eagle, Cottier, and Jackson allege that the hotel manager, Nick Uhre came to the lobby, yelled at them, and ejected them from the hotel. This is a far cry from opening a letter with a garnishment summons to a third party, as was the situation in *Ojogwu*. The Court must examine the depth and quality of the damages alleged because all "embarrassment" is not equivalent. The Court notes that Ojogwu was at home; Plaintiffs were in a public space. Ojogwu's interaction was over an alleged debt and the Fair Debt Collection Practices Act; Plaintiffs' was over alleged discrimination on the basis of race in violation of 42 U.S.C. § 1981. Ojogwu looked at a document; Plaintiffs Bowman, Eagle, Cottier, and Jackson were in a face-to-face encounter with a large man who allegedly challenged their presence, argued and screamed at them, and ejected them from the hotel.

Plaintiff Red Bear allegedly was refused based on a local identification policy which was unavailable for her perusal. The complaint indicates she felt "threatened, embarrassed, humiliated, disturbed, and shocked." (Doc. 84, PgID 1009). Her encounter, too, was face-to-face and in a public place. Her understanding at the time was that the local identification policy was discretionary and was employed against her on the basis of race.

As a result, Plaintiffs allegedly experienced humiliation, embarrassment, and emotional distress in conjunction with the loss of federally protected rights under § 1981, i.e., the ability to contract "to the full and equal benefit of all laws

and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981(a). This is concrete harm—not something abstract or hypothetical—resulting in humiliation, embarrassment, and emotional distress, all coming from the fact that they were Native American and not white citizens.

The Court finds that *Ojogwu* is distinguishable from Plaintiffs' situation for the following reasons. The humiliation one might feel at opening a letter revealing a Fair Debt Collection Practices Act violation differs in quality and depth from the humiliation a person would feel after an encounter in public resulting from refusal to rent hotel rooms on the basis of race which was followed, in the case of Bowman, Eagle, Jackson and Cottier, by ejection from the premises. If proved, Plaintiffs' injuries are sufficiently concrete to fit within the parameters of the torts of negligent or intentional infliction of emotional distress, in accord with *TransUnion's* directives to seek common law analogies for current harms. *Bassett*, 60 F.4th at 1136 n.2.

Several other factors are persuasive on the issue of Plaintiffs' standing. Plaintiffs reside in the same community as the Grand Gateway. Any policy of discrimination would be a matter of community concern. An added factor is that the policy targeted Native Americans. Plaintiffs Bowman, Cottier, Eagle, Jackson, and Red Bear are Native Americans who were facially excluded by the hotel policy. When answering "What's it to you?", their answer would have been concern and disbelief over an announced and publicized policy of discrimination on the basis of race in their community. When they followed up on the announced policy, they were not permitted to rent hotel rooms. This made it very much "something" to them.

The Court concludes that the injuries claimed by Plaintiffs, including discrimination and other intangible harms, satisfy the requirement of injury in fact for the purposes of Article III.

### 2. Alleged Lack of Standing by "Testers"

Although no single factor is dispositive in analyzing the "tester" cases for purposes of standing, several considerations are persuasive. First, the Court should consider whether there has been any conduct by a defendant that prompts the effort to make a contract, such as in *Havens* or *Keck*, or is there merely a random search on the internet to look for possible statutory violations, such as in the *Laufer* and *DeBoard* cases. Next, is there geographical proximity or an in-person encounter in the effort to make a contract, or is there merely an internet search? Next, does the individual seek to make a contract or is there an intent to abandon the effort once a violation is discovered? In addition, are the people endeavoring to make a contract hired just for that purpose? Have those seeking to make a contract used fictitious credentials? Are the plaintiffs trying to remedy alleged harms to themselves or just trying to see that the law is enforced? How many lawsuits have the plaintiffs filed on this issue against how many defendants? All of these questions are pertinent in answering the question "What's it to you?" as discussed in more detail below.

As required, the Court analyzes the facts in the light most favorable to Plaintiffs as in ruling on a motion for summary judgment. The Court previously denied Defendants' motion for summary judgment on the basis Plaintiffs lack standing. (Doc. 206). The Court requested further briefing on the issue and continues to employ the standard of review in the light most favorable to Plaintiffs, the non-moving Parties.

In applying the legal standards to the situation at hand, the Court recognizes that the definition of "tester" in cases such as *Havens* and *Acheson* has a legal meaning which differs from the use of the term in common parlance. For example, a person might say, "I'm going to test the milk in the baby's bottle to make sure it isn't too hot"; "I'm going to test how bad the undertow is before I let the kids go

into the ocean." It is abundantly clear that such use of the term is colloquial and must be considered when evaluating Plaintiffs' deposition testimony regarding their "testing" at the Grand Gateway and the implications for their standing in this case.

Beyond that, the Court determines that Plaintiffs Bowman, Cottier, Eagle, Jackson, and Red Bear were responding to social media posts that on their face stated a policy that Grand Gateway had implemented. This was nothing like the fishing expeditions by plaintiffs in cases such as *Laufer*, *Shumway*, and *DeBoard*, who seek to create lawsuits when they have had no information other than their own web searches to indicate there is a problem of discrimination. Here, Defendant Connie Uhre allegedly announced the "no Natives" policy on social media. The local community of Rapid City apparently became aware of the posts very quickly. Native Americans were the subject of the posts. Bowman, Eagle, Jackson, Cottier, and Red Bear are Native Americans and appear to be activists in the community who followed up on the posts. The Court is aware that Defendants have claimed defenses to raise on the merits, but for purposes of standing, Plaintiffs are quite unlike the "testers" in the cases cited above.

Furthermore, in many of the cases involving "testers," plaintiffs bring numerous lawsuits against numerous defendants. The Plaintiffs in this case have brought one specific lawsuit against Defendants based on specific information disseminated by one Defendant in their own community. Unlike Laufer, Harty, and DeBoard these Plaintiffs seek damages, not just enforcement of the law.

Plaintiffs Bowman, Cottier, Eagle, Jackson, and Red Bear testified that they would have paid for the hotel rooms and rented them. They were not permitted to complete the transactions. It appears that most of the rooms would have been used for needy people for economic reasons or as a result of domestic abuse, or in one case, possibly for Plaintiff Jackson and her sons for a "staycation." This is

sufficient to satisfy any concern that a "tester" has no intent to use the goods or services sought. This is concrete harm, not hypothetical.

Defendant Connie Uhre announced through her posts the implementation of a policy for the Grand Gateway of excluding Native people. The Plaintiffs decided to see if this was in fact a policy, i.e., they tested it, or in common parlance, checked it out. When they were ejected from the hotel or, in the case of Red Bear, denied the opportunity to rent based on a local identification policy, they concluded this was because of the purported policy. All Plaintiffs testified they would have followed through with the rental. Plaintiffs weren't looking for a problem to correct—Connie Uhre's posts created the problem.

The Court finds that the Plaintiffs are not "testers" who acted in some fashion that would eliminate their standing in this case. All intended to rent the rooms they sought in their local community. None of the Plaintiffs was just seeing whether there was a violation under the statute that would result in corrective action. All are claiming money damages based on discrimination and the effects of discrimination. There is nothing hypothetical in Plaintiffs' allegations—all allege the concrete harm of discrimination that occurred during face-to-face encounters in a public place after Connie Uhre's social media posts were distributed, followed by humiliation, embarrassment, and emotional distress after they were not permitted to rent hotel rooms.

### 3. Alleged lack of standing by "representatives of NDN"

Plaintiffs Bowman, Cottier, Eagle, Jackson, and Red Bear testified that they decided on their own to go to the Grand Gateway. No one sent them; it appears to have been an "organic" effort in response to the social media posts that stated that Native Americans would be barred from service. While the Complaint asserts they acted on behalf of NDN, (Doc. 84, ¶ 74), other paragraphs of the Complaint and

their deposition testimony assert they acted on their own initiative as well. The Court recognizes that NDN is an activist organization and that the individual Plaintiffs also can be described as activists, to one extent or another. That does not mean that each Plaintiff can act only as a representative of NDN or only as an individual. The Court accepts for the purposes of the standing analysis that the Plaintiffs were acting in a dual role as individuals who are Native American and activists for Native American causes, and to some extent and in varying degrees, on behalf of NDN. The goals are the same: advocating for equal treatment for Native Americans. The Court is unwilling to impose an either-or standard on the Plaintiffs such that they either are solely individual Native people or solely NDN activists but not both. They can be and were both and to say otherwise is to deny their identity as Native people.

In view of *Domino's Pizza* and its progeny, with respect to each Plaintiff the Court must decide whether the person acted on behalf of NDN to such an extent that it outweighs the person's actions as an individual and finds as follows:

Plaintiff Red Bear is an employee of NDN. She went to the Grand Gateway late in the evening and not during normal business hours. She stated no one from NDN management told her to go and she went of her own accord because of her concern about Connie Uhre's social media posts. She intended to rent a room or rooms, which would have been used, most likely by a domestic violence victim or a needy person. The Court finds Plaintiff Red Bear went to the Grand Gateway primarily in her individual capacity and does not lack standing as a representative of NDN. The Court denies dismissal of Red Bear's § 1981 claim on the basis she lacks standing.

Plaintiff Eagle is an employee of NDN and serves as the Director of Operations. She joined Plaintiffs Jackson, Bowman, and Cottier in going to the Grand Gateway after she saw the social media posts. She was not told to go but

34

went during business hours. She spoke for the group and asked to reserve five
rooms on behalf of NDN. The organization rents rooms for domestic violence
victims and those who lack shelter. She spoke to Nick Uhre and said the group
was NDN. She and the others in the group wore NDN apparel, although that was
their normal work clothing. Tilsen and Cottier expected Eagle would pay for the
rooms on behalf of NDN. Her efforts to enter into a contract for the hotel rooms
appears to have been primarily on behalf of NDN. The Court finds that the balance
tips in favor of Plaintiff Eagle having acted as a representative of NDN when she
endeavored to rent the hotel rooms, and therefore, she lacks standing as an
individual. The Court grants dismissal of Plaintiff Eagle's § 1981 claim for lack of
standing.

Plaintiff Bowman was a NACA fellow and not an employee of NDN on
March 22, 2022. She went with Eagle, Jackson, and Cottier to the Grand Gateway
and experienced the refusal to rent rooms and the encounter with Nick Uhre.
There is no indication she did anything pertinent to this case on behalf of NDN or
had any authority to do anything for NDN. Therefore, the Court finds Plaintiff
Bowman acted as an individual and not as a representative of NDN. The Court
denies dismissal of Plaintiff Bowman's § 1981 claim on the basis of standing.

Plaintiff Jackson is an employee of NDN and was so employed on March
22, 2022. She went to the Grand Gateway during business hours although no one
told her to go as part of her work. She was there with her mother, Mary Bowman.
She wanted to see if she could rent a room. She intended to pay for the room and
use it for her family, or in the alternative, to provide it for a needy person or
domestic violence victim. The Court finds Plaintiff Jackson acted as an individual
and not as a representative of NDN. The Court denies dismissal of Plaintiff
Jackson's § 1981 claim on the allegation of lack of standing.

Plaintiff Cottier is an employee of NDN and was on March 22, 2022. He went with Eagle, Jackson, and Bowman during business hours to see if he could rent a room at the Grand Gateway. He was not told to go by NDN management. He would not have stayed in the room and anticipated Plaintiff Eagle "most likely" would have paid for it so NDN could use it for a needy person. When Cottier arrived at the hotel with Eagle, Bowman, and Jackson, he waited in the lobby for Nick Uhre to come and speak to them. When Uhre approached the group, he targeted Cottier, apparently in a case of mistaken identity, and directed his ire at him by screaming at him before ejecting the group. The Court finds Plaintiff Cottier acted primarily as an individual even though Nick Uhre chose to focus on him as an associate of NDN. The Court denies dismissal of Plaintiff Cottier's § 1981 claim on the basis of standing.

## 4. Judicial Admission

The alleged judicial admission by Plaintiffs appears in a paragraph in the Third Amended Complaint, which reads in its entirety as follows: "74. On March 22, 2022, representatives of NDN Collective—Ms. Eagle, Mr. Cottier, Ms. Jackson, and Ms. Bowman (collectively the 'NDN Plaintiffs')—entered the Grand Gateway Hotel to reserve five rooms on behalf of the organization." (Doc. 84, PgID 1012, ¶ 74). Defendants assert that, "These Plaintiffs have also pleaded that they were there on behalf of NDN Collective and not on their own behalf, which is a judicial admission." (Doc. 275, PgID 6724).

The Court disagrees with Defendants' characterization of ¶ 74—it does not say that the individuals were not there on their own behalf. It asserts they were there on behalf of NDN, which also appears in additional paragraphs of the Complaint. (Doc. 84, ¶¶ 115, 117). In other paragraphs of the Complaint and in

depositions and interrogatories, the Plaintiffs also have described their presence at the Grand Gateway as individuals who were harmed individually by Defendants. (Doc. 84, ¶¶ 112, 117, 121). The Plaintiffs have demonstrated sufficient individual interaction at the Grand Gateway with Nick Uhre, including his ejecting them from the hotel after their effort to rent rooms was refused, to assert individual harm in connection with their effort to contract for rooms, and consequently, to endeavor to establish standing as individuals. The Court declines Defendants' invitation to read ¶ 74 alone as a judicial admission that would preclude a determination of standing for each Plaintiff based on the facts pertinent to that person, particularly when Plaintiffs have argued they occupied a dual role as individual activists and as representatives of NDN. Paragraph 74 is not an admission, but instead is part-and-parcel of Plaintiffs' theory of the case. *See Warner Bros*, 840 F.3d at 978-79; *Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC,* 477 F.3d 383, 394 (6th Cir. 2007) (expressing reluctance to treat statements relating to opinions and legal conclusions as binding judicial admissions). Dismissal on the basis of a purported judicial admission is not warranted.

## ISSUE II.  DECLARATORY AND INJUNCTIVE RELIEF

Defendants' motion for summary judgment seeks dismissal of Plaintiffs' claims for declaratory and injunctive relief, (Doc. 152), on which the Court deferred ruling. (Doc. 206). Defendants renew the motion here. (Doc. 275, PgID 6739). In their previous motion, Defendants argued that the consent decree which resolved the case of *United States of America v. Retsel,* (5:22-cv-5086, Doc. 59), which this Court approved on November 29, 2023, renders these claims moot. Defendants repeat that argument and add that Plaintiffs have conceded that they seek only remedies for past harm and not for any present or future harm, making

declaratory and injunctive relief unavailable. (Doc. 275, PgID 6739). Plaintiffs aver that their injuries are ongoing, that they do not believe they have a right to contract at the Grand Gateway equally with non-Natives, and therefore the Court should reserve declaratory and injunctive relief as a possible remedy. (Doc. 273, PgID 6648).

## A. LEGAL STANDARD

Declaratory relief may not be awarded in the absence of a case or controversy. *Equipment Mfrs. v. Janklow,* 88 F.Supp.2d 1061, 1065 (D.S.D. 2000). As the Eighth Circuit stated in *Marine Equipment Mgt. Co. v. United States,* to find a case or controversy within the meaning of the Declaratory Judgment Act, the court must determine whether there exists "a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." 4 F.3d 643, 646 (8th Cir. 1993) (cleaned up). It is well-recognized that a party may launch a challenge to a request for declaratory judgment by arguing that "a decision on the merits will render the request for declaratory judgment moot." *Simmons v. Butler,* 2019 WL 2231081, *3 (E.D. Mo. May 22, 2019). *See also* 10B Wright & Miller, Federal Practice and Procedure § 2757 (4th ed. 2024). Declaratory relief is based on "equitable considerations" and is discretionary. *South Dakota v. Mineta,* 278 F.Supp.2d 1025, 1029-30 (D.S.D. 2001).

With respect to injunctive relief, the Supreme Court has stated that to obtain forward-looking relief, "the plaintiff must establish a risk of future injury that is traceable to the [] defendants and likely to be redressed by an injunction against them." *Murthy,* 603 U.S. at 69. In this regard, the plaintiff's burden is to show the allegedly wrongful behavior is "likely to occur or continue." *Id.* In *Frost v. Sioux*

*City, Iowa,* the Eighth Circuit cautioned that a plaintiff who seeks injunctive relief "against future conduct of defendants who caused injury in the past" must show "a real and immediate threat that she would again suffer similar injury in the future." 920 F.3d 1158, 1161 (8th Cir. 2019). Thus, *Frost* held that a plaintiff who no longer lives in the city nor has a dog lacks standing to pursue injunctive relief in connection with an ordinance that bans certain dogs. *Id. Accord Mitchell v. Dakota County Social Services*, 959 F.3d 887, 896 (8th Cir. 2020) (speculative future harm is insufficient to establish "real and immediate threat of injury" and is insufficient as basis for prospective relief). Past injuries alone are insufficient for standing to seek injunctive relief for future constitutional violations. *Park v. Forest Service of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000); *Youngbear v. Bayens,* 2023 WL 9475652, *3 (N.D. Iowa Sept. 29, 2023) (citing *Frost,* 920 F.3d at 1161). *But see Sherman v. Kasotakis*, 314 F.Supp.2d 843, 848 (N.D. Iowa 2004) (determining injunctive relief after trial was appropriate based on a pattern of conduct by defendants).

## B. ANALYSIS

In the case at bar, the Court notes the following that are relevant to the Defendants' renewed motion for dismissal of the declaratory and injunctive relief claims. First, on November 29, 2023, Defendants entered into a consent decree with the United States in a case arising out of the incidents occurring at the Grand Gateway hotel in March, 2022, involving the Plaintiffs in this case. *United States of America v. Retsel*, 5:22-cv-5086. The consent decree does not include an admission of responsibility by Defendants but does agree to certain remedial measures. (Id., Doc. 59). These include limiting Connie Uhre's participation in the operation of the Grand Gateway, enjoining Defendants from denying Native Americans the "full and equal enjoyment of all of the goods, services, facilities,

privileges and advantages of the Grand Gateway Hotel," and interfering with rights secured by "the prohibition against discrimination or segregation in places of public accommodation under the Civil Rights Act of 1964, 42 U.S.C. § 2000a." (Id., PgID 759). In addition, Defendants agreed to issue an apology, retain a compliance officer, implement an anti-discrimination policy, develop an outreach and marketing plan, train employees in the provisions of the Civil Rights Act, perform compliance testing, and submit reports to the Department of Justice. (Id., PgID 760-66). The consent decree remains in effect until November 2026. (Id., PgID 767, 768). At this juncture, the Court cannot predict whether the jury will find the Defendants liable for any or all of the alleged acts of discrimination in the case at bar, but the consent decree resolves important issues raised by the instant case with respect to possible future conduct by Defendants.

In addition, Plaintiffs point to no specific future harm that makes declaratory and injunctive relief necessary. They argue that "discrimination and exclusion" from the Grand Gateway are ongoing injuries and that they do not believe they have a right to contract there in a way that is equal to non-Native people. (Doc. 273, PgID 6649). They argue these are ongoing injuries for which the Court can "craft appropriate equitable relief" after the merits of the case have been resolved. (Id.). Defendants respond that Plaintiffs' request for declaratory relief is centered on Plaintiffs' claims relating solely to past conduct, eliminating a live case or controversy suitable for a declaratory judgment. (Doc, 275, PgID 6740). They assert that the consent decree renders the request for declaratory relief moot. They argue further that Plaintiffs have failed to assert a "real and immediate" threat of future injury which would make injunctive relief appropriate. (Id., PgID 6745).

On a related matter, Defendants point to a statement in Defendants' bankruptcy filing indicating Plaintiffs are seeking relief for "past harm." *In re Retsel Corporation*, No. 24-bk-50081 (Bankr. D.S.D. 2024), Doc. 76, at 5, ¶ 13.

Defendants assert this constitutes a "judicial admission," discussed previously at
Section I.A.6, which would bar injunctive relief. The filing was Plaintiffs'
response to Defendants' insurance company's opposition to motions for relief from
the automatic stay resulting from filing of the Defendants' bankruptcy action. (Id.
at 1). As Plaintiffs note, the comment was made in a different proceeding in a
different context and "judicial admissions are binding for the purpose of the case in
which the admissions are made." *Warner Bros.*, 840 F.3d at 978. They are not
"conclusive and binding in separate and subsequent cases." *State Farm,* 405 F.2d
at 686. This was in a memorandum, not a pleading. Courts have recognized that
"statements contained in memoranda, as opposed to pleadings, Fed. R. Civ. P. 7(a),
generally do not give rise to judicial admission." *Huggins v. Federal Exp. Corp.*,
2008 WL 441727 *4 and n.1 (E.D. Mo. Feb. 14, 2008). The Court finds Plaintiffs'
statement was not a judicial admission in this case.

Given that the consent decree in 5:22-cv-5086 is in place until November
2026 and that Plaintiffs have not identified any ongoing or future harm warranting
declaratory and injunctive relief, the Court grants dismissal of Count II,
Declaratory Relief, and Plaintiffs' prayer for injunctive relief.

## CONCLUSION

The principal issues resolved by this Order center on whether the Plaintiffs
lack Article III standing because their alleged injuries in fact are insufficient to
confer standing; whether they lack standing because they were merely "testers";
and whether they lack standing as individuals because they acted as representatives
of NDN Collective.

As discussed in detail above, the Court concludes that Plaintiffs Red Bear,
Eagle, Bowman, Jackson, and Cottier have alleged sufficient facts concerning their

injuries in fact to support their standing.  The face-to-face encounters resulting in Plaintiffs' inability to rent hotel rooms—one of which involved their being yelled at and escorted from a public place—were not the type of situations that would produce only mild embarrassment and distress.  Particularly if shown to be emanating from alleged racism, the resulting alleged damages are sufficient to satisfy the injury in fact standard.

The challenge to the Plaintiffs' standing based on the "tester" theory fails. The Plaintiffs were made aware of posts stating that Native Americans would not be permitted to rent rooms at a local hotel.  This disturbing information prompted them to try to rent rooms at the hotel; their efforts were rebuffed in face-to-face encounters.  Plaintiffs intended to pay for and use the rooms for themselves or those in the community in need.  Plaintiffs were responding to Connie Uhre's posts and were not merely searching the internet in an effort to enforce the law.  They seek damages based on their inability to complete the contracts they sought to make.

Defendants' final challenge to Plaintiffs' standing addressed in this Order is whether they have standing as individuals or acted solely as representatives of NDN. The Court is persuaded that when Plaintiffs went in person to the Grand Gateway, a hotel in their local community, they went in part as individuals and also in part because of their association with a Native advocacy organization, NDN Collective.  The Court has concluded that Plaintiffs Red Bear, Bowman, Cottier, and Jackson acted primarily as individuals and denies the challenge to their standing as merely representatives of NDN.  On the other hand, Plaintiff Eagle acted primarily as representatives of NDN, and therefore lacks standing.

With respect to the request for declaratory and injunctive relief, the Court has determined that Plaintiffs have not identified ongoing or future harm that warrants declaratory and injunctive relief.  Furthermore, the Consent Decree in

*United States of America v. Retsel,* 5:22-cv-5086, resolves any issues that would be likely to arise in the future. Therefore, dismissal of the claims for declaratory and injunctive relief is warranted.

Accordingly, IT IS ORDERED that:

1. Dismissal of the 42 U.S.C. §1981 claims of Plaintiffs Red Bear, Eagle, Jackson, Bowman, and Cottier on the basis of lack of standing for absence of cognizable injury in fact is denied;

2. Dismissal of the 42 U.S.C. § 1981 claims of Plaintiffs Red Bear, Eagle, Jackson, Bowman, and Cottier on the basis of lack of standing on the theory they are "testers" who lack standing is denied;

3. Dismissal of the 42 U.S.C. § 1981 claims of Plaintiffs Red Bear, Bowman, Cottier, and Jackson on the basis of lack of standing as individuals because they acted as representatives of NDN Collective is denied;

4. Dismissal of the 42 U.S.C. § 1981 claim of Plaintiff Eagle on the basis of lack of standing as an individual because she acted on behalf of NDN Collective is granted and the claim is dismissed;

5. Dismissal of Count II, which seeks Declaratory Relief, and Plaintiffs' prayer for injunctive relief, is granted.

Dated this 17th day of April, 2025.

BY THE COURT:

*Lawrence L. Piersol*
_____
Lawrence L. Piersol
United States District Judge