UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| NDN COLLECTIVE, SUNNY RED BEAR, NICK COTTIER, BRE JACKSON, MARY BOWMAN, and GEORGE BETTELYOUN, <br><br> Plaintiffs, <br><br> v. <br><br> RETSEL CORPORATION, d/b/a GRAND GATEWAY HOTEL and d/b/a CHEERS SPORTS LOUNGE AND CASINO, and CONNIE UHRE, <br><br> Defendants, <br><br> and <br><br> RETSEL CORPORATION, d/b/a GRAND GATEWAY HOTEL and d/b/a CHEERS SPORTS LOUNGE AND CASINO, and NICHOLAS UHRE <br><br> Counterclaimants, <br><br> v. <br><br> NDN Collective, <br><br> Counterclaim-Defendant. | Civ. No. 5:22-cv-05027-LLP <br><br><br> **DEFENDANT RETSEL CORPORATION'S MEMORANDUM IN SUPPORT OF ITS COMBINED RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, ALTERNATIVE MOTION TO ALTER, AMEND, OR REMIT THE JUDGMENT, AND FURTHER ALTERNATIVE MOTION FOR A NEW TRIAL** |

## <u>INTRODUCTION</u>

Defendant Retsel Corporation ("Retsel") respectfully moves, under Federal Rules of Civil Procedure 50(b), 59(a), and 59(e), to vacate the judgment entered against Retsel (ECF No. 435) and entry of judgment in Retsel's favor on all claims; alternatively, alteration, amendment, or remittitur of the judgment; or, in the second alternative, a new trial on all issues of liability as to Retsel.

This case arises from a series of contentious encounters at the Grand Gateway Hotel involving Retsel, Nicholas Uhre ("Nick"), and Nick's deceased mother, Connie Uhre ("Connie"), on one hand, and George Bettelyoun, Nick Cottier, Bre Jackson, and Mary Bowman (together, "Plaintiffs"), all of whom were testers posing as potential guests, on the other. The trial that ensued disclosed no proof of intentional discrimination, but blurred distinct events, conflated personal conflict with racial animus, and substituted speculation and conjecture for evidence.

The verdict against Retsel rests on legally insufficient proof of intent, agency, and damages. Contributing to these errors were evidentiary rulings that kept the jury from hearing critical, contemporaneous facts, while allowing inflammatory and irrelevant material to take center stage.

The record shows race-neutral explanations for Retsel's conduct, no basis to impute individual actions to the corporation, no competent evidence of

compensatory damages, and no lawful foundation for punitive damages. Under settled law, the evidence cannot support a finding of liability against Retsel. Therefore, as explained in detail below, Retsel is entitled to prevail on its renewed motion for judgment as a matter of law. Alternatively, the judgment should be altered or amended to vacate all findings of liability under Section 1981 and, as a necessary consequence, to strike the associated compensatory and punitive damages awards predicated on those claims, or at least remit the punitive damages awarded to Red Bear. In the further alternative, Retsel is at least entitled to a new trial on all issues of liability.

## RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

### I.    Legal Standard

A party is entitled to judgment as a matter of law when "a reasonable jury would not have a legally sufficient evidentiary basis" to find for the opponent. FED. R. CIV. P. 50(a)(1). If the Court denies a motion for judgment as a matter of law before the verdict, the movant may renew the motion after the verdict. FED. R. CIV. P. 50(b). The Court may not credit unreasonable inferences or inferences that conflict with undisputed facts. *Sip-Top, Inc. v. Ekco Grp., Inc.*, 86 F.3d 827, 830 (8th Cir. 1996). And where the record offers nothing more than speculation to support a verdict, judgment as a matter of law is required. *Id.*

2

**II.    Retsel is entitled to judgment as a matter of law on Plaintiffs' Section 1981 claim for racial discrimination.**

**A.    Plaintiffs presented no legally sufficient evidence of intentional racial discrimination or pretext.**

The purpose of 42 U.S.C. § 1981 is to bar discrimination in making, carrying out, changing, and ending contracts. 42 U.S.C. § 1981(b). Because Section 1981 discrimination claims rest on circumstantial evidence, such claims are analyzed under the familiar burden-shifting framework:

> To establish a *prima facie* claim of racial discrimination under 42 U.S.C. § 1981, the plaintiff must show that . . . the defendant <u>intended to discriminate</u> against him on the basis of race. Once the plaintiff establishes a *prima facie* case of racial discrimination, the burden shifts to the defendant to offer a <u>legitimate, nondiscriminatory reason for its actions</u> to rebut the presumption of discrimination. Then, the plaintiff must demonstrate that the <u>defendant's proffered reason was a pretext</u> for unlawful discrimination.

*Williams v. Lindenwood Univ.*, 288 F.3d 349, 355 (8th Cir. 2002) (citations omitted and emphasis added).

Here, the undisputed evidence shows that Retsel's June 2020 encounter with Bettelyoun did not constitute intentional discrimination. (Exs. 201–203.) At trial, Bettelyoun testified that he felt mistreated and humiliated. Critically, however, no competent evidence supports any racial statement, policy, or action tying the incident to racial discrimination. This is because Nick made no derogatory comments, and the video evidence does not support Bettelyoun's subjective belief

3

that he was singled out because he was Native American. At most, the evidence shows a heated dispute—not purposeful interference with contractual rights based on race. Subjective perception, without proof of racial motive, cannot sustain a Section 1981 claim. *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887–88 (8th Cir. 2004).

The same is true of Red Bear's March 21, 2022 interaction with Retsel. (Exs. 204–205.) Retsel's "no locals" policy was a race-neutral safety measure, adopted after a shooting at the hotel and used previously during periods of increased violence and crime. Hotel staff explained that the policy was not race-based. Critically, the staff were willing that night to rent a room to Muffie Mousseaux, a Native American, demonstrating that the policy was *not* applied as a proxy for race. Red Bear's disagreement with the policy, and her subjective belief that it was discriminatory, does not convert an otherwise legitimate, non-discriminatory policy into intentional racial discrimination or pretext.

Finally, the March 22, 2022 interaction with members of the NDN Collective likewise had absolutely nothing to do with race. Nick's conduct that day was fueled by his belief that NDN Collective and its affiliates were responsible for the personal attacks and threats directed at him and his family following his mother's Facebook post. Nick's anger was legitimately directed at the organization he believed was orchestrating or amplifying those attacks, not at Native Americans

4

as a racial group. This is confirmed by the undisputed fact that Nick made no racial statements, did not invoke Native identity, and did not act based on who the individuals were, but rather on whom Nick believed the individuals represented and the hostility he associated with them. That distinction is fatal to Plaintiffs' claims.

Taken together, the evidence falls well short of establishing that Retsel acted with intentional racial discrimination or that any legitimate, race-neutral explanation was mere pretext. Plaintiffs' claims rest on subjective perceptions, speculation, and vision through a lens predisposed to find discrimination—not competent proof that race motivated Retsel's conduct. Accordingly, Retsel is entitled to judgment as a matter of law on all Section 1981 claims against it.

### B.    Plaintiffs failed to establish agency or vicarious liability as to Connie.

Traditional agency principals apply to civil rights liability, including Section 1981 claims. *Meyer v. Holley*, 537 U.S. 280, 290–91 (2003). An agent may bind a principal through actual or apparent authority. *Trs. of Graphic Comm'ns Int'l Union Upper Midwest Loc. 1M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719, 727 (8th Cir. 2008). Corporate titles alone do not transform an officer into an agent. *Colosimo v. United States*, 707 F. Supp. 2d 926, 939 (S.D. Iowa 2010) (citing *United States v. Bisbee*, 245 F.3d 1001, 1007–08 (8th Cir. 2001)).

Here, Retsel cannot be held vicariously liable for Connie's conduct, as the record is bereft of evidence that Connie was its agent. There is no basis for apparent authority, as nothing in the record suggests that Retsel did anything to clothe Connie with authority to speak on its behalf.

Nor is there evidence of actual authority. Connie held a title, but no authority to act or speak on Retsel's behalf. Nick testified that Connie was named "president" as a family peacekeeping measure. Yet Connie had no ownership or financial stake in the company, and all Retsel staff understood that Connie could not unilaterally set policy or bind the company. Rather, any meaningful corporate action—including adoption of any company-wide policy—required a board vote. Plaintiffs presented no contrary evidence. In fact, Connie was expressly instructed to stay away from the hotel—conduct that negates any claim of ratification or condonation.

To be sure, Connie's offensive Facebook post had nothing to do with Retsel. Nick testified unequivocally that no one at Retsel had prior knowledge of the post, discussed it, approved it, or helped draft it. Connie did not disclose to Nick or his siblings that she intended to publish the post. Connie posted at 3 a.m. from Cabo on her personal Facebook account, underscoring that the post was a private—not corporate—communication. The Uhre family first learned of the post only after it was published online and immediately disavowed it. Plaintiffs presented no

6

evidence that any Retsel employee authorized the post in advance, ratified the post after-the-fact, or otherwise had any involvement whatsoever with the post.

In light of these undisputed facts, there is no basis for imputing to Retsel liability for Connie's personal Facebook post. Thus, Retsel is entitled to judgment as a matter of law on the Section 1981 claim premised on Connie's actions.

### C.    Plaintiffs failed to proffer any evidence supporting damages.

Compensatory damages "are intended to redress the concrete loss that plaintiff has suffered by reason of Defendant's wrongful conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). An award of emotional distress damages must be supported by competent evidence of a genuine injury, including proof of the nature and extent of the harm caused by the alleged violation. *Forshee v. Waterloo Indus., Inc.*, 78 F.3d 527, 531 (8th Cir. 1999). Although expert testimony is not strictly required, such evidence is critical to establishing whether the claimed emotional distress was actually caused by the alleged misconduct. *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1298 (8th Cir. 1997). Conclusory or generalized statements are insufficient, because they provide no basis to assess the severity, duration, or cause of the claimed injury. *Bailey v. Runyon*, 220 F.3d 879, 881 (8th Cir. 2000).

Here, Plaintiffs failed to present competent evidence of compensatory damages. The jury heard only narratives of anger, embarrassment, sadness, fear,

7

and frustration arising from being denied hotel rooms. None of the Plaintiffs presented medical records, psychological treatment, diagnoses, or any objective evidence of an injury.

For example, Bettelyoun testified that he voluntarily chose to quarantine for two weeks out of fear that he might have been exposed to COVID-19. But that decision reflects a precautionary response to a perceived health risk—not evidence of an injury caused by discrimination. No evidence was presented that Bettelyoun was actually infected, took a COVID-19 test, sought medical or psychological care, or suffered any lasting impairment tied to that decision.

The same evidentiary gap exists for the other Plaintiffs. Red Bear, Cottier, Jackson, and Bowman described feeling humiliated, triggered, scared, or angry. Yet they presented no evidence that they had undergone counseling or therapy, taken medication, been unable to work, or sustained any other concrete consequence of the alleged emotional distress. Plaintiffs' accounts repeatedly merged the hotel encounters with prior unrelated trauma and general lifetime experiences of discrimination, making causation impossible to prove. Such generalized and subjective reactions do not support an award of emotional distress damages.

NDN Collective likewise failed to prove any compensatory damages. NDN Collective did not identify any out-of-pocket loss, lost revenue, increased expenses, or other measurable injury flowing from the alleged conduct. Without

8

evidence of any concrete harm to the organization itself, NDN Collective cannot recover compensatory damages as a matter of law.

Because the evidence cannot sustain the jury's compensatory damages award, it follows that Retsel likewise cannot be liable for punitive damages.[1] *Krause v. Bobcat Co.*, 297 F. Supp. 2d 1212, 1219–20 (D.N.D. 2003) ("The request for punitive damages is not an independent claim."); *Sobeyde v. KLDiscovery*, No. 20-cv-02196 (SRN/TNL), 2021 WL 1111076, at *8 (D. Minn. Mar. 23, 2021) ("[W]hether a plaintiff can seek an award of punitive damages depends on whether a defendant violated [Section 1981]."). Therefore, the punitive damages award must also be vacated.

## III. Retsel is entitled to judgment as a matter of law on Plaintiffs' claim for assault, due to lack of evidence supporting vicarious liability.

Under South Dakota law, Retsel cannot be liable for Connie's alleged assault unless she was acting as its agent. *Kirlin v. Halverson*, 2008 S.D. 107, ¶ 24, 758 N.W.2d 436, 447. If Connie acted solely on her own, and no agency relationship enabled or facilitated her conduct, liability for the assault cannot be imputed to Retsel as a matter of law. *Id.*

---

[1] *See infra* Section IV of Retsel's Motion to Alter, Amend, or Remit the Judgment (explaining that there is no independent basis for punitive damages and that the punitive damages award must therefore be vacated).

9

The assault claim suffers from the same agency failure of proof that defeats the discrimination claims. On the day of the assault, Connie had no actual authority to act for Retsel. Nick and the board had told Connie not to go to the hotel. In fact, she was supposed to meet Nick elsewhere, and went to the property anyway without notice, permission, or corporate purpose. Connie also lacked apparent authority, because Retsel made no representation that she was authorized to confront protesters or speak for the company. Acting in defiance of instructions and outside any corporate role, Connie's rogue conduct cannot be imputed to Retsel. Thus, Retsel is entitled to judgment as a matter of law on the assault claim.

<u>**IN THE FIRST ALTERNATIVE:**</u>
<u>**MOTION TO ALTER, AMEND, OR REMIT THE JUDGMENT**</u>

## I.    Legal Standard

A motion to alter or amend a judgment, under Federal Rule of Civil Procedure 59(e), serves the purpose of "correcting manifest errors of law or fact or . . . present[ing] newly discovered evidence." *Innovative Home Health Care, Inc. v. P.T.O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir. 1998). Although the phrase "alter or amend" implies something less than "set aside," Rule 59(e) may be used to set aside the entire judgment. *Sanders v. Clemco Indus*, 862 F.2d 161, 169 (8th Cir. 1988). A Rule 59(e) motion should be granted when the movant demonstrates that the judgment was based on a "manifest error of law." *Yeransian v. B. Riley FBR, Inc.*, 984 F.3d 633, 636 (8th Cir. 2021).

10

## II.    The judgment should be amended to reflect that Plaintiffs have no standing to assert Section 1981 claims.[2]

Federal judicial power is confined to the resolution of cases and controversies. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). For there to be a case or controversy under Article III of the United States Constitution, plaintiff must have standing—in other words, a personal stake in the case. *Id.* Plaintiff must prove a personal stake in the case, by showing that the injury: (1) is concrete, particularized, and actual or imminent; (2) was likely caused by defendant; and (3) would likely be redressed by judicial relief. *Id.*

The party invoking federal jurisdiction bears the burden of showing that it has Article III standing for each claim raised and for each form of relief requested. *Id.* at 431. The elements of standing "are not mere pleading requirements[,] but rather an indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also TransUnion*, 594 U.S. at 431 (holding that "the specific facts set forth by the plaintiff to support standing must be supported adequately by the evidence adduced at trial") (internal quotation marks omitted).

Here, Red Bear, NDN Collective, Cottier, Jackson, and Bowman lack Article III standing because they did not suffer a concrete injury. The undisputed evidence shows that, had Retsel agreed to rent rooms to Red Bear or NDN

---

[2] Retsel incorporates by reference all prior briefing and arguments regarding Plaintiffs' lack of standing. (*See, e.g.*, ECF Nos. 152, 269, 282, 349.)

11

Collective and its members, they would not have personally rented or used the rooms. Plaintiffs went to the hotel for the sole purpose of testing whether Retsel would refuse to rent them rooms. Red Bear, NDN Collective, Cottier, Jackson, and Bowman had no desire to actually enter into a contract with Retsel.

It follows that Plaintiffs sustained no cognizable injury. *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 302 (7th Cir. 2000) (observing that the right Section 1981 protects is the right to make and enforce a contract); *see also Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1270–72 (D.C. Cir. 1994). At most, Plaintiffs were deprived of the opportunity to decline to stay at the hotel. As a matter of law, however, this is insufficient to confer Article III standing under Section 1981. Without a real intent to contract, Plaintiffs allege no injury—requiring vacatur of the judgment for lack of standing.

**III.    The judgment should be amended to reflect that, for purposes of their Section 1981 claims, Plaintiffs did not engage in a protected activity.**

   **A.    Bowman, Jackson, and Cottier did not try to contract with Retsel in their own right, but merely as NDN Collective's agents.**

The right to make a contract guaranteed by Section 1981 is the right "to give and receive contractual rights on one's own behalf." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 475 (2006) (emphasis omitted). To establish a Section 1981 claim, plaintiff must show he has, or would have, rights under an existing or proposed contract that he wished to make and enforce. *Id.* at 476. An agent who

executes a contract on behalf of her principal will not be a party to the contract and will have no rights under the contract. *Id.* at 475. As such, the agent has no cause of action under Section 1981, even if defendant refuses to deal with the agent based on the agent's race. *Id.*

In this case, the undisputed evidence shows that Bowman, Jackson, and Cottier were acting as NDN Collective's agents. Plaintiffs proffered no evidence that Bowman, Jackson, and Cottier were trying to negotiate with Retsel in their personal capacity and to rent rooms for themselves. Rather, Bowman, Jackson, and Cottier were acting exclusively on behalf of, and attempting to rent rooms for use by, NDN Collective. For this reason, Bowman, Jackson, and Cottier would not have been parties to any contract between NDN Collective and Retsel. This means that even if Retsel had refused to deal with NDN Collective, based on Bowman, Jackson, and Cottier's race, Plaintiffs still failed to establish that they engaged in a protected activity under Section 1981. Therefore, Bowman, Jackson, and Cottier lack standing to assert Section 1981 claims as a matter of law, and judgment must be entered in Retsel's favor.

### B.    Bettelyoun did not try to contract with Retsel in his own right.

Bettelyoun's Section 1981 claim fails for the same reason. The undisputed evidence shows that it was Bettelyoun's sister who tried to book a room during the June 2020 encounter, not Bettelyoun himself. It follows that, like the other

13

Plaintiffs, Bettelyoun would not have been a party to any contract with Retsel—rather, his sister would have been.

What is more, the undisputed evidence also shows that Bettelyoun would not have been a third-party beneficiary to any contract between his sister and Retsel. A purported third-party beneficiary "must clearly show that [the contract] was entered into with the intent on the part of the parties thereto that such third party should be benefited thereby." *Sisney v. Reisch*, 2008 S.D. 72, ¶ 9, 754 N.W.2d 813, 817–18; *see also Sisney v. State*, 2008 S.D. 71, ¶ 10, 754 N.W.2d 639, 643. Yet Plaintiffs offered no evidence demonstrating that Bettelyoun's sister and Retsel clearly intended for Bettelyoun to have the room after his sister paid for it. Therefore, Bettelyoun cannot establish that he had, or would have had, any contractual rights with Retsel, and his Section 1981 claim also fails as a matter of law.

### C. NDN Collective, Bowman, Jackson, and Cottier could not have formed a lawful contract with Retsel.

South Dakota imposes a mandatory statutory duty on lodging establishments, to maintain a truthful and accurate guest registry. SDCL § 34-18-21. The statute requires every hotel to collect accurate identifying information before renting a room, including: "the name of the guest, the number in the party, the place of permanent residence of the guest, the date of registration, the date of departure, the daily rate charged, and the motor vehicle license number of the

14

registrant." SDCL § 34-18-21. Violation of this statutory mandate exposes the hotel operator to criminal liability. SDCL § 34-18-32 (holding that violations constitute a Class 2 misdemeanor).

Here, it would have been impossible for Retsel to have complied with this statutory mandate. This is because NDN Collective, Bowman, Jackson, and Cottier conceded that they did not intend to occupy the rooms personally, could not identify the actual intended guests, and had no plan for the number of guests who would occupy the rooms or the duration of their supposed occupancy. Because Plaintiffs were not seeking rooms for themselves, Retsel lacked the basic information required by statute to complete a lawful rental transaction.

Under these circumstances, it would have also been impossible for any lawful contract to have been formed between Plaintiffs and Retsel. Indeed, any attempted contract would not only have exposed Retsel to criminal liability but also would have been void and unenforceable. Because a void contract cannot form the basis of a Section 1981 claim, Retsel cannot be held liable for such claims. *Resol. Tr. Corp. v. Home Sav. of Am.*, 946 F.2d 93, 96 (8th Cir. 1991) (holding that contracts in violation of federal regulations are unenforceable, because "one who participates in an illegal act cannot assert any right founded upon the illegal transaction").

15

**IV.    The judgment should be amended to vacate the punitive damages awards.**

In the context of Section 1981 claims, a punitive damages request involves two distinct inquiries: (1) whether the requisite mental state exists—malice or reckless indifference to federally protected rights; and (2) whether that mental state can be properly imputed to the employer under agency principles. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534–35, 544–45 (1999) (citing 42 U.S.C. § 1981a).

Punitive damages require more than intentional discrimination. Plaintiff must prove that defendant acted with knowledge that its conduct violated federal law or with conscious disregard of that risk. 42 U.S.C. § 1981a(b)(1); *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 843 (8th Cir. 1998). That standard is met only where a managerial employee acts with reckless disregard for federal law or a supervisor's conduct reflects actual malice. *Bryant v. Jeffrey Sand Co.*, 919 F.3d 520, 526 (8th Cir. 2019).

To impute the agent-managerial employee's mental state to the principal-employer, plaintiff must establish that: (1) the principal authorized the doing and the manner of the act; (2) the agent was unfit and the principal was reckless in employing him; (3) the agent was employed in a managerial capacity and was acting in the scope of his employment; or (4) the principal or a managerial agent ratified or approved the act. *Kolstad*, 527 U.S. at 542–43.

16

Here, the punitive damages award cannot stand because the record contains no legally sufficient evidence of the requisite mental state. Plaintiffs presented no evidence that Nick or any Retsel employee knew that his conduct violated federal civil rights law or consciously disregarded that risk. Instead, Plaintiffs asked the jury to infer malice or recklessness from the mere fact that they had contentious interactions with Retsel staff—an approach *Kolstad* forbids. Nor did the evidence demonstrate conduct so egregious or outrageous as to support punitive damages. The jury heard testimony about refusals to rent rooms, disputes over identification or deposits, and confrontations at the hotel. But these are isolated service interactions, not extreme misconduct demonstrating an evil motive or reckless indifference to civil rights.

Even if an individual staff member acted with the requisite mental state, Plaintiffs nevertheless failed to prove any basis for imputing liability for punitive damages to Retsel. This is because Plaintiffs did not present evidence that any Retsel staff member authorized, directed, or approved the alleged conduct, or recklessly employed or retained an unfit agent.

Not only that, Plaintiffs also failed to show that any individual staff member acted in a managerial capacity. Although Connie was labeled "president," the evidence demonstrates that she was president in name only and lacked authority to set or approve company policy. Likewise, although Nick managed day-to-day

17

operations, he could not unilaterally set corporate policy without board approval. And the undisputed evidence established that the board did not approve—and in fact *disapproved*—of both Nick's "no-locals" policy and Connie's racist Facebook posts made on her private account. Far from ratifying such conduct, the board affirmatively rejected it.

**V.      The judgment for Red Bear on punitive damages should be remitted.**

At a minimum, the punitive damages award to Sunny Red Bear is constitutionally excessive and must be remitted. The jury awarded Red Bear $1 in nominal compensatory damages but $8,000 in punitive damages—an *8,000-to-1* ratio that far exceeds due-process limits. The Supreme Court has made clear that "few awards exceeding a single-digit ratio between punitive and compensatory damages" will satisfy due process. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). Where, as here, the jury expressly found no actual compensable injury, punitive damages must be especially constrained. A nominal-damages verdict confirms the absence of concrete harm and leaves no constitutional justification for a punitive award untethered from actual injury.

Under *Campbell*, the outer constitutional limit for punitive damages in this circumstance is a 9:1 ratio. Applied here, that cap permits, at most, $9 in punitive damages on Red Bear's $1 nominal award. Nothing about Defendants' conduct— an isolated, nonviolent encounter involving no physical injury, no economic loss,

18

and no ongoing harm—justifies punishment beyond that limit. Accordingly, the

Court should remit Red Bear's punitive damages award to $9.

**<u>IN THE SECOND ALTERNATIVE:</u>**
**<u>MOTION FOR A NEW TRIAL</u>**

## I.    Legal Standard

A new trial is appropriate when the first trial resulted in a miscarriage of

justice, in that the verdict was against the weight of the evidence, damages were

excessive, and/or trial errors. FED. R. CIV. P. 59(a); *Gray v. Bicknell*, 86 F.3d 1472,

1480 (8th Cir. 1996). "In determining whether a verdict is against the weight of the

evidence, the trial court can rely on its own reading of the evidence—it can weigh

the evidence, disbelieve witnesses, and grant a new trial even where there is

substantial evidence to sustain the verdict." *Wilson v. Lamp*, 995 F.3d 628, 631 (8th

Cir. 2021). The trial court can likewise "reject evidence because it finds it lacking

in credibility or plausibility." *Harris v. Dep't of Army*, 119 F.3d 1313, 1320 (8th

Cir. 1997).

## II.    Retsel is entitled to a new trial on liability.

### A.    Retsel incorporates by reference all the arguments set forth in support of its renewed motion for judgment as a matter of law and motion to alter or amend the judgment.

Solely in the event that this Court denies Retsel's Rule 50(b) renewed

motion for judgment as a matter of law, Rule 59(e) motion to alter, amend, or remit

the judgment, and Rule 60(b) motion (ECF No. 349), Retsel requests a new trial on

19

liability. In support thereof, Retsel incorporates by reference all arguments set forth in the reference motions, *supra* at Renewed Motion for Judgment as a Matter of Law, Motion to Alter, Amend, or Remit the Judgment.

### B. The Court's evidentiary rulings, either individually or cumulatively, warrant a new trial on liability.

#### 1. The Court prejudicially erred in barring the video depicting Red Bear's admission that no discrimination had occurred.

This Court barred Retsel from introducing exculpatory evidence on grounds of untimely disclosure. Specifically, this Court barred a March 21, 2022 video depicting Red Bear, immediately after the confrontation at issue, stating on camera that Retsel did not refuse service on the basis of race, but because of a "no-locals" policy. (Ex. 207 at 11:09-11:40.) The person recording the video speaks on camera with Red Bear and confirms that the hotel was willing to rent to her—directly refuting Plaintiffs' racial discrimination claims. (Ex. 207 at 11:09-11:30.)

This Court abused its discretion in barring the video. The governing procedural rule does not impose an automatic bar on evidence disclosed after the discovery deadline. FED. R. CIV. P. 37(c)(1). Rather, Rule 37 provides that evidence is still admissible, where the untimely disclosure was substantially justified or harmless. *Id.* In evaluating the admission of untimely disclosed evidence, courts consider four factors: (1) the reason for the untimely disclosure; (2) surprise or prejudice to the opponent; (3) the impact of admission on trial efficiency; and

20

(4) the importance of the evidence. *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008).

Here, the Court excluded the exculpatory video without undertaking this analysis. Had it done so, the Court would have concluded that the evidence was admissible.

First, there was a justifiable excuse for the untimely disclosure. When counsel discovered the video, during his review of the file, he reasonably—albeit mistakenly—presumed that predecessor counsel had already disclosed it to Plaintiffs. Upon learning that was not the case, counsel immediately disclosed the video.

Second, admission of the video would not have surprised or unduly prejudiced Plaintiffs. Everyone knew the video existed. Red Bear was depicted on the video and plainly knew she was being recorded. Red Bear and the video's recorder, Mousseaux, testified as to who had recorded the video. Mousseaux is shown filming in the background of the admitted lobby footage, which evidence had been timely disclosed to Plaintiffs. (Ex. 204.) Given this, Plaintiffs cannot credibly claim they were unaware of the video before trial. *Myles v. RENT-A-Center, Inc.*, No. JKB-15-300, 2016 WL 3077399, at *6 (D. Md. June 1, 2016) (finding untimely video disclosure harmless when opponent had prior knowledge of the video through deposition testimony).

21

Third, admission of the video would not have slowed the trial in any meaningful way. The video could have been played contemporaneously with the lobby footage already admitted, and it would have required at most minimal additional testimony from Mousseaux and Red Bear to authenticate and contextualize it. Any incremental time would have been negligible.

Fourth, the video was central to Retsel's defense of the Section 1981 claims. The video constitutes exculpatory evidence, in that it reflects Red Bear's admission that no racial discrimination occurred. The video was the only contemporaneous, neutral account of what the participants themselves said and believed moments after the March 21, 2022 confrontation. By keeping that evidence from the jury, the Court deprived Retsel of its most powerful impeachment evidence. Had the jury heard and seen the video admission, Retsel surely would have prevailed.

In sum, exclusion of the video was an abuse of discretion under Rule 37(c)(1), and its exclusion substantially affected Retsel's ability to present its defense. Therefore, Retsel is entitled to a new trial on liability.

### 2.    The Court prejudicially erred in admitting political and conspiracy theory evidence attributable to the Uhre family.

The Court prejudicially erred by allowing Plaintiffs, over Retsel's repeated objections, to inject evidence of Nick's personal political opinions and conspiracy theories into the trial. *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006). Through Nick's testimony and multiple exhibits, the jury heard that he

22

believed: (1) the MacArthur Foundation secretly controlled prisoner releases and funneled information to NDN Collective; (2) NDN Collective was tied to criminal conspiracies; (3) public officials were corrupt; and (4) crime in Rapid City resulted from Native Americans being released pursuant to racial quotas. (Exs. 30, 53, 60, 62, 64, 74, 75, 80, 81). The jury also heard that Nick's mother shared these views. None of this evidence was relevant, however, to any element of any claim—rather, it served only to portray Nick and his family as lunatic extremists.

Plaintiffs deliberately collapsed the distinction between Nick's personal beliefs and Retsel's corporate intent. By repeatedly emphasizing that Nick was the hotel's manager and a member of its board, Plaintiffs invited the jury to impute his private opinions to the organization itself. That sleight of hand was improper. The result was to leave the jury with the false impression that Nick and the Uhres and Retsel were one and the same—substituting character assassination for proof of discriminatory conduct.

Plaintiffs' tactic paid off. Plaintiffs were permitted to substitute a narrative of fringe ideology for proof of discriminatory intent. Once the jury heard that Nick believed Native American activists secretly controlled law enforcement and that NDN Collective was tied to criminal activity, the case became a referendum on Nick's worldview, rather than the hotel's conduct. Because this evidence was

23

wholly irrelevant, overwhelmingly prejudicial, and included layers upon layers of hearsay, its harmful admission requires a new trial on liability.

### 3.    The Court prejudicially erred in admitting evidence of Nick's alleged "Rosebud" statements.

The Court committed additional error with the admission of Nick's alleged "Rosebud" statements. The Court allowed Bettelyoun to testify that, after being refused a room, Nick said that if Bettelyoun were "from Rosebud," Bettelyoun would "be a problem." That evidence should have been excluded, however, as irrelevant, unsupported by the video evidence, and unfairly prejudicial.

This is true for several reasons. Bettelyoun admitted that his recollection of what Nick had said was unreliable and had changed over time. Bettelyoun conceded that his memory of other key statements—including whether Nick used profanity—was wrong, even though Bettelyoun had made those same claims in a Facebook post just hours after the confrontation. (Ex. 120.) The video recordings, which captured the interaction from multiple angles, do not contain any "Rosebud" comment. (Exs. 201–203.) Allowing Bettelyoun to present that evidence anyway invited the jury to credit a disputed, uncorroborated, and stale recollection over the best available evidence—video recordings that do not lie and cannot be spun.

The resulting prejudice to Retsel is undeniable. In the context of this case, "Rosebud" is not a neutral geographic reference. It is loaded with racial meaning and was offered solely to wrongly imply that Retsel staff harbored racial animus

24

toward Native Americans—an inference that the objective evidence does not support. Because Plaintiffs repeatedly cast Nick as the face and decisionmaker of the hotel, the jury was invited to treat this alleged remark as proof of Retsel's institutional intent, magnifying its prejudicial effect. That error was highly prejudicial and requires a new trial on liability.

**4.      The Court prejudicially erred in admitting Sherwyn's testimony.**

The Court erred in admitting the testimony of Plaintiffs' hotel industry expert, Professor David Sherwyn. Sherwyn's opinions were not grounded in any reliable methodology and improperly invaded the jury's role. Over Retsel's repeated objections, Sherwyn told the jury that Retsel's "logical purpose" was "to greatly reduce the Native population in their hotel" and that Retsel's stated reasons were "pretextual." But these are not matters within Sherwyn's expertise: hotel management and industry practice. Rather, Sherwyn was impermissibly allowed to offer bare legal conclusions about intent, motive, and discrimination. FED. R. EVID. 702; *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) (holding that Rule 702 does not allow an expert to tell the jury what defendant meant, what defendant was trying to do, or whether defendant acted with discriminatory purpose).

Sherwyn's opinions also lacked the required "fit." Section 1981 requires proof of intentional discrimination in specific contracting decisions involving

25

specific plaintiffs. But that is not what Sherwyn did. Instead, Sherwyn relied on post-event guest data and generalized "industry standards" to suggest discriminatory intent. That kind of aggregate, disparate-impact-style analysis cannot explain why any particular Plaintiff was allegedly mistreated. *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389–90 (1982) (holding that Section 1981 can be violated only by purposeful discrimination, not policies that have a disparate impact). Therefore, such evidence could not possibly help the jury to decide the actual issues before it.

The error was compounded by Sherwyn's testimony regarding the "no locals" policy and the hotel's temporary closure. Sherwyn testified that those business decisions were discriminatory in purpose and effect. But Retsel offered unrebutted evidence that the policies were adopted in response to safety concerns, vandalism, and escalating confrontations. The error was compounded by Sherwyn's refusal to review Retsel's Rule 30(b)(6) deposition or to consider any evidence offered by Retsel or Nick, rendering his conclusions one-sided and untethered from the full evidentiary record. Whether those decisions were reasonable or justified was for the jury to decide.

The resulting prejudice was substantial. Plaintiffs portrayed Sherwyn as a leading national expert and used his opinions to legitimize their theory of intentional racial exclusion. In closing arguments, Plaintiffs' counsel emphasized

26

Sherwyn's opinions to argue that Retsel had deliberately tried to drive Native American patrons away. In a case where intent was the central issue, the erroneous admission of this expert's imprimatur entirely explains the verdict. Therefore, for this additional reason, Retsel is entitled to a new trial on liability.

###### 5.    The Court prejudicially erred in excluding evidence of Retsel's impending foreclosure.

The Court's exclusion of evidence that Retsel was facing an imminent foreclosure materially skewed the punitive damages trial. The jury was instructed to consider what amount of punitive damages was necessary, "considering the defendant's financial condition," to punish and deter. (ECF No. 427 at 27). Simultaneously, the jury was denied the most crucial fact about Retsel's finances—that its bank had already filed a foreclosure action seeking to take control of the hotel. Meanwhile, the jury heard only that Retsel had roughly $5 million in the bank and $20 million in insurance coverage, creating a profoundly misleading picture of Retsel's true financial position.

The prejudice was substantial. Jurors were never informed that Retsel was on the verge of losing the hotel. Those facts go directly to both punishment and deterrence. By excluding them, the Court deprived the jury of the context necessary to impose a fair and proportionate punitive award, thereby warranting a new trial on liability.

27

**6.      The Court prejudicially erred in excluding evidence concerning Hermus Bettelyoun that established no discriminatory intent.**

The Court prejudicially erred in excluding evidence that Hermus Bettelyoun ("Hermus") had previously smeared fecal matter on a hotel bed. Such evidence went directly to Nick's motive and state of mind. That incident demonstrated that Hermus responded to discipline by vandalizing hotel property in an extreme and hostile manner, which explained why Nick later viewed him as dangerous and reacted with heightened anger and caution. The evidence was not offered to show bad character, but to explain why Nick acted as he did when NDN Collective affiliates returned in March 2022. The Court forced Retsel to defend its actions without the very context that explained its manager's response, skewing the jury's assessment of Retsel's intent and unfairly prejudicing its defense. By keeping this evidence from the jury, the Court deprived jurors of the context necessary to evaluate intent and credibility, and that exclusion materially affected the verdict and warrants a new trial on liability.

**C.      The verdict form misstated the Section 1981 claims, warranting a new trial on liability.**

A defendant is entitled to a new trial when jury instructions or the verdict form mislead the jury or have a probable effect on the verdict. *Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494, 499 (8th Cir. 2010). Here, Questions 1 through 6 of the verdict form repeatedly asked whether each plaintiff

28

prevailed on a "claim of discrimination." (ECF No. 436 at 32–37.) That phrasing is fatally imprecise. Section 1981 does not prohibit discrimination writ large; it prohibits discrimination in the making and enforcement of contracts. 42 U.S.C. § 1981(b). By stripping the claim of its statutory core and recasting it as a free-floating discrimination inquiry, the verdict form permitted the jury to find liability without ever deciding whether Retsel impaired a plaintiff's contractual rights. In effect, the verdict form transformed Section 1981 from a contract statute into a general civility code, untethered from its text and limits. *See Gregory v. Dillard's, Inc.*, 565 F.3d 464, 475 (8th Cir. 2009) (claims alleging discriminatory surveillance and watchfulness, unconnected from interference with protected contract interest, cannot support a Section 1981 claim).

To be sure, the jury instructions accurately explained that Section 1981 protects the right to make and enforce contracts. But the verdict form never required the jury to apply the contractual requirement at the decisive moment. By reducing Section 1981 to a generic "claim of discrimination," the verdict form invited liability without a finding that any plaintiff was denied a contractual right.

That inconsistency between the instructions and the verdict constitutes plain error affecting Retsel's substantial rights. *Hall v. Ashley*, 607 F.2d 789, 791 (8th Cir. 1979) (reversing for new trial where inconsistent jury instructions and verdict forms prevented jury determination of intent). It misstated the nature of the claim

29

submitted to the jury, removed an essential statutory element from the liability determination, and lowered Plaintiffs' burden of proof. Because the verdict rests on a legally defective and confusing submission, a liability-only trial on the Section 1981 claims is required.

## CONCLUSION

For all the foregoing reasons, Retsel respectfully requests that this Court grant the following relief: (1) vacate the judgment entered against Retsel and enter judgment for Retsel and against Plaintiffs; (2) in the first alternative, alter or amend the judgment to vacate all findings of liability under Section 1981, or at least remit the punitive damages awarded to Red Bear; (3) in the second alternative, grant a new trial on all issues of liability vis-à-vis Retsel; and (4) grant such further and additional relief as this Court deems just.

Dated: January 16, 2026

*Haylee M. Culver*

Haylee M. Culver (SD Bar #4993)
Don Derrico (admitted *pro hac vice*)
GORDON REES SCULLY MANSUKHANI
283 West Front Street, Suite 003
Missoula, MT 59802
701-300-3449
hculver@grsm.com
dderrico@grsm.com

*Attorneys for Defendant Retsel Corporation*
