**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| NDN COLLECTIVE, SUNNY RED BEAR, NICK COTTIER, BRE JACKSON, MARY BOWMAN and GEORGE BETTELYOUN,<br><br>Plaintiffs,<br><br>v.<br><br>RETSEL CORPORATION, d/b/a GRAND GATEWAY HOTEL and d/b/a CHEERS SPORTS LOUNGE AND CASINO,<br><br>Defendant,<br><br>and<br><br>RETSEL CORPORATION, d/b/a GRAND GATEWAY HOTEL and d/b/a CHEERS SPORTS LOUNGE AND CASINO and NICHOLAS UHRE,<br><br>Counterclaimants,<br><br>v.<br><br>NDN Collective,<br><br>Counterclaim Defendant. | Case No. 5:22-cv-05027-KES<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO RETSEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW, ALTERNATIVE MOTION TO ALTER, AMEND, OR REMIT THE JUDGMENT, AND FURTHER ALTERNATIVE MOTION FOR A NEW TRIAL (Dkt. 449)** |

The Court should deny Retsel's Motion for Judgment as a Matter of Law, Alternative Motion to Alter, Amend, or Remit the Judgment, and Further Alternative Motion for a New Trial (the "Motion"), Dkts. 449 and 450. Retsel cannot clear the high bar applicable to the three parts of its Motion. At trial, the jury heard evidence of racial discrimination, intent, agency, and damages that supported the verdict. Retsel's repeated arguments about standing fail for the same reasons already addressed by Plaintiffs and this Court. Despite Retsel's lack of any citations to

the trial transcript, the Court did not make evidentiary errors warranting a new trial, nor did Retsel make a sufficient record of its objections or positions that warrant the relief it seeks.

## ARGUMENT

### I. Retsel's renewed motion for judgment as a matter of law should be denied.

#### A. Legal Standard.

The Eighth Circuit has observed that "judges must be extremely guarded in granting judgments as a matter of law after a jury verdict." *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003). "A jury verdict will not be set aside unless there is a complete absence of probative facts to support the verdict." *Walsh v. Nat'l Comput. Sys., Inc.,* 332 F.3d 1150, 1158 (8th Cir. 2003) (cleaned up).

In considering the motion, the Court views the record in the light most favorable to the prevailing party. *Wash Solutions, Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 892 (8th Cir. 2005). Here, the Court must "assume that all conflicts in the evidence were resolved in favor of [Plaintiffs]" and must "assume as proved all facts that [Plaintiffs'] evidence tended to prove[.]" *Kohler*, 335 F.3d at 772 (citation omitted). "[A] party may not advance new arguments in its Rule 50(b) motion that were not properly raised in its Rule 50(a) motion." *Miller v. Huron Regional Medical Center*, 936 F.3d 841, 847-48 (8th Cir. 2019).

#### B. Plaintiffs presented ample evidence of intentional racial discrimination and pretext.

To establish a claim under 42 U.S.C. § 1981, a plaintiff must prove: (1) membership in a protected class; (2) discriminatory intent on the part of the defendant; (3) engagement in a protected activity; and (4) interference with that activity by the defendant. *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 469 (8th Cir. 2009) (en banc), *cert. denied* 558 U.S. 1025 (2009). Retsel challenges the sufficiency of the evidence to prove discriminatory intent. (Dkt. 450 at 3-5.)

*1. George Bettelyoun.*

Retsel cannot argue now that it is entitled to judgment as a matter of law on George Bettelyoun's § 1981 claim because Retsel never made that argument in its Rule 50(a) motion during trial. (*See* Trial Transcript ("Tr.") 848:19-850:21.) Retsel's motion at trial addressed Connie Uhre's posts and email in March 2022 and whether those constituted a board policy. That argument had no bearing on Bettelyoun's incident in June 2020. Because Retsel's Rule 50(a) motion at trial did not challenge the evidence of discriminatory intent as to George Bettelyoun's claim, Retsel may not raise that issue post-trial.

Separately, ample evidence exists that Nick Uhre acted with discriminatory intent when he excluded Bettelyoun from the hotel. The jury saw video of almost the entire encounter between Bettelyoun and Nick Uhre. (Exs. 134, 135, and 139.) The jury was able to evaluate Nick Uhre's behavior both in the video and on the witness stand, which supports an inference of discrimination based on how Nick Uhre treated Bettelyoun. In addition, the videos directly contradicted Nick Uhre's own description of the event (*see, e.g.*, Tr. 42:7-43:7 (claiming that he had behaved appropriately and Bettelyoun was condescending)), leaving the jury free to reject Nick Uhre's testimony.

Nick Uhre admitted that he was immediately suspicious of Bettelyoun because he was "giggling." (Tr. 40:20-42:6.) Identifying Bettelyoun as a "problem" customer before Bettelyoun did anything supports an inference of racial discrimination. Nick Uhre testified that he never knew Bettelyoun was Native American. (Tr. 259:3-8.) But Bettelyoun looked and presented as Native American in the video and in court, again leaving the jury free to disregard Nick Uhre's testimony. Both Bettelyoun and Nick Uhre testified that Nick Uhre made a comment referencing "Rosebud," (Tr. 351:14-24 (Bettelyoun) and 321:21-25 (Uhre), Ex. 120 (contemporaneously

posting that Nick Uhre made a comment about Rosebud)), further undermining Nick Uhre's credibility and reinforcing the conclusion that race featured in Bettelyoun's exclusion from the hotel. Finally, the jury heard testimony that the videos of the incident provided by Nick Uhre to the police did not contain approximately 21 seconds of the interaction. (Tr. 350:24-351:24.) From this, the jury could conclude, for example, that Nick Uhre made the "Rosebud" comment during the missing portion of the video, as Bettelyoun testified. (*Id.*)

Other evidence confirms Nick Uhre's discriminatory intent. On June 5, 2020, following the George Bettelyoun incident, Nick Uhre texted the other Retsel shareholders, "Another native kick him out[.]" (Ex. 81.) On June 7, 2020, he wrote "I guess if you're native you're entitled to treat people [] like shit." (Ex. 78.) On June 13, 2020, Nick Uhre discussed the George Bettelyoun incident with a third party by text message. The third party asked Nick Uhre, "Have [you] ever talk to Connie about it? What is her plan?" Nick Uhre responded "She loves it, good maybe the natives will stay away." (Ex. 80.) Sufficient evidence of discriminatory intent supports the jury's verdict.

2. *Sunny Red Bear.*

Retsel's sole argument that Red Bear failed to prove discriminatory intent is that Retsel had a "no locals" policy that justified excluding Red Bear from the hotel. (Dkt. 450 at 4.) The jury was free to reject Retsel's pretextual justification for its discrimination, and the jury's decision was supported by sufficient evidence.

Connie Uhre emailed the hospitality industry in Rapid City to make clear that she, the President of Retsel, did not want Native Americans at the hotel. (Ex. 53.) Then Nick Uhre doubled down on Connie Uhre's email, asking other hotels to send all "problem guests" to certain properties—a thinly veiled reference to the Native Americans mentioned in Connie

Uhre's original email. (*Id.*) Neither Nick Uhre nor Josh Uhre, who both responded to Connie's email, personally or on behalf of Retsel disavowed her comments. (*Id.*) Connie Uhre also posted similar sentiments twice on social media. (Exs. 43, 91.) When a Retsel employee explained that the hotel could not discriminate openly against Native Americans, she suggested using a "no locals" policy to accomplish the same purpose. (Ex. 12.) Retsel's records show that its "no locals" policy was routinely disregarded even when it was in place. (Tr. 669:7-8, 11-22; 675:5-11.) The "no locals" policy was never written down or defined, and Plaintiffs' expert David Sherwyn explained why that failure makes discrimination inevitable. (Tr. 667:13-14, 669:11-22; Ex. 133 starting at 0:10 (employee indicating that the policy is not written down).) The proffered justification for the "no locals" policy—to prevent partying and property damage—did not apply to Red Bear, who was not there to party. (*See* Tr. 426:25-427:8.) Retsel's "no locals" policy was in place for just twelve hours, during which time Retsel also considered "jacking up" the hotel's rates and shutting down the hotel. (Tr. 146:22-147:2, 192:2-194:10.) It was fair for the jury to conclude that all of these actions were designed to keep out one specific population—local Native Americans—because Retsel was afraid of them. Finally, contrary to Nick Uhre's testimony, Retsel's board never implemented <u>any</u> policy on March 21, undermining Retsel's defense that it could only act through its board of directors. (*See* Ex. 64 (showing that no board meeting had occurred as of March 22 when several board members asked for a meeting to occur).) In short, the jury had ample evidence from which it could determine that Retsel's exclusion of Red Bear was based on her race and that the "no locals" justification was pretext for racial discrimination.

3. *March 22 Plaintiffs.*

Similarly, Retsel's only argument that the March 22 Plaintiffs (NDN Collective, Jackson, Bowman, and Cottier) did not establish discriminatory intent is that Nick Uhre was responding to perceived threats from NDN Collective. (Dkt. 450 at 4-5.) The jury was free to reject this pretextual justification.

First, Nick Uhre repeatedly claimed that he and his family were threatened but never showed the jury direct evidence of threats. To the contrary, the police determined that none of the conduct Nick Uhre reported constituted a threat. (Ex. 31 at 3-4.) The jury could reject Nick Uhre's testimony on that basis. The jury could also reject Retsel's explanation based on the evidence discussed with respect to Red Bear's claim.

Additional evidence also shows discrimination on March 22 and undercuts Retsel's pretext. Although the hotel was purportedly shut down, Nick Uhre let a golf acquaintance stay at the hotel. (Ex. 69.) And even if the jury accepted Nick Uhre's explanation that he thought Hermus Bettelyoun threatened him, Nick Uhre excluded some Native Americans—NDN Collective, Cottier, Bowman, and Jackson—from the hotel based on the actions of a different Native American, Hermus Bettelyoun, who was not present. (Ex. 137 starting at 0:40 (showing Nick Uhre demand "Bettelyoun out!" and Ms. Eagle telling him "[Bettelyoun]'s not here").) Retsel's own employees believed that Nick Uhre's actions were discriminatory. (*Id.* at 2:04 (Clarity Self saying "so now we look even more racist by saying 'because you're NDN Collective you can't rent'").) And Nick Uhre repeatedly told the jury that he disliked NDN Collective before Hermus Bettelyoun's post (*E.g.*, Tr. 67:7-8, 13-21, 68:6-21), which could support a conclusion that Nick Uhre's treatment of the March 22 Plaintiffs had nothing to do

with Hermus Bettelyoun and was instead motivated by Nick Uhre's animus toward NDN Collective and Native Americans.

#### 4. *Other evidence of racial discrimination.*

In addition to the evidence cited above, other evidence supports the jury's conclusion that Retsel was motivated by racial animus:

- In an email to hotel staff in September 2021, Retsel President Connie Uhre wrote, "We are going to talk more, we are afraid we are going to get trash people . . . by renting out the pool side . . . letting shit in through the sliding glass doors and it is not worth it. **When staff can see an old couple, non native, these would be OK because even the old natives rent rooms for delinquent relatives**." (Ex. 3 (emphasis added).)[1]
- On October 8, 2020, Connie Uhre wrote that the hotel was struggling because there were purportedly "just drunk Indians to hire . . . ." (Ex. 77.)
- On February 9, 2022, Connie Uhre wrote an email complaining about "Passed out Drunks, Circles of Natives, with knives, even on our golf courses." (Ex. 5.)
- Connie Uhre expressed similar sentiments in her purported apology letter on March 22, 2022. (Ex. 11.) While titled an apology, the racially-charged letter contained further evidence of racial animus and discriminatory intent.
- In a July 14, 2021 Facebook post, Nick Uhre attacked Nick Tilsen's Native American heritage in graphic terms. (Ex. 60.)
- In a December 15, 2021 Facebook post, Nick Uhre claimed, without support, that "[NDN] collective runs cover for the Sinaloa cartel to ship meth into the reservation. My opinion" (Ex. 62.)
- On April 27, 2022, Connie Uhre reiterated that "I can not tell the Good Natives from the Bad[.]" (Ex. 8.)
- On May 28, 2022, Connie Uhre sent an email to a third party containing over a dozen racial epithets decrying alleged behavior of "Bad Natives." She suggests that 65% of Native Americans are "Bad Natives." (Ex. 35.)
- Retsel's hotel policies charged an extra 15% incidental charge for tribal bookings that were not charged to non-tribal group bookings. (Ex. 33.)

---

[1] The fact that Connie Uhre was issuing instructions to staff on hotel operations in September 2021 also undercuts Retsel's agency argument.

In addition, the jury heard Nick Uhre repeatedly testify in ways that explicitly and implicitly indicated a bias against Native Americans. (*See, e.g.*, Tr. 144:20-146:18.) So too with statements by Connie Uhre (Dkt. 355-1 (Connie Uhre Depo. Tr.) 71:10-13 ("Now, that policeman was stocky and almost looked Mexican, dark complected. He was not Native, but he looked Hawaiian or one of those colors. Not White, like me."); Dkt. 372 (no objection by Retsel to this testimony); Tr. 330:6 (testimony read into the record)) and other Retsel board members. (Ex. 126 (Chad Uhre stating "What makes the [sic] choose to identify as Native? . . . I would venture to guess it's the benefits. Like this 'Free' money. . . . My kids are less than 1/32 Native. It doesn't make sense for them to be able to qualify for the 'benefits'. If they don't 'suffer' from the 'suppressions associated' if that is even real?"); Tr. 428:5-18 (Josh Uhre shouting "Natives killing Natives" at protesters).) The jury could reasonably conclude that Retsel was motivated by racial animus and its justifications were pretext.

The jury was able to resolve the conflicts in testimony and determine the credibility of each witness. The jury believed Plaintiffs and did not believe Retsel. That is a sufficient basis for the jury's verdict. *See Hampton v. Dillard Dept. Stores, Inc.*, 247 F.3d 1091, 1107 (10th Cir. 2001) (observing that intent is often not subject to direct proof and that a jury may weigh conflicting testimony to determine a discriminatory motive).

### C. Plaintiffs established that Retsel is liable for the discriminatory acts of its officers and employees.

Retsel next argues that it cannot be liable for Connie Uhre's discriminatory social media posts. (Dkt. 450 at 5-7.) That argument fails at the outset because these posts are not the sole basis for Retsel's liability under § 1981; rather, they are evidence of discriminatory intent, an element of Plaintiffs' claim. And Connie Uhre's social media posts are not the only evidence of discrimination, as detailed above. In other words, even if the jury gave no weight to Connie

Uhre's posts, it still had ample evidence, including documents, testimony, and inferences, to find that Retsel acted with discriminatory intent.

Setting that aside, sufficient evidence linked Connie Uhre's social media posts and other discriminatory actions to Retsel. Connie Uhre was the president of Retsel and a board member. (Ex. 131.)[2] In addition to her two social media posts, she sent a variety of written communications, including an industry-wide email that Nick Uhre doubled down on (Ex. 53) and an email instructing hotel staff not to allow Native Americans to check into certain rooms in the hotel (Ex. 3.) She received and reviewed records and emailed instructions to staff. (Dkt. 355-1 (Connie Uhre Depo. Tr.) 12:20-23, 13:3-7; Dkt. 372 (no objection by Retsel to this testimony); Tr. 330:6 (testimony read into the record).) She created a to-do list for the front desk on November 30, 2021. (Ex. 6.) She had no independent or personal interest, other than her role as an officer and director of Retsel, that would have explained her conduct at issue.

There is no requirement that a company officially adopt a written policy by a board vote for discrimination to occur. A business is liable for discrimination if an employee discriminates even in the absence of any official corporate policy authorizing discrimination. *See, e.g.*, *Sherman v. Kasotakis*, 314 F. Supp. 2d. 843, 849-50 (N.D. Iowa 2004) (discussing facts of four customers who were excluded from a restaurant by a waiter, with no evidence of a corporate policy of discrimination); *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 258-59 (4th Cir. 2001) (reversing summary judgment in favor of a hotel because plaintiffs had made a prima facie case of discrimination based on the actions of the hotel clerk, with no mention of a formal

[2] Retsel's citation (Dkt. 450 at 5) to *Colosimo v. United States*, 707 F. Supp. 2d 926, 939 (S.D. Iowa 2010), is misplaced. That case dealt with whether a corporate officer was a "responsible person" under 26 U.S.C. § 6672, a failure to collect and pay tax. Here, Connie Uhre's status as a corporate officer and director is evidence the jury could consider in applying the Court's agency instruction. (Dkt. 427 at 12.)

corporate policy of discrimination or clerk's managerial authority). Retsel's claim that it could only act via an official board action is also disproved by the fact that Nick Uhre repeatedly changed hotel policy on March 21 and 22, 2022, without an official board vote. (*See* Ex. 64 (indicating that no board member had yet occurred by late morning on March 22).) As discussed above, there was sufficient evidence for the jury to conclude that purportedly race-neutral "policies" the hotel adopted were pretext for discrimination. The jury had sufficient evidence to reject Retsel's defense that the hotel was not responsible for Connie Uhre's conduct.

**D. Plaintiffs offered sufficient evidence of damages.**

In *Block v. R.H. Macy & Co., Inc.*, the Eighth Circuit addressed a damages award for a § 1981 claim and stated:

> Because of the difficulty of evaluating the emotional injuries which result from deprivations of civil rights, courts do not demand precise proof to support a reasonable award of damages for such injuries. *Williams,* 660 F.2d at 1272 (damages for emotional harm presumed from infringement of substantive constitutional right); *Smith,* 536 F.2d at 236 (humiliation or mental distress established by plaintiff's own testimony); *Seaton v. Sky Realty Co.,* 491 F.2d 634, 636 (7th Cir.1974) (humiliation inferred from the circumstances).

712 F.2d 1241, 1245 (8th Cir. 1983). Here, the jury awarded the Plaintiffs between $1 and $25,000 in compensatory damages for the discrimination and loss of civil rights they suffered. Each Plaintiff testified about the impact Retsel's discrimination had. (Tr. 349:11-16, 355:3-7, 358:13-19 (Bettelyoun), Tr. 427:9-428:4 (Red Bear), Tr. 516:6-13, 518:16-519:25 (Eagle on behalf of NDN Collective), Tr. 573:9-12, 574:2-14 (Jackson), Tr. 546:18-25, 547:16-548:4 (Bowman), 622:6-623:14 (Cottier).) This is consistent with the evidentiary showing in *Block* and other discrimination cases. *See, e.g.*, *Hampton*, *Inc.*, 247 F.3d at 1115 (upholding a compensatory damages award of $56,000 even though the loss of the value of the perfume sample was negligible); *Giron v. City of Alexander*, 693 F. Supp. 2d 904, 953-57 (E.D. Ark. 2010) (discussing damages).

Retsel's general citation to *Forshee v. Waterloo*, 178 F.3d 527, 531 (8th Cir. 1999), does not strengthen its argument. That decision found there was insufficient evidence of emotional distress based on the plaintiff's loss of employment. But it did not require that all emotional distress damages must be supported by medical evidence. *Forshee* cited *Hall v. Gus Const. Co., Inc.*, 842 F.2d 1010 (8th Cir. 1988). In *Hall*, three plaintiffs were awarded emotional distress damages between $15,000 and $20,000 for the humiliation of sexual harassment without the need for medical diagnoses. 842 F.2d at 1017. No independent medical evidence or other concrete documentation was required of Plaintiffs here, particularly where no Plaintiff claimed a unique diagnosis caused by this case. Retsel has not proffered any alternative theory of causation for the discrimination damages—Retsel's own discrimination is the only possible cause.

Finally, punitive damages can be awarded even where compensatory damages are relatively minor. (*See* Section II(G), *infra*.) Damages are not an element of a claim under § 1981. A plaintiff who establishes discrimination under § 1981 can recover nominal damages in the absence of other damages. *Hicks v. Brown Grp., Inc.*, 902 F.2d 630, 652 (8th Cir. 1990), *judgment vacated on other grounds*, 499 U.S. 914 (1991) ("Section 1981 [] grants an absolute right to be free of discrimination in the making and enforcement of contracts, the violation of which entitles the victim to nominal damages irrespective of actual injury."); *Sherman v. Kasotakis*, 314 F. Supp. 2d 843, 848 (N.D. Iowa 2004) (confirming jury's award of nominal and punitive damages where the jury found no emotional distress damages).

**E. Retsel is vicariously liable for Connie Uhre's assault of Sunny Red Bear.**

The Court instructed the jury on agency. (Dkt 427 at 16-17.) Retsel did not object to that instruction. (Tr. 864:18-22.) "Jurors are presumed to follow the court's instructions." *Farrington v. Smith*, 707 F.3d 963, 972 (8th Cir. 2013) (quotations and citation omitted).

The evidence supported the jury's finding on agency. Connie Uhre was the president and a director of Retsel. (Ex. 131.) She was physically in the parking lot of the hotel when the assault occurred. (Ex. 132 5:10-6:15.) She stated that she was trying to protect the hotel's van. (Dkt. 355-2 (Connie Uhre Crim. Trial Tr.) 225:5-9, 225:20-226:5, 11-13, 228:9-10; Dkt. 372 (Retsel's objection to Connie's criminal trial testimony); Dkt. 290 (overruling Retsel's objections); Trial Tr. 334:7-9 (where Plaintiffs' designated portions of Connie's criminal transcript were read into the record).) The video showed her deliberately trying to interfere with people protesting the hotel. (Ex. 132 5:10-6:15.) After she was arrested, she was taken back into the hotel to meet with police in a back office. (Dkt. 355-2 237:8-16.) Even after Connie Uhre's discriminatory email and social media post, Retsel's board retained her in her position as president and director. (*See* Tr. 753:22-24.) All of those facts indicate that she was acting on behalf of Retsel, not in her own personal interest.

## II. Retsel's motion to alter, amend, or remit the judgment should be denied.

### A. Legal Standard.

Retsel's motion to alter or amend the judgment is based on Rule 59(e). (Dkt. 450 at 10.) "Rule 59(e) motions serve the limited function of correcting manifest errors of law or fact or to present newly discovered evidence." *Lowry ex rel. Crow v. Watson Chapel School Dist.,* 540 F.3d 752, 761 (8th Cir. 2008) (internal quotation omitted). "A district court has broad discretion in determining whether to grant or deny a motion to alter or amend judgment pursuant to Rule 59(e)." *Id.*

### B. Plaintiffs have standing to assert claims under § 1981 because they were not just testers.

Retsel argues that Plaintiffs did not suffer any concrete injury because they "went to the hotel for the sole purpose of testing" and had no desire to rent rooms. (Dkt. 450 at 11-12.) Retsel

does not identify any manifest error of law or newly discovered evidence that would support a motion under Rule 59(e).[3]

Each plaintiff was physically present at the hotel. (Tr. 346:3-4 (Bettelyoun), Tr. 420:9-18 (Red Bear), Tr. 514:13-21 (Eagle on behalf of NDN Collective), Tr. 544:2-6 (Bowman), 572:5-8 (Jackson), 617:19-21 (Cottier).) Each attempted to present, or would have presented, identification and paid for a room. (Tr. 346:5-9, 380:22-25 (Bettelyoun), 424:4-5 (Red Bear), 514:20-515:2, 519:8-14 (Eagle on behalf of NDN Collective), 544:16-18 (Bowman), 571:5-8 (Jackson), 619:10-13 (Cottier).) Each was kicked out of the hotel before the transaction could be completed. (Exs. 134 & 135 (Bettelyoun), Tr. 424:4-7 & Exs. 133 & 138 (Red Bear), Tr. 519:8-14 & Exs. 136-137 (Eagle on behalf of NDN Collective, Bowman, Jackson, and Cottier).) Those facts are sufficient to confer standing. *See, e.g.*, *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 471 (8th Cir. 2009) (en banc) (holding that a plaintiff must show a "tangible attempt to contract" to establish a § 1981 claim); *Shumate v. Twin Tier Hosp., LLC*, 655 F. Supp. 2d 521, 533-34 (M.D. Penn. 2009) (collecting cases). Even if Plaintiffs wanted to see if Retsel would rent a room to them, that fact does not defeat standing. *See Laufer v. Looper*, 22 F.4th 871, 883 (10th Cir. 2022) (citing *Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 273 (5th Cir. 2022) (being a testing neither confers nor defeats standing). The Court instructed the jury that Plaintiffs could not recover if they were solely testers. (Dkt. 427 at 14.) By finding in favor of Plaintiffs, the jury concluded that Plaintiffs were not solely testers. Plaintiffs have standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021) (explaining when a hypothetical plaintiff has standing to sue for violations of federal environmental law).

---

[3] Retsel may not refer generally to four different pretrial briefs in lieu of showing specific manifest errors of law. *See* Dkt. 450 at 11 n.2 (purportedly incorporating four prior briefs with no specific allegations of error).

### C. Bowman, Jackson, and Cottier have standing separate and apart from NDN Collective.

Retsel next alleges that Bowman, Jackson, and Cottier were acting as NDN Collective's agents and therefore did not have any individual rights under a putative contract with the hotel. (Dkt. 450 at 12-13.) Again, Retsel does not identify any portion of a prior order, the jury instructions, or the verdict that contains a manifest error of law. Instead, Retsel repeats its previously-rejected legal argument.

A plaintiff need not personally pay for or rent a hotel room to establish a claim under § 1981. *Shumate v. Twin Tier Hosp., LLC*, 655 F. Supp. 2d 521, 533-34 (M.D. Penn. 2009) (collecting cases). Each Plaintiff made a "tangible attempt to contract" with Retsel and were "thwarted" from doing so. *See Morris v. Dillard Dept. Stores, Inc.*, 277 F.3d 743, 751 (5th Cir. 2001). That is sufficient to show a protected activity under § 1981.

Retsel's citation to *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 475 (2006) continues to miss the mark. The issue in *McDonald* was "whether a plaintiff who lacks any rights under an existing contractual relationship with the defendant, <u>and who has not been prevented from entering into such a contractual relationship</u>, may bring suit under . . . 42 U.S.C. § 1981." *Id.* at 472 (emphasis added). The plaintiff in *McDonald* never asserted that he had or attempted to form a contractual relationship with the defendant. *Id.* at 476. Here, as discussed in the previous section, each Plaintiff was personally present in the hotel and testified that he or she did, or would have, presented identification and form of payment to rent a room, had the transaction not been terminated by Retsel. Each Plaintiff would have enjoyed the rights and benefits of a contract with the hotel but for Retsel's racial discrimination.

### D. Bettelyoun had standing under § 1981.

Retsel again argues that Bettelyoun did not try to rent a room. (Dkt. 450 at 13-14.) That is contrary to the evidence. Bettelyoun attempted to present his identification. (Ex. 134 at 2:06; Tr. 380:22-25.) He intended to stay in the hotel room. (Tr. 346:5-9; Ex. 134; Ex. 120.) While his sister would pay for the hotel with her debit card, he intended to pay her back. (Tr. 346:5-9.) As an actual guest of the hotel, Bettelyoun would have had rights under a contract with the hotel, which is protected under § 1981. *Shumate*, 655 F. Supp. 2d at 533-34 (collecting cases). Even if that were not the case, Bettelyoun would have standing as a third-party beneficiary. *See, e.g., Prieto Automotive, Inc. v. Volvo Car USA, LLC*, No. 1:21-cv-01085-KES-EPG, 2024 WL 3011170, at *5 (E.D. Cal. June 14, 2024) (finding that contract signatories had rights under a contract for purposes of a § 1981 claim and their business was an intended third-party beneficiary of the contract); *Kass Hout v. Community Care Network Inc.*, Case No. 2:20-CV-441-JPK, 2022 WL 4016971, at *4-10 (N.D. Ind. Sept. 2, 2022) (finding that a surgeon was a third-party beneficiary of a contract between a medical center and community hospital for purposes of a § 1981 claim). Retsel may not hide behind the absence of express contract terms where Retsel itself prevented the formation of a contract.

### E. South Dakota's guest registry statute does not invalidate Red Bear's and the March 22 Plaintiffs' claims.

Retsel next repeats its argument that it would have been impossible for the hotel to rent rooms to the Red Bear and the March 22 Plaintiffs because other people may have stayed in the hotel rooms and hotels are required to collect certain identification information from guests.

(Dkt. 450 at 15-16.) Retsel did not raise the cited statute as a defense in its pleadings.[4] (*See* Dkt. 128 at 16-17.) It cannot raise this defense now and cannot show manifest error based on it.

Retsel's argument is also wrong. The cited statute imposes requirements on hotel owners, not on guests. *See* SDCL § 34-18-21. The statute does not require the identification of every person in a room, just the "guest" and the "number of people in the party," so if multiple people stay in the room, only one needs to provide identification. In addition, there is no evidence that any Plaintiff would have lied or concealed the identity of who was staying in the room if Retsel requested additional identification. Retsel could have sought to develop that testimony, but it did not. Retsel's suggestion that the contract would have been impossible is based only on speculation. And Retsel points to no court that has done what Retsel asks this Court to do—find that a plaintiff cannot bring a civil rights claim related to discrimination based on the hypothetical application of a contract defense.

Furthermore, Red Bear had rented rooms at the Grand Gateway on prior occasions that she then allowed unhoused relatives to stay in. (Tr. 420:21-421:16.) And Retsel's own guest logs show that it routinely rented rooms to guests without collecting their identification. (*See* Exs. 84, 85, 86, 87 (showing guest entries throughout without an address—information collected from guests' identifications).) In fact, the first page of Exhibit 87 alone shows ten guests without identification information recorded. It is not "impossible" for Retsel to do precisely what it had done routinely in the past.

[4] Impossibility, impracticality, or frustration of purpose are defenses to a breach of contract claim. *See Groseth Int'l, Inc. v. Tenneco, Inc.*, 410 N.W.2d 159, 165-68 (S.D.1987) (citing Restatement (Second) of Contracts § 265 (1981)). Retsel would not be able to establish these defenses because no contract was formed due to Retsel's discrimination.

In addition, the core of Retsel's argument is that a plaintiff must have intended to personally use or consume the good or service that they attempted to purchase. That is not a requirement under § 1981.

Finally, Retsel never claimed at trial that it did not permit Plaintiffs to rent rooms because of identification issues or a guest registration statute. Retsel relied instead on other pretextual justifications for excluding each Plaintiff. Again, Retsel could have solicited testimony from its witnesses on this defense but did not. This defense is an excuse manufactured after the fact.

**F. The jury's punitive damages award was supported by sufficient evidence of malice.**

Retsel argues that a punitive damages award is improper because (1) there is no evidence that any Retsel employee acted with the requisite mental state, and (2) there is no basis to impute the actions of Nick Uhre and Connie Uhre to Retsel. (Dkt. 450 at 16-18.) Again, Retsel points to no specific manifest error that would support its motion.

The Court instructed the jury on the requirement to impose punitive damages. (Dkt. 427 at 26-27.) Retsel did not object to this instruction. (Tr. 869:16-24.)

Evidence supports the jury's imposition of punitive damages. Evidence—detailed above—supported the jury's conclusion that Retsel engaged in intentional discrimination based on race.[5] (*See* Section I(B), *supra*.) Retsel acknowledged throughout trial that racial discrimination is wrong (Tr. 188:7-8, 290:19; Dkt. 380-1 (Connie's Depo. Tr.) 30:14-31:10, 32:4-6, 84:12-14); Dkt. 392 (Plaintiffs lodging no objection to the designated testimony)), meaning that if the jury concluded that Retsel did, in fact, discriminate, that Retsel did so in knowing violation of Plaintiffs' civil rights. Retsel did not provide any testimony that it removed

[5] Retsel cites to 42 U.S.C. § 1981a(b)(1) to limit punitive damages. (Dkt. 450 at 16.) That statute is specific to intentional discrimination in employment. The applicable statute here—42 U.S.C. § 1981—contains no such limitation.

or disciplined any board member, including Connie or Nick Uhre, after the discrimination occurred. In fact, Connie Uhre remained as president until November 2023 (Tr. 748:22-24), and Nick remains a shareholder (Tr. 40:3-5). The jury could also consider Nick Uhre, Chad Uhre, Connie Uhre (by deposition), and Retsel's credibility and demeanor when testifying and lack of remorse in determining an appropriate punishment.

Retsel's argument about managerial mental states (Dkt. 450 at 16-18) also does not apply here because this is not an employment discrimination case. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999), *Bryant v. Jeffrey Sand Co.*, 919 F.3d 520 (8th Cir. 2019), and *Howard v. Burns Bros, Inc.*, 149 F.3d 835 (8th Cir. 1998) are all employment discrimination cases. There is no reason in an accommodations case to require that the discrimination be committed by a manager—unlike an employment case, in a public accommodation case the plaintiff may only interact once with a single employee of the defendant. *See Sherman*, 314 F. Supp. 2d at 860-63 (rejecting the application of *Kolstad* outside the employment context). Retsel provides no authority to support its position in an accommodations case.

Even if this rule applied here, Plaintiffs easily meet that standard. Nick Uhre was employed in a managerial capacity and acting within the scope of his employment. (*See* Tr. 39:24-40:2 (testifying that Nick Uhre was "de facto general manager" during the 2020 to 2022 timeframe).) Even if Retsel had requested this type of instruction from the Court—which it did not—the evidence here supports the jury's imposition of punitive damages against Retsel.

Retsel's only other argument—offered without any legal authority—is that Retsel's board never formally adopted a policy of discrimination so the company itself must not have approved of discrimination. That is not a requirement for a violation of § 1981 or for punitive damages. Such a holding would effectively eliminate any punitive damages; as Sherwyn testified, no

company since the end of the Jim Crow era has explicitly adopted a formal policy of discrimination. (Tr. 664:12-665:4.) Nick Uhre, acting as the manager of the hotel, excluded Plaintiffs. The jury determined that the Plaintiffs were excluded on the basis of intentional racial discrimination. Nick Uhre's acts were the acts of the hotel and there is no requirement that the board formally adopt those actions via a written policy.

### G. Red Bear's punitive damages award comports with due process.

Retsel argues that Red Bear's punitive damages award must be remitted because she only received $1 in compensatory damages on her discrimination claim. (Dkt. 450 at 18-19.) This argument has been clearly rejected by binding precedent. In *Bryant*—a case Retsel itself cited—the Eighth Circuit upheld a jury verdict that awarded a plaintiff $1 in compensatory damages and $250,000 in punitive damages in an employment discrimination case. 919 F.3d at 527. After discussing the general rules on punitive damages, the Eighth Circuit stated:

> While punitive damage awards are ordinarily within a single-digit multiple of the compensatory damage award, this ratio's usefulness diminishes when the jury awards only nominal damages. The Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula" comparing compensatory and punitive damages. *Gore*, 517 U.S. at 582, 116 S. Ct. 1589. "Punitive damages may withstand constitutional scrutiny when only nominal or a small amount of compensatory damages have been assigned, even though the ratio between the two will necessarily be large." *JCB, Inc. v. Union Planters Bank, NA*, 539 F.3d 862, 876 (8th Cir. 2008).
>
> As in prior cases addressing nominal damages, we decline to place undue weight on the mathematical ratio between compensatory and punitive damages. *See, e.g.*, *Haynes v. Stephenson*, 588 F.3d 1152, 1158 (8th Cir. 2009). The "general goal" of the proportionality factor is to ensure that punitive damages are "proportional to the actual injury suffered." *Arizona v. ASARCO LLC*, 773 F.3d 1050, 1056 (9th Cir. 2014) (en banc). The higher award of punitive damages is justified in this case because "a particularly egregious act has resulted in only a small amount of economic damages" and "the monetary value of noneconomic harm might have been difficult to determine." *Gore*, 517 U.S. at 582, 116 S. Ct. 1589. The jury may not have been able to easily quantify the monetary value of Bryant's injuries. But that does not mean the indignities he suffered were insubstantial, or that a punitive damages award of $250,000 is unreasonable.

*Id*. at 528. In light of the factors identified in *State Farm Mut. Auto. Ins. Co. v. Campbell*, the most important of which is the degree of reprehensibility of a party's conduct, sufficient evidence supports a punitive damages award. 538 U.S. 408, 418 (2003) (using the following factors: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases").

Here, evidence supports the jury's conclusion that Retsel's conduct was reprehensible. *See id*. at 419 (discussing factors showing reprehensibility). Retsel intentionally discriminated against Native Americans, it tried to cover up that discrimination by inventing pretextual justifications, and it refused to acknowledge its discrimination throughout trial. Retsel's conduct was in deliberate disregard of Plaintiffs' civil rights and was in furtherance of Retsel's longstanding racial animus toward Native Americans. Retsel's actions were repeated, not isolated. And Retsel's actions were intentional, not accidental.

The discrepancy between the consequential damages award and the punitive damages award is relatively small: $7,999. And the punitive damages award for Red Bear is smaller than punitive damages awarded in other cases. *See, e.g.*, *Bryant*, 919 F.3d at 528 (affirming a $250,000 punitive damage award and referring to other discrimination cases involving larger punitive damages awards); *Sherman*, 314 F. Supp. 2d at 870 (discussing the remittitur standard and finding that a punitive damages award of $12,500 was not shocking). Red Bear's punitive damages award also matches the punitive damages awarded to each of the other individual March 22 Plaintiffs.

The jury had "considerable flexibility" to determine punitive damages. *Bryant*, 919 F.3d at 527. The punitive damages award to Red Bear is reasonable and does not shock the conscience. The Court should not remit Red Bear's punitive damages award.

**III. Retsel's motion for a new trial should be denied.**

**A. Legal Standard.**

The standard for granting a new trial under Rule 59(a) is whether the verdict is "against the great weight of the evidence." *Butler v. French,* 83 F.3d 942, 944 (8th Cir. 1996). In evaluating a motion for a new trial, the court must determine "whether a new trial is necessary to prevent a miscarriage of justice." *Maxfield v. Cintas Corp.*, 563 F.3d 691, 694 (8th Cir. 2009). "Where the district court's denial of [a motion for a new trial] is based on its conclusion that the verdict is not contrary to the weight of the evidence, its holding is 'virtually unassailable.'" *Nanninga v. Three Rivers Elec. Co-op.*, 236 F.3d 902, 908 (8th Cir. 2000) (quoting *Pulla v. Amoco Oil Co.*, 72 F.3d 648, 656 (8th Cir. 1995)).

Further limiting the instances in which a new trial is authorized, Rule 61 also provides that "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial[.] . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61. Evidentiary rulings at trial "will not be disturbed unless there is a clear and prejudicial abuse of discretion." *Gee v. Pride*, 992 F.2d 159, 161 (8th Cir. 1993). A party may not raise evidentiary objections after trial that were not made at the time without showing plain error. *Id*. ("Failure to object to questions at the earliest opportunity constitutes a waiver of the right to argue on appeal that the questions were improper, absent plain error by the trial court.").

**B. The Court did not err in barring Retsel's unproduced video.**

The Court correctly excluded Retsel's unproduced video as evidence in Retsel's case-in-chief. Retsel had possession of the video and did not produce it to Plaintiffs or identify it as an exhibit until the Friday before trial. (Tr. 79:1-80:11, 91:4-9.) Under Rule 37(c), Retsel was not permitted to use the video in its case-in-chief.

Retsel's Motion contends that the Court erred because it did not analyze whether the failure to disclose was substantially justified or harmless. (Dkt. 450 at 20-22.) But Retsel never made any argument at trial about substantial justification or harmlessness. (*See* Tr. 80:20-82:23). Instead, Retsel took the position that Plaintiffs should have produced the video to Retsel, which the Court rejected because there was no evidence that Plaintiffs were in possession, custody, or control of the video. (Tr. 90:21-91:14.) Notably, Retsel does not contend this ruling was incorrect. Retsel may not present a new argument after trial that it could have made at trial, nor can Retsel blame the Court for not undertaking an analysis that Retsel never asked the Court to make.

Although the Court need not analyze the factors in *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008), because Retsel never raised that argument, Retsel is incorrect that its failure to produce this evidence is substantially justified or harmless. The burden to prove harmlessness or justification is on the nondisclosing party. *See Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 704 (8th Cir. 2018). Retsel's Motion offers no real justification for nondisclosure. Instead, Retsel blames its prior counsel for not disclosing the video. (Dkt. 450 at 21.) That is no justification at all, it simply shifts blame among Retsel's various law firms. (*See* Tr. 91:22-92:3 (Retsel's counsel conceding that it is bound by the actions of prior counsel).) Retsel's argument that Plaintiffs would not be prejudiced by use of the video at trial (Dkt. 450 at 21) is also incorrect—while Red Bear testified that she was aware Mousseau was recording

something on her phone, that does not mean she had ever seen the video before. Playing an undisclosed video to a witness is naturally prejudicial because the witness is ambushed by the evidence. The video also would have impacted trial efficiency because it was nearly 24 minutes long and contained many hearsay statements that would have required individualized consideration. Finally, the evidence was not as important as Retsel claims. Much of the conversation was captured on Retsel's security footage that was admitted into evidence. (Exs. 133, 138.)

In describing the importance of the evidence, Retsel admits that its value would have been for impeachment, claiming "the Court deprived Retsel of its most powerful <u>impeachment</u> evidence." (Dkt. 450 at 22 (emphasis added).) The Court did no such thing—in fact, the Court explicitly told Retsel that it could use the video to impeach Red Bear or Mousseau. (Tr. 91:10-14.) Retsel chose not to use that evidence to impeach Red Bear. Retsel did, in fact, use the video to refresh Red Bear's recollection. (Tr. 483:3-484:16.) Retsel also used the video to refresh Mousseau's recollection (Tr. 500:21-22) but did not use the video to impeach her, despite asking numerous follow-up questions about the interaction covered by the video (Tr. 502:1-506:24). If the video was truly as important to Retsel's case as Retsel now claims, there is no explanation for why Retsel did not use the video to impeach Red Bear or Mousseau or to further refresh their recollections. While Retsel may now wish that it had used this evidence differently at trial, that is not a reason to grant a new trial.

Finally, Retsel does not show how the Court's exclusion of the undisclosed video from Retsel's case-in-chief resulted in a miscarriage of justice. Much of the video was admitted in Retsel's security camera footage and was used by Plaintiffs and Retsel throughout the trial. (Exs. 133, 138.) Retsel asked Red Bear and Mousseau questions about the video and played portions

of it to refresh their recollections. Had Retsel wanted, it could have used the video to impeach Red Bear, but Retsel chose not to do so. There is no miscarriage of justice in excluding the video from Retsel's case-in-chief.

### C. The Court did not err in admitting evidence of Nick Uhre's animus toward Native Americans and NDN Collective.

Retsel incorrectly argues that the Court erred when it admitted evidence of Nick Uhre's racial bias against Native Americans because they included "fringe" beliefs. (Dkt. 450 at 22-24.)

First, Retsel's Motion does not point to a specific error the Court allegedly made. Neither Plaintiffs nor the Court should have to hunt through the transcript for an alleged error in the record. The Court need not address this undeveloped argument.[6]

Second, Retsel did not object at trial to evidence on this basis. Because Retsel did not point to a specific question and contemporaneous objection at trial that was overruled, Retsel cannot show that a new trial is appropriate. Otherwise, a party could sandbag at trial by remaining silent on objections and then determine later whether it will make objections in a post-trial motion after it knows the outcome of the trial.

Furthermore, while Retsel objected to a number of exhibits it mentions in its Motion, its trial objections were often based on hearsay or relevance, never on a "character assassination" argument. (*See, e.g.*, Tr. 66:24 (objecting to Ex. 62 on relevance); Tr. 69:25-70:1 (objecting to Ex. 60 on relevance).) In other instances, Retsel's objections were sustained to the portions of the exhibits offered. (*See* Tr. 61:2-9 (sustaining the objection to portions of Ex. 80); Tr. 54:5-7 (sustaining the objection to portions of Ex. 81).) And although Retsel now claims that the admission of Exhibit 53 warrants a new trial, that exhibit was redacted to show only statements

[6] It would be inappropriate for Retsel to identify purported errors in a reply brief that were not identified in its initial brief. That approach would deprive Plaintiffs of the ability to specifically respond to Retsel's arguments.

of Retsel and one statement from a non-party that was not offered for the truth of the matter asserted. (Tr. 107:19-108:6, 133:14-21, 134:1-135-3.)

Beyond the exhibits, Nick Uhre's testimony was often unprompted. In fact, at times Plaintiffs' counsel objected to Nick Uhre's testimony and Retsel's counsel asked that Nick Uhre be allowed to continue his answers. (*See* Tr. 112:3-8, 113:19-25, 118:19-23.) Retsel cannot ask for a new trial based on testimony its own witness gave and to which its own counsel not only did not object but asked the Court to allow. The proper mechanism to address Nick Uhre's beliefs about Native Americans, beyond contemporaneous objections, would have been on Retsel's direct examination of Nick Uhre, not a motion for a new trial.

Third, the evidence is not "character assassination" based on association with fringe conspiracy theories—it was probative evidence that Nick Uhre felt threatened by Native Americans and explained why he discriminated against them in the hotel. *Twymon v. Wells Fargo*, 462 F.3d 925, 934 (8th Cir. 2006), does not help Retsel. In that case, the Eighth Circuit stated that stray remarks are not evidence of discrimination. *Id*. That is simply not analogous to the facts of this case or Retsel's argument for a new trial. Such statements are probative of discriminatory intent. *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 876-77 (8th Cir. 2008) ("Stray remarks <u>standing alone</u> do not give rise to an inference of discrimination. But, neither are they irrelevant. Such comments are surely the kind of fact which could cause a reasonable trier of fact to raise an eyebrow, thus providing additional threads of evidence that are relevant to the jury." (cleaned up and emphasis added)). Those comments are also consistent with substantial other evidence, including emails, texts, and social media posts, in which Retsel—through its officers, directors, and manager—disparaged Native Americans and, in some cases, specifically disparaged Native American guests of their hotel because they are Native American. (*E.g.*, Exs.

3 (disparaging comments regarding Native American relative to non-Native American guests) & 81 ("Another native kick him out.")

Evidence of Nick Uhre's bias against Native Americans was not an improper character attack. Discriminatory intent is an element of Plaintiffs' § 1981 claims. Nick Uhre was the manager and a director of Retsel. He personally excluded Bettelyoun and the March 22 Plaintiffs from the hotel. He made the decision to use the "no-locals" pretext to exclude Red Bear and later made the decision to close the hotel. His views on Native Americans were relevant to whether Retsel's justifications for Nick Uhre's own actions were real or were pretext for discrimination. Retsel was free to challenge Plaintiffs' evidence with its own evidence and examination. The jury heard all the evidence and believed Plaintiffs instead of Retsel. That is the function of a jury trial, not a justification for a new trial.

### D. The Court did not err in admitting evidence of Nick Uhre's "Rosebud" statement to George Bettelyoun.

Retsel contends that the Court erred when it admitted testimony from Bettelyoun that Nick Uhre made a comment about "Rosebud." (Dkt. 450 at 24-25.)

First, Retsel did not object to this testimony. (Tr. 351:14-24.) Without a contemporaneous objection on which it could rule, the Court did not err and Retsel did not preserve this argument. Second, Retsel was free to impeach Bettelyoun—and it did. (Tr. 371:24-372:23.) That impeachment was ineffective, in part because the video provided by Nick Uhre was missing about 21 seconds of the interaction. Third, there was no prejudice to admitting Bettelyoun's Rosebud statement. Nick Uhre also confirmed in his testimony that he did, in fact, make a statement about Rosebud to Bettelyoun. (Tr. 321:21-25.) The evidence that Nick Uhre made a comment about "Rosebud" to Bettelyoun—admitted by both Nick Uhre and Bettelyoun—was probative of discriminatory intent.

### E. The Court did not err in admitting Sherwyn's testimony.

Retsel next argued that Plaintiffs' expert, David Sherwyn, improperly offered opinions about Retsel's intent and used a disparate impact analysis. (Dkt. 450 at 25-27.)

First, Retsel does not point to specific portions of Sherwyn's testimony that it believes were inadmissible. That is likely because Retsel did not object at trial on the basis it now uses to request a new trial. The Court should not have to speculate or search for Retsel's objections.

Sherwyn testified about the hotel industry standards and general practices, including how hotels handle discrimination matters and public relations crises. (*See generally* Tr. 661:12-680:15.) His testimony was based on his training and experience and was proper expert testimony. (Ex. 124.) Unlike the expert in *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) (finding that an expert could not testify about probable cause or qualified immunity because those were questions of law for the court), Sherwyn did not testify about a legal question for the court—he testified about matters that would help the jury understand Retsel's conduct and determine if Retsel acted with discriminatory intent.[7] Retsel could have called its own expert to rebut Sherwyn's testimony but opted not to call him.

Sherwyn did not transform the case into a disparate-impact case. Sherwyn offered analysis to show the impact that Retsel's actions had on Native Americans staying at the hotel, but the jury instructions and verdict form required Plaintiffs to prove intentional discrimination regarding specific individuals, not disparate impact. This argument misses the point.

Finally, Retsel's argument that Sherwyn should have reviewed other evidence was challenged on cross-examination (Tr. 690:17-701:19) and is not a basis for a new trial.

---

[7] In the only instance where Retsel objected because Sherwyn mentioned case law, the Court sustained that objection. (Tr. 677:25-678:2.)

### F. The Court did not err in excluding evidence of Retsel's foreclosure.

Retsel claims that the Court erred when it excluded evidence of Retsel's foreclosure. (Dkt. 450 at 27.) This is inaccurate. In its ruling on motions in limine, the Court ruled that Retsel could address evidence of its net worth and its ownership of the hotel, but that it could not specifically discuss the foreclosure action. (Dkt. 321 at 3-4.) That is consistent with how the Court handled the issue during the trial. (Tr. 832:10-13.)[8] In fact, the Court asked a jury question on whether Grand Gateway was still profitable. (Tr. 834:6-14.) And Retsel did not object to questions about Retsel's retained earnings or the 2025 insured value of the property. (Tr. 753:7-20.)

Furthermore, the jury only imposed punitive damages totaling $32,001. (Dkt. 434.) Retsel makes no argument why that is an unfair or disproportionate punitive damages award justifying a new trial in light of its financial condition.

### G. The Court did not err in excluding evidence related to Hermus Bettelyoun.

Retsel argues that the Court erred when it precluded evidence of a separate alleged incident involving Hermus Bettelyoun. (Dkt. 450 at 28.)

The Court excluded evidence of this incident under Rule 403. (Dkt. 321 at 4-7.) Retsel does not explain how or why that ruling was wrong. In particular, Retsel never addresses the fact that the "evidence" supporting this accusation was created after the fact, lacked foundation, and had little relevance to the claims in this trial. (Dkt. 321 at 6.) Moreover, because Hermus Bettelyoun was deceased, permitting such testimony would have been unfair because Hermus Bettelyoun could not defend himself, and the testimony would be inflammatory and prejudicial.

---

[8] Retsel was not allowed to use unproduced financial statements (see Tr. 765:17-767:5) but it could have addressed its financial condition using the statements it did produce or by further developing testimony from its witnesses consistent with the Court's rulings.

If Retsel believed that circumstances at trial justified reconsideration of the ruling in limine, it should have asked during trial. (*See* Dkt. 321 at 7 ("At this juncture, the Court grants the motion to exclude . . . .").) It did not and cannot seek a new trial on that basis.

Furthermore, Nick Uhre testified—despite the motion in limine—that he was afraid of Hermus Bettelyoun, felt threatened by him and NDN Collective in general, and decided not to rent rooms to them. But the jury also heard substantial evidence that Nick Uhre's claims were pretextual, that he was biased against NDN Collective for a variety of reasons that had nothing to do with Hermus Bettelyoun, and that his actions were motivated by race. The verdict is not contrary to the weight of the evidence—which finding is virtually unreviewable—and no miscarriage of justice occurred.

**H. The verdict form did not mislead the jury.**

Retsel claims that the verdict form is imprecise because it used the phrase "claim of discrimination" rather than mentioning contractual rights. (Dkt. 450 at 28-30.) "In reviewing a substantive challenge to jury instructions, the pertinent inquiry is 'whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury.' " *Horstmyer v. Black & Decker, Inc.,* 151 F.3d 765, 771 (8th Cir.1998) (quoting *Kan. City Power & Light Co. v. Ford Motor Credit Co .,* 995 F.2d 1422, 1430 (8th Cir.1993)).

"To preserve alleged errors in the jury instructions, a party must make a specific objection that distinctly states the matter objected to and the grounds for the objection" before the jury is released. *Lopez v. Tyson Foods, Inc.*, 690 F.3d 869, 875-76 (8th Cir. 2012). Otherwise, the party attacking the jury instructions must establish plain error. *Id.* at 876. Plain error only exists if (1) the instructions, taken as a whole, deviate from a legal rule; (2) the error is clear under current law; and (3) the error affects substantial rights. *Id.* at 877. "Plain error will not be

corrected unless . . . it seriously affects the integrity, fairness, or public reputation of judicial proceedings." *Id.* Plain error "must result in a miscarriage of justice" if left uncorrected. *Id.* at 876.

Retsel did not object to the verdict form. (Tr. 870:9-13.) Retsel may not make a belated objection now. And Retsel admits that the jury instruction on § 1981 accurately states the law. (Dkt. 450 at 29 ("To be sure, the jury instructions accurately explained that Section 1981 protects the right to make and enforce contracts.").) Even if Retsel could object now, this concession makes clear that the jury instructions, taken as a whole, accurately state the law. There is no plain error in the verdict form.

**CONCLUSION**

Retsel does not identify any error that would justify judgment as a matter of law, amending the judgment, or granting a new trial. Retsel's kitchen sink post-trial Motion should be denied.

Dated: January 30, 2026

Respectfully submitted,

*/s/ Timothy W. Billion*

Brendan V. Johnson (SD Bar # 3263)
Timothy W. Billion (SD Bar # 4641)
Thad A. Titze (SD Bar #5204)
ROBINS KAPLAN LLP
150 East 4th Place, Suite 704
Sioux Falls, SD 57104
Tel: 605-335-1300
BJohnson@RobinsKaplan.com
TBillion@RobinsKaplan.com
TTitze@RobinsKaplan.com

ATTORNEYS FOR PLAINTIFFS