UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| NDN COLLECTIVE, SUNNY RED BEAR, NICK COTTIER, BRE JACKSON, MARY BOWMAN and GEORGE BETTELYOUN,<br><br>Plaintiffs,<br><br>v.<br><br>RETSEL CORPORATION, d/b/a GRAND GATEWAY HOTEL and d/b/a CHEERS SPORTS LOUNGE AND CASINO,<br><br>Defendant,<br><br>and<br><br>RETSEL CORPORATION, d/b/a GRAND GATEWAY HOTEL and d/b/a CHEERS SPORTS LOUNGE AND CASINO and NICHOLAS UHRE,<br><br>Counterclaim Plaintiffs,<br><br>v.<br><br>NDN COLLECTIVE,<br><br>Counterclaim Defendant. | 5:22-CV-05027-KES<br><br>ORDER DENYING MOTION FOR JUDGMENT AS A MATTER OF LAW, DENYING ALTERNATIVE MOTION TO ALTER, AMEND, OR REMIT THE JUDGMENT, AND DENYING FURTHER ALTERNATIVE MOTION FOR A NEW TRIAL |

After the jury returned its verdict, defendant, Retsel Corporation, moved under Fed. R. Civ. P. 50(b) for vacatur of the judgment against Retsel and entry of judgment for Retsel on all claims against it. Docket 449. Alternatively, Retsel moves under Fed. R. Civ. P. 59(e) to alter, amend, or remit the judgment and to vacate all findings of liability under 42 U.S.C. § 1981. *Id.* As a second

alternative, Retsel moves under Fed. R. Civ. P. 59(b) for a new trial on the issue of its liability. *Id.* Plaintiffs, NDN Collective, Sunny Red Bear, Nick Cottier, Bre Jackson, Mary Bowman, and George Bettelyoun filed a response. Docket 460. Retsel filed a reply in support of its combined motion. Docket 469.

## BACKGROUND

Defendant, Retsel Corporation, owned the Grand Gateway Hotel, a business that is located near the North Lacrosse Street exit of interstate I-90 in Rapid City, South Dakota. On June 4, 2020, George Bettelyoun, an enrolled member of the Oglala Sioux Tribe, travelled to Rapid City from Minneapolis, Minnesota to attend his nephew's funeral. Docket 448-2 at 8-10. After finishing his nine-hour drive, he met his sister, Melanie, at the Grand Gateway Hotel to rent a room for the night. *Id.* at 10. George did not bring a credit card with him to Rapid City, so Melanie agreed to cover the cost of staying at the hotel using her debit card until George could pay her back. *Id.*

The pair entered the hotel and approached the front desk. There, they met Nicholas Uhre, Retsel's manager, who had been watching them with concern while they waited by the front door. Docket 448 at 41-43 (Nick testifying that he thought Bettelyoun "could be" a potential problem, and that he felt concerned by seeing them giggle). As a part of the check-in process, Nick asked the pair to provide a credit card to cover incidental expenses incurred during George's stay. Docket 448-2 at 11-12. Perhaps because she and her five children were living on a tight budget at the time, Melanie asked why Nick was asking for her debit card now. *Id.* Nick began to explain that hotels often ask

for credit cards from guests when they check in. *Id.* George interrupted, saying "[w]e know what it's like to stay at a hotel." *Id.*

Everything escalated immediately. An incensed Nick raised his voice and demanded that George and Melanie leave the hotel at once. *Id.* at 13; *see also* Docket 423 at 8 (noting the admission of plaintiffs' exhibits 134, 135 and 139). George was taken aback by the sudden aggression and began filming Nick with his cell phone. Docket 448-2 at 13. Nick began filming George as well and stepped out from behind the front desk to approach George up-close and shouted at him to leave. *Id.* at 13-14. George shouted back at Nick, calling him a "fuckin' racist." *Id.* at 24. Nick, now very angry, continued to get "up in [George's] face[]" as George and Melanie cautiously stepped backward toward the hotel's front door to leave the building. *Id.* at 15. Nick called the police to report George shortly after the siblings left, and would later testify that he did so because he found George to be a potential threat. Docket 448 at 44. George posted about the incident on social media the next day, describing how he was treated and commenting that the incident was "a perfect example of customer service and how Natives are treated in Rapid City[.]" Docket 448-2 at 18-19.

The hotel's security cameras recorded this altercation, and the recording was played for the jury multiple times during the trial. *See* Docket 448 at 46; Docket 448-2 at 12-16; Docket 423 at 8. Some parts of the altercation were missing from the security footage. Docket 448 at 47-48; Docket 448-2 at 25-26. George testified at trial that in a part of the altercation that is not contained in the recording, Nick made a comment that George would be a problem if he was

"from Rosebud." Docket 448-2 at 52. He further testified that the incident left him feeling defenseless, humiliated, broken, embarrassed, and discriminated against. *Id.* at 13, 15-16.

Almost two years after this incident, a nineteen-year-old Native American man was shot and killed by another young man inside the Grand Gateway Hotel. *See* Docket 448-1 at 49-50. Shortly after the murder, Nick exchanged a series of emails and instant messages with the other members of his family who served on Retsel's board of directors. *See id.* at 37-45. The group discussed what they believed to be the causes of a crime problem in Rapid City, including racial quotas on the number of inmates in the Pennington County Jail and a conspiracy between Mexican drug cartels and the MacArthur Foundation to advance a twofold aim of sowing racial division and expanding a criminal fentanyl enterprise in Rapid City. *Id.* Connie Uhre, President of Retsel and Nick's mother, sent the following email:

> Thanks Josh, I did not remember that name. You were there. I really do not want to allow Natives on property. Every time we have problems I call the police with it, the first thing they ask is what nationality was he or she and 98 percent of the time I have to say Native and we call at least once a week. They kill each other walk around with guns. We need new leadership in Rapid City. Open containers all over the place. Drunk. We have spent 40,000 on cameras and now they wear black hoodies and black face mask and they all live in the Hud housing called Knoll wood area. The problem is that -- is we do not know the nice ones from the bad Natives... so we just have to say no to them.

*Id.* at 42; *see also* Docket 424 at 93. Connie then posted the following announcement on her Facebook page:

4



**Connie Uhre**
Do to the killing that took place at the Grand Gateway Hotel on March 19 2022 at 4 am plus all the vandalism we have had since the Mayor and Police Department are working with the non profit organization ( Dark Money) . We will no long allow any Native American on  property. Or in Cheers Sports Bar. Natives killing Natives. Rancher and Travelers will receive a very special rate of 59.00 a night. Book Direct.

1d    Like    Reply



**Connie Uhre**
Rapid City has gone to Hell since the City has been accepting all the Free Money with strings attached, Look up Dark Money! McAuthor Foundation and many others

1d    Like    Reply

Docket 424 at 22; *see also* Docket 448-1 at 222-23. Around the same time, Nick enacted what he called a "no-locals" policy at the hotel, i.e., a policy to not rent any rooms to people who live in the Rapid City area. Docket 448-1 at 51-52.

Word of Connie's announcement quickly spread throughout the Rapid City community. On March 21, 2022, plaintiff Sunny Red Bear, who is Native American, visited the Grand Gateway Hotel with her brother, Hermus Bettelyoun, and attempted to book a room for Hermus. Docket 448-2 at 82-88. They were sent away by the front desk personnel, who cited the hotel's no-locals policy. *Id.* at 88. The next night, plaintiffs Mary Bowman, Bre Jackson,

Nick Cottier, and others, who are all Native American, also attempted to book rooms at the hotel, but they too were ordered to leave. *Id.* at 179-80, 209-10, 236-37; Docket 448-3 at 27-28.[1]

At this point, the Grand Gateway Hotel was being discussed in the Rapid City community. *See* Docket 448-1 at 93-95 (Nick describing the attention on the Grand Gateway Hotel from the local media and the mayor). On May 27, 2022, a group of demonstrators led a protest in front of the Grand Gateway Hotel. Docket 448-2 at 70. Red Bear was one of the event's organizers. *Id.* While there, she began recording the protestors' demonstrations with her cell phone to later post on social media and promote a boycott of the hotel. *Id.* at 74. As Red Bear's video shows, Connie arrived at the protest in a van, drove up to the demonstrators, and personally confronted them. *Id.* at 77; Docket 423 at 2 (noting admission of Sunny Red Bear's video as exhibit 17). Connie repeatedly honked her car's horn at the group. *Id.* Because Red Bear was wary of escalation, she admonished the other protestors to focus on what they had been doing and not engage with what she believed to be an attempt by Connie to instigate more conflict. Docket 448-2 at 78. Connie then exited her vehicle and approached Red Bear with a bottle of Pledge dust spray. *Id.* at 79-81. Connie sprayed the bottle onto Red Bear's phone camera and into Red Bear's

---

[1] Plaintiffs Bowman, Jackson, and Cottier were representatives of plaintiff NDN Collective at the time of their visit to the hotel. Each alleged that they were discriminated against both in their personal capacities as Native Americans and as representatives of a Native American activist organization. Docket 448-2 at 207, 232-33; Docket 448-3 at 27-28; *see also infra* Part II.C.

face and eyes. *Id.* Red Bear called the police soon after, who spoke to Connie and had paramedics examine Red Bear's eyes. *Id.* at 80. Connie was later convicted of simple assault in South Dakota State Court. Docket 161-16; Docket 427 at 15.

NDN Collective and Red Bear commenced this lawsuit on March 23, 2022, alleging that Retsel discriminated against them in the making or enforcement of a contract in violation of 42 U.S.C. § 1981. Docket 1 at 2-8; *see also* Docket 84 at 6-10, 18-19 (reflecting that Cottier, Jackson, Bowman, and Bettelyoun were joined as individual plaintiffs). Red Bear also sued Retsel for assault based on Connie's actions with the Pledge spray. Docket 84 at 28-29.

Before trial, the court excluded certain evidence following various motions in limine, including evidence pertaining to a foreclosure action against Retsel and evidence relating to behavior of Hermus Bettelyoun during a stay at the Grand Gateway Hotel prior to the incident between him, Red Bear, and hotel staff in 2022. *See* Docket 321 at 4-7. This court also excluded a video filmed by a woman named Muffie Mousseau because defense counsel did not disclose the video as an exhibit until after the court's deadline to do so under the scheduling order passed. Docket 448 at 91-92. This video depicted statements by Red Bear that she and others were not refused service because of their race, but because of Retsel's no-locals policy. *Id.* at 87-89.

During a five-day jury trial, Nick testified about his feelings toward Native Americans, NDN Collective, and defended Retsel's no-locals policy. Docket 448-1 at 29-30, 51-52, 77-78, 202. To establish that Retsel was

vicariously liable for Connie's assault of Red Bear, evidence was presented regarding Connie's level of authority within Retsel. *Id.* at 210-11. To establish damages, the jury heard testimony from plaintiffs about the impact Retsel's alleged discrimination had on their well-being. Docket 448-2 at 13, 91-92, 210, 237; Docket 448-3 at 29. Plaintiffs testified about their intentions to rent a room at the Grand Gateway Hotel if allowed to by front desk personnel, which was probative of whether these plaintiffs were "testers" who lack standing to sue under § 1981. Docket 448-2 at 10, 91, 179, 208, 235; Docket 448-3 at 27-29. Plaintiffs' expert, David Sherwyn, testified that Retsel's policies failed to align with best practices in the hotel industry. Docket 448-3 at 64-87. He opined that a sharp drop in the number of Native Americans staying at the Grand Gateway Hotel occurred after Retsel implemented its no-locals policy. *Id.* at 80-81.

At the conclusion of its case, Retsel moved for judgment as a matter of law on all claims against it. *Id.* at 254-59. Retsel now renews its judgment as a matter of law on these claims under Fed. R. Civ. P. 50(b), in the alternative under Fed. R. Civ. P. 59(e) for the judgment to be amended, or under Fed. R. Civ. P. 59(a) for a new trial. Docket 449. The court addresses each argument separately.

## DISCUSSION

### I.   Judgment as a Matter of Law

#### A.   Legal Standard

A court may grant judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." Fed. R. Civ. P. 50(a)(1). When reviewing a Rule 50(a) motion, the court "view[s] the evidence in the light most favorable to the nonmoving party." *Sip-Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827, 830 (8th Cir. 1996). "Judgment as a matter of law is appropriate when the record contains no proof beyond speculation to support a verdict." *Arabian Agric. Servs. Co. v. Chief Indus., Inc.*, 309 F.3d 479, 482 (8th Cir. 2002) (citation modified).

If the district court does not grant a movant's 50(a) motion, the "movant may file a renewed motion for judgment as a matter of law[.]" Fed. R. Civ. P. 50(b). "[A] party may not advance new arguments in its Rule 50(b) motion that were not properly raised in its Rule 50(a) motion." *Miller v. Huron Reg'l Med. Ctr.*, 936 F.3d 841, 847-48 (8th Cir. 2019) (citation omitted); *see also Parada v. Anoka Cnty.*, 54 F.4th 1016, 1022-23 (8th Cir. 2022). "The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion under Rule 50(a)." *Christians v. Young*, 2025 WL 2083852, at *1 (D.S.D. July 24, 2025) (quoting 9B *Wright & Miller's Federal Practice & Procedure,* § 2537 (3d ed. 2008)). The Eighth Circuit requires that "judges must be extremely guarded

in granting judgments as a matter of law after a jury verdict." *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003).

### B.    Plaintiffs Presented Sufficient Evidence of Discriminatory Intent

Retsel first contends that the individual plaintiffs did not present sufficient evidence of discriminatory intent to satisfy § 1981's requirements. Docket 450 at 4-6. Retsel argues that the jury was not shown any "racial statement, policy, or action tying the incident to racial discrimination[]" nor any derogatory comments from Nick, and thus plaintiffs' feelings that they were discriminated against amount to mere subjective perception. *Id.* at 3-4. Retsel reasserts that its no-locals policy was a legitimate "race-neutral safety measure[]" and that the record demonstrates that it was not enacted as a pretext for discrimination. *Id.* at 5. Retsel notes that Nick's interactions with plaintiffs were "heated," but argues that "the undisputed fact that Nick made no racial statements, did not invoke Native identity, and did not act based on who the individuals were, but rather on whom Nick believed the individuals represented and the hostility he associated with them[]" explains his anger toward them, instead of racial animus. *Id.* at 5-6.

In its original motion for judgment as a matter of law, Retsel only raised this argument with respect to the sufficiency of Connie's 2022 Facebook post and email to show Retsel's discriminatory intent. Docket 448-3 at 256-57. But the altercation with George Bettelyoun took place in 2020. Docket 84 at 2; Docket 448-2 at 32. Thus, the only argument that Retsel raised in its initial

motion concerning its discriminatory intent does not pertain to Bettelyoun. Because Retsel did not make this argument in its Rule 50(a) motion as it pertains to Bettelyoun, Retsel cannot raise this now. *See Miller,* 936 F.3d at 847-48.

But even if the argument had been timely raised with respect to Bettelyoun, the jury was presented with sufficient evidence to conclude that Bettelyoun's expulsion was for discriminatory purposes. The jury saw video of the altercation between Bettelyoun and Nick and was free to infer discriminatory intent from Nick's aggressive tone and conduct. *See* Docket 448 at 45-48 (plaintiffs' counsel published the video to the jury and questioned Nick about his behavior). The jury also heard testimony that Nick made comments about Bettelyoun possibly being from the Rosebud Indian Reservation during omitted portions of the video. Docket 448-2 at 15. And after this altercation, Nick sent text messages to other Retsel stakeholders stating "[a]nother Native kick[] him out," and "I guess if you're native you're entitled to treat people like shit." Docket 448 at 57-58. The jury was free to conclude from this evidence that Nick's actions carried discriminatory intent.

Regarding plaintiffs Red Bear, Bowman, Cottier, Jackson, and NDN Collective, the jury was shown various statements by Retsel's agents that demonstrated discriminatory intent. For example, the jury saw Facebook posts by Connie, who was president of Retsel, explicitly stating that Native Americans posed problems for Retsel's business in various ways. *See, e.g.*, Docket 448-1 at 46-47. Testimony was presented from which the jury could reasonably

conclude that the Uhre brothers acted in a manner that indicated a motive to discriminate against Native Americans. *See, e.g.*, Docket 448-1 at 28-29 (Nick testified about responding agreeably to an email disparaging Native American history and culture), 49-51 (Nick repeatedly described the murder that took place at the Grand Gateway Hotel shortly before Retsel implemented its no-locals policy as a "Native on Native violent shooting,"); Docket 448-2 at 92 (Red Bear described Josh Uhre shouting "Natives killing Natives" at protestors).

The jury was also free to determine that Retsel's "no locals" policy was a pretext for discrimination rather than a legitimate safety measure. *See* Docket 427 at 12 (explaining to the jury that they may find that wrongful treatment is "because of race" if the greater weight of the evidence shows that it is a pretext to hide discrimination). The jury was shown evidence that the "no locals" policy was never written down and was inconsistently enforced. Docket 448-1 at 78. Retsel implemented this policy after Connie sent an email and published a Facebook post indicating an express desire to keep Native American guests out of the hotel. *Id.* at 46-47; *see also* Docket 424 at 92-93, 1413. This evidence suffices for a reasonable jury to conclude that Retsel's race-neutral policies were pretexts to mask discriminatory intent.

### C.    Plaintiffs Established that Connie Uhre is an Agent of Retsel Corporation

Retsel also argues that Connie's social media activity cannot be used to prove that it acted with discriminatory intent because Connie did not have actual or apparent authority to act as an agent of Retsel. Docket 450 at 6-8.

12

Retsel argues that despite Connie's title of "president," she lacked the authority to enact hotel policy independent of Retsel's board, and her Facebook post announcing a ban of Natives at the Grand Gateway Hotel was no more than an unsanctioned, personal social media post made using her private account. *Id.* at 7.

Case law within the Eighth Circuit does not require that a corporate § 1981 defendant formally ratify the discriminatory actions of its agents for those actions to create liability for a corporate defendant. *See, e.g., Green v. Dillard's, Inc.*, 483 F.3d 533, 541 (8th Cir. 2007) (concluding that a corporate defendant could be liable for actions of an employee that it did not stop or remedy); *Sherman v. Kasotakis*, 314 F. Supp. 2d 843, 860-61 (N.D. Iowa 2004) (agreeing with the Fifth Circuit's determination that vicarious liability for defendants in § 1981 public accommodations cases does not turn on whether the employee held managerial or supervisory authority). And plaintiffs offered evidence contradicting Retsel's premise that the corporation could only act by vote of its board. For example, Nick "pulled the trigger" on Retsel's no-locals policy without board approval. *See* Docket 448-1 at 225.

Retsel's defense here does not respond to the substance of plaintiffs' case. Connie's actions were not just offered as a formal announcement of a discriminatory hotel policy, but also served as circumstantial evidence to show that Retsel's no-locals policy was a pretext for discrimination. As previously discussed, plaintiffs presented evidence of Nick's texts and emails about Native Americans at the hotel, a video of him dealing with a Native American

13

customer, and his own testimony regarding his feelings about Native Americans. *See supra* part I.B. This circumstantial evidence of discriminatory intent was in addition to Connie's Facebook activity. Thus, plaintiffs have presented a sufficient evidentiary basis for a jury to find in their favor, and the court denies judgment as a matter of law on that basis.

### D.     Plaintiffs Offered Sufficient Evidence Supporting Damages

Retsel next argues that plaintiffs have "failed to present competent evidence of compensatory damages[] . . . only narratives of anger, embarrassment, sadness, fear, and frustration arising from being denied hotel rooms." Docket 450 at 8-9. Retsel argues that the individual Native American plaintiffs "merged the hotel encounters with prior unrelated trauma and general lifetime experiences of discrimination, making causation impossible to prove." *Id.* at 9. Similarly, Retsel argues that NDN Collective "did not identify any out-of-pocket loss, lost revenue, increased expenses, or other measurable injury flowing from the alleged conduct." *Id.*

As Retsel identifies, the difficulty of determining causation is why the Eighth Circuit "[does] not demand precise proof to support a reasonable award of damages for [Civil Rights] injuries." *Block v. R.H. Macy & Co., Inc.*, 712 F.2d 1241, 1245 (8th Cir. 1983); *see also Williams v. Trans World Airlines, Inc.*, 660 F.2d 1267, 1272 (8th Cir. 1981) (reiterating that the Eighth Circuit presumes there are damages for emotional harm upon the infringement of a substantive constitutional right); *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 236 (8th Cir.

14

1976) (holding that a plaintiff's own testimony may be solely sufficient to establish humiliation or mental distress).

Each plaintiff testified about the humiliation and mental distress he or she suffered. *See* Docket 448-2 at 13 (Bettelyoun testifying to "shock," feeling like he was being "treated unfairly," and feeling "defenseless. There was nothing I could do."), 91-92 (Red Bear testifying as to how the episode was "triggering," stirred memories of a lifetime of discrimination, and how the "ugly" experience weighed in her chest and gut), 210 (Bowman testifying she was "shocked" at the display of "very explicit racism"), 237 (Jackson testifying that the experience left her "scared" and "traumatize[d]"); Docket 448-3 at 29-30 (Cottier testifying that the experience was embarrassing, and seeing its effect on Bowman left him hurt and ashamed). This testimony provided competent evidence of damages relating to plaintiffs' emotional distress, humiliation, and stigmatic injury.

Regarding NDN Collective, Retsel's arguments that the organization failed to prove compensatory damages are moot because the jury awarded it only nominal damages. Docket 434 at 7. The nominal damages award also does not pose a problem for the jury's award of $1 in punitive damages. *See Sherman,* 314 F. Supp. 2d at 874-76 (declining to disturb a jury's award of punitive damages where they awarded a civil rights plaintiff only nominal damages).

Because plaintiffs presented a sufficient evidentiary basis for a reasonable jury to award compensatory damages, the court denies judgment as a matter of law on that basis.

### E.   Retsel is Not Entitled to Judgment as a Matter of Law as to Red Bear's Assault Claim

Retsel next argues that judgment as a matter of law on the assault claim is required because Connie lacked actual or apparent authority to act on Retsel's behalf. Docket 450 at 10-11. Retsel repeats its arguments that Connie's title as Retsel's president or her belief that she was acting to protect the hotel's interests are insufficient to demonstrate that a principal-agent relationship existed between her and Retsel. *Id.* Retsel claims that Red Bear offered no evidence that Retsel authorized Connie to confront protestors, nor did Retsel hold her out as having the authority to do so. *Id.* at 11.

The jury was instructed on the issue of Retsel's vicarious liability for the assault and determined that Connie was acting in her capacity as an employee of Retsel. Docket 427 at 16-17; Docket 434 at 8. In South Dakota, "[a]ctual authority is such as a principal intentionally confers upon the agent, or intentionally or by want of ordinary care, allows the agent to believe himself to possess." SDCL § 59-3-2. Apparent or ostensible authority is authority that "a principal intentionally, or by want of ordinary care, causes or allows a third person to believe the agent to possess." SDCL § 59-3-3. "[W]hether or not an agent is acting within the scope of his apparent authority is to be determined as a question of fact from all the circumstances of the transaction and the nature of the principal's business." *McKinney v. Pioneer Life Ins. Co.*, 465 N.W.2d 192, 195 (S.D. 1991) (citation omitted).

16

At the time of the assault, Connie was the president of Retsel and one of its directors. Docket 448 at 39; Docket 424 at 1448-49. Connie was physically present in the hotel's parking lot when she committed the assault and stated that her objective there was to protect a van belonging to the Grand Gateway Hotel. Docket 448-1 at 235 (Connie's testimony from the criminal trial read into the record); Docket 355-2 at 105-06, 107-08 (Connie explaining her actions at the protest during her criminal trial). Connie did not step down as president of Retsel until November 2023, well after she assaulted Red Bear and posted her inflammatory announcement on Facebook. Docket 448-3 at 160. While Connie's officer status does not necessarily confer vicarious liability onto Retsel, *see Bass v. Happy Rest, Inc.*, 507 N.W.2d 317, 320 (S.D. 1993), the jury was free to infer that because Connie remained president during and after these events that Retsel was "allow[ing] . . . third person[s] to believe" her to possess authority to act on behalf of Retsel. *See* SDCL § 59-3-3. Thus, this court finds that Red Bear offered sufficient evidence for a reasonable jury to conclude that Connie acted on behalf of Retsel and denies judgment as a matter of law with regard to the assault claim.

## II.    Motion to Alter, Amend, or Remit the Judgment

### A.    Legal Standard

Rule 59(e) motions serve only the "limited function of correcting manifest errors of law or fact or to present newly undiscovered evidence." *United States v. Metro St. Louis Sewer Dist.*, 440 F.3d 930, 933 (8th Cir. 2006) (citation modified). "To prevail on a Rule 59(e) motion, the movant must show that (1)

17

the evidence was discovered after trial; (2) the movant exercised due diligence to discover the evidence before the end of trial; (3) the evidence is material and not merely cumulative or impeaching; and (4) a new trial considering the evidence would probably produce a different result." *Id.* "A district court has broad discretion in determining whether to alter or amend a judgment[.]" *Global Network Techs., Inc. v. Regional Airport Auth.*, 122 F.3d 661, 665 (8th Cir. 1997) (citation modified).

### B. Plaintiffs Had Standing to Assert a § 1981 Claim

In its motion to alter, amend, or remit the judgment, Retsel first argues that Red Bear, NDN Collective, Cottier, Jackson, and Bowman lack standing under Article III of the United States Constitution because they were "testers" who did not have a sincere intention to rent a room at the Grand Gateway Hotel. Docket 450 at 12-13. Retsel has raised this argument many times in prior filings. *See, e.g.,* Docket 349 at 3; Docket 320 at 1 (Judge Piersol recounting the numerous times Retsel has argued that plaintiffs lack standing). This court has repeatedly rejected this argument, and reserved the fact question of whether plaintiffs went to the Grand Gateway Hotel only to test for the jury to determine. *See, e.g.,* Docket 206 at 22-23; Docket 427 at 14 (instructing the jury to consider the testing issue); Docket 480 at 9-10.

Retsel's argument here is no different than in its previous motions. Plaintiffs testified during the trial that they would have booked and used the hotel rooms they sought for various purposes if Retsel had permitted them to do so. *See, e.g.,* Docket 448-2 at 85, 208, 235. Retsel's thwarting of their

18

opportunity to form this contract is why plaintiffs suffered a cognizable injury-in-fact. Testers lack a cognizable injury under Article III because they did not lose anything as a result of discriminatory treatment toward them. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) (explaining why testers do not have standing under Article III); *see also Smith v. Golden China of Red Wing, Inc.*, 987 F.3d 1205, 1209-10 (8th Cir. 2021) (explaining that a tester's lack of a sincere intent to transact with a business forecloses his having standing to bring a suit against them). But here, the jury's verdict reflects an acceptance of plaintiffs' testimony that they would have entered into a contract with Retsel had they been allowed to do so. Because defendants have not identified a manifest error of law or presented newly discovered evidence, the court denies Retsel's motion to vacate the judgment for lack of standing.

### C.    Bettelyoun, Bowman, Jackson, Cottier, and NDN Collective Attempted to Contract with Retsel in their Own Right

Retsel next argues that because "Bowman, Jackson, and Cottier were acting as NDN Collective's agents," they "failed to establish that they engaged in a protected activity under Section 1981." Docket 450 at 13-14. Retsel cites *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470 (2005) for the proposition that "[a]n agent who executes a contract on behalf of her principal will not be a party to the contract and will have no rights under the contract." *Id.* Retsel reasons that because NDN Collective would have been the party opposite to

Retsel in the contract, rather than Bowman, Jackson, and Cottier, those three plaintiffs lack standing to assert a claim under § 1981. *Id.*

Retsel has raised this argument many times. Its formulation here is no different than in previous motions. *See e.g.,* Docket 152-2 at 29-35; Docket 349 at 22-23. As Judge Piersol wrote in his order ruling on Retsel's motion for partial summary judgment, "the [p]laintiffs were acting in a dual role as individuals who are Native American and activists for Native American causes, and to some extent and in varying degrees, on behalf of NDN." Docket 279 at 34. NDN Collective and the individual plaintiffs who acted as its representatives both had standing because both alleged that Retsel discriminated against them.

Retsel's citation to *Domino's Pizza* does not change this conclusion. *In Domino's Pizza,* the plaintiff lacked rights under an existing contract and "ha[d] not been prevented from entering into such a contractual relationship[.]" *Domino's Pizza*, 546 U.S. at 472. The plaintiff in *Domino's Pizza* did not assert that it had or attempted to enter into a contract with the defendant. *Id.* at 476. Unlike the plaintiff in *Domino's Pizza,* plaintiffs here specifically testified that they would have entered into a contract on their own behalf had they been allowed to do so. *See* Docket 448-2 at 84-85, 178-79, 208, 236; Docket 448-3 at 26. All that is required for standing under § 1981 is a tangible attempt to contract. *See Gregory v. Dillard's, Inc.*, 565 F.3d 464, 470-71 (8th Cir. 2009) (en

20

banc). In ruling for plaintiffs, the jury necessarily found that they did make such an attempt. Thus, each had standing under § 1981.

The same is true of George Bettelyoun. Retsel argues that "[t]he undisputed evidence shows that it was Bettelyoun's sister who tried to book a room during the June 2020 encounter, not Bettelyoun himself," and claims that "[p]laintiffs offered no evidence demonstrating that Bettelyoun's sister and Retsel clearly intended for Bettelyoun to have the room after his sister paid for it." Docket 450 at 14-15. But the jury saw evidence and heard testimony that Bettelyoun asked Nick about renting a room, presented his identification, and intended to actually stay in the room. Docket 448-2 at 11-12, 44-45. Even if Bettelyoun would have paid for the hotel room using his sister's debit card, these facts suggest that he would have been a party to the contract. The South Dakota statute providing the foundational definition of consideration reads as follows:

> Any benefit conferred or agreed to be conferred upon the promiser by any other person to which the promiser is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer as an inducement to the promiser, is a good consideration for a promise.

SDCL § 53-6-1. In the contract contemplated between Bettelyoun and Retsel, the consideration he offered was the promise to pay for the hotel room. Retsel does not cite any South Dakota authority suggesting that payment using another person's money or debit card cannot create valid consideration. Thus,

the jury did not err in finding that Bettelyoun engaged in a protected activity under § 1981.

Retsel also argues that NDN Collective, Bowman, Jackson, and Cottier could not have formed a lawful contract with Retsel because it would have been impossible for them to comply with the mandates of SDCL § 34-18-21. Docket 450 at 15-16. This statute requires that hotels keep a registry of certain information about their guests, such as their names, permanent places of residence, and arrival/departure dates. *See* SDCL § 34-18-21. Retsel argues that because plaintiffs "did not intend to occupy the rooms personally, could not identify the actual intended guests, and had no plan for the number of guests who would occupy the rooms or the duration of their supposed occupancy[,]" the contract they sought was legally impossible and no rights under § 1981 could flow from it. Docket 450 at 16.

As this court explained in a previous order, Retsel's argument here reframes its standing argument by presenting it as an argument about contractual impossibility. *See* Docket 480 at 11-12. But if plaintiffs had formed a contract with Retsel, there is no evidence that whoever would have ultimately stayed in the rooms would not have provided their identifying information to the hotel as required by SDCL § 34-18-21. Because defendants have not identified a manifest error of law or fact or presented newly discovered evidence on this issue, the motion to vacate the judgment is denied.

22

**D.    The Punitive Damages Awards Will Not be Vacated**

Retsel next argues that the judgment should be amended to vacate the punitive damages awards on the § 1981 claims. Docket 450 at 17-19. Retsel argues that to impute the mental states of managerial employees like Nick and Connie to Retsel Corporation requires proof that "(1) the principal authorized the doing and the manner of the act; (2) the agent was unfit and the principal was reckless in employing him; (3) the agent was employed in a managerial capacity in the scope of his employment; or (4) the principal or a managerial agent ratified or approved the act." *Id.* at 17; *see also Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 542-43 (1999). Retsel claims that plaintiffs failed to provide evidence supporting any of these means of imputing Connie or Nick's behavior to Retsel. Docket 450 at 18-19.

While Retsel cites *Kolstad* for the requirements to impute the required mental state to Retsel, *id.* at 16, *Kolstad* was a case about employment discrimination, not discrimination in the context of public accommodations. *Kolstad*, 527 U.S. at 530. Courts within the Eighth Circuit have recognized that "the standards for imposing liability against an employer for the acts of an employee differ depending on the context of the case[,]" and the appropriate factors for determining agency vary depending on if the court is reviewing a § 1981 consumer case or employment discrimination case. *See Sherman*, 314 F. Supp. 2d at 860-61.

Regardless, even if this court applies the *Kolstad* factors, plaintiffs provided sufficient evidence for a jury to conclude that Retsel's employees'

23

mental states could be imputed to it. As previously discussed, Connie remained president of Retsel long after she announced the discriminatory hotel policy on her Facebook page. *See supra* part I.E. Nick was employed as the general manager of the company between 2020 and 2022, when the alleged discriminatory acts occurred. *See* Docket 448 at 39-40. These facts meet prongs 3 and 4 of the *Kolstad* analysis comfortably. And plaintiffs provided sufficient evidence that Retsel's agents acted with the "malice, intentional misconduct, or willful and wanton misconduct" that the court's instructions laid out as a necessary condition for awarding punitive damages. Docket 427 at 26-27. As previously discussed, the jury was shown a video of Nick aggressively shouting at George Bettelyoun while telling him to leave, Docket 448 at 45-48, the Facebook post and statements from Connie suggesting racial animus, *see, e.g.*, Docket 448-1 at 46-47, 222-23; Docket 424 at 2-3, 15, 81, 105, and Nick describing Native Americans in racially insensitive terms, *see, e.g.*, Docket 448 at 74-75; Docket 424 at 96, 103. The jury was free to infer that the Uhres acted maliciously from this combination of evidence. Because Retsel has not shown that a manifest error of law or fact occurred or identified newly discovered evidence that would change the verdict, the motion to vacate the punitive damages awards against Retsel on plaintiffs' § 1981 claims is denied.

### E.    The Judgment for Red Bear on Punitive Damages Will Not Be Remitted

Retsel next argues that, if this court does not vacate Red Bear's punitive damages award, the judgment on her discrimination claim should be remitted

for being unconstitutionally excessive. Docket 450 at 19-20. Unlike for the other individual plaintiffs, the jury awarded Red Bear only nominal damages on this claim. Docket 434 at 3. But it awarded her $8000 in punitive damages. *Id.* Retsel argues that the Supreme Court outlined an "outer constitutional limit" of a 9:1 punitive-to-compensatory damages ratio in *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408 (2003). Docket 450 at 19-20. Retsel claims that Red Bear did not present any evidence justifying a punitive damages award beyond that strict ratio. *Id.*

This court does not agree with Retsel's understanding of *Campbell.* In *Campbell,* the Court underwent a straightforward application of the factors outlined in *BMW of North America, Inc. v. Gore,* 517 U.S. 559 (1996) to determine that the punitive damages awarded were excessive. *Campbell,* 538 U.S. at 418. These factors, which will aid this court's analysis here, are "whether[] the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* at 419; *see also Gore,* 517 U.S. at 576-77. Contrary to Retsel's strict reading of *Campbell,* the Court was careful to caveat its holding with statements that its previously used punitive-to-compensatory damages ratios, while instructive, are "not binding," and "ratios greater than those [the Court] ha[s] previously upheld may comport with due process where 'a particularly egregious act has

25

resulted in only a small amount of economic damages.' " *Campbell*, 538 U.S. at 425 (quoting *Gore*, 517 U.S. at 582).

The Eighth Circuit has "decline[d] to place undue weight on the mathematical ratio between compensatory and punitive damages." *Bryant v. Jeffrey Sand Co.*, 919 F.3d 520, 528 (8th Cir. 2019). And examples exist of the Eighth Circuit affirming mixes of compensatory and punitive damages with discrepancies far exceeding the award here. *See, e.g., id.* at 525. Here, Retsel's intentional discrimination was a statutory violation of the sort that may result in moderate economic loss to Red Bear, but that a jury may nevertheless find "reprehensible" or "malicious" given the evidence that defendants acted with racial insensitivity, animus, and aggression. Because defendants have not shown that a manifest error of law or fact occurred or identified newly discovered evidence that would change the verdict, defendants' motion to remit the jury's award of punitive damages to Red Bear is denied.

## III.    Motion for a New Trial

### A.    Legal Standard

After the district court denies a motion under Rule 59(a), the movant "may include an alternative or joint request for a new trial under Rule 59[]" in addition to a renewed motion for judgment as a matter of law. Fed. R. Civ. P. 50(b). Under Fed. R. Civ. P. 59(a), the court may grant a new trial to any party on all or some of the issues following a jury trial. The court should grant a new trial where "the verdict was against the great weight of the evidence, so that granting a new trial would prevent a miscarriage of justice." *Jacobs Mfg. Co. v.*

*Sam Brown Co.*, 19 F.3d 1259, 1266 (8th Cir. 1994) (internal quote omitted). "In determining whether or not to grant a new trial, a district judge is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *King v. Davis*, 980 F.2d 1236, 1237 (8th Cir. 1992) (citation omitted). "The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).

### B.    The Court Did Not Err in Excluding the Red Bear Video

In its alternative motion for a new trial on the issue of liability under Rule 59(a), Retsel first argues that this court prejudicially erred by excluding a video taken by Muffie Mousseau that it believes to be potentially exculpatory. Docket 450 at 21-23. This video was in Retsel's possession prior to trial but was never disclosed to plaintiffs. *See* Docket 448 at 80-92 (the parties discussing the undisclosed video). The court refused to admit the video in Retsel's case-in-chief because Retsel did not disclose it by this court's deadline to produce exhibits, but held that the video could be used for impeachment purposes. Docket 448 at 90-92; Docket 448-1 at 111-12. Retsel argues that this court abused its discretion by not admitting the video because its late disclosure nevertheless satisfied the criteria of Fed. R. Civ. P. 37(c)(1), which permit the admission of evidence that was untimely disclosed when doing so is substantially justified and harmless. Docket 450 at 21. Retsel argues that this court was required to admit this video because Retsel's counsel's mistaken

27

belief that it was already disclosed by its predecessor counsel was excusable, admission of the video would not have surprised plaintiffs because security footage in plaintiffs' possession showed Mousseau recording the video, the video would not have slowed the trial in any way, and the video provided impeachment evidence that was indispensable to Retsel's defense against plaintiffs' § 1981 claims. *Id.* at 21-23.

> Retsel's arguments are unconvincing. The federal rules provide that,
>
> > Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

Fed. R. Civ. P. 61. The Eighth Circuit has held that evidentiary rulings made during trial "will not be disturbed unless there is a clear and prejudicial abuse of discretion." *Gee v. Pride*, 992 F.2d 159, 161 (8th Cir. 1993) (citation omitted). When a party seeks to introduce untimely disclosed evidence, district courts have "wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case." *Wegener v. Johnson,* 527 F.3d 687, 692 (8th Cir. 2008) (citations omitted). "When fashioning a remedy, the district court should consider . . . the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony." *Id.* (citation omitted)*.*

Here, it was Retsel's responsibility to disclose evidence in its possession by the required date. And even with the video excluded from use for Retsel's

28

case-in-chief, its value as impeachment evidence was not diminished by this court's ruling. *See* Docket 448 at 91 (recording this court's explanation to Retsel that it could still use Mousseau's video as impeachment evidence despite the untimely disclosure). Retsel argues that the video is important because it is "its most powerful impeachment evidence." Docket 450 at 23. But this court specifically ruled that "there may be portions of [the video] that can be used as impeachment for either Sunny Red Bear or Muffie Mousseau." Docket 448 at 92. Retsel, however, did not attempt to use the video as impeachment evidence for either Red Bear or Mousseau. Because the court did not exclude the video as impeachment evidence and it did not abuse its discretion by refusing to admit the video in Retsel's case-in-chief, there was no error. Even if there was error, the verdict was not against the great weight of the evidence, so the motion for new trial is denied.

## C.    The Court Did Not Err in Allowing Nick Uhre's Testimony About Conspiracy Theories

Retsel next argues that this court erred in allowing plaintiffs to "inject evidence of Nick's personal political opinions and conspiracy theories into the trial." Docket 450 at 23. Retsel argues that allowing Nick to testify as to his beliefs in various conspiracy theories concerning NDN Collective and Rapid City public officials was error because the theories were not relevant to plaintiffs' § 1981 claims, and "served only to portray Nick and his family as lunatic extremists." *Id.* at 23-26. Retsel refers both to Nick's testimony at trial and exhibits 30, 53, 60, 62, 64, 74, 75, 80, and 81 as examples of erroneously admitted evidence. *Id.* at 24.

29

Retsel's motion does not identify a specific error by this court pertaining to this testimony. When Retsel did object to such exhibits during trial, the court sustained the objections and the inadmissible material was redacted. *See* Docket 448 at 54, 60-61; Docket 448-1 at 12-13. For the remaining exhibits and testimony regarding Nick's conspiracies, each one was probative of Retsel's discriminatory intent because the evidence could fairly be interpreted as revealing Nick's prejudice toward Native Americans, which could be imputed to Retsel because of his position as a general manager. *See, e.g.,* Docket 424 at 90-95 (Nick and Josh Uhre discussing their beliefs that the MacArthur foundation, the Clinton family, and others are working with a Native American woman to help supply a drug dealing operation), 97 (suggesting NDN Collective "runs cover" for Mexican drug cartels); Docket 448-1 at 17-19 (Nick testifying as to his belief that crime in Rapid City is rising because of a conspiracy among various nongovernmental and governmental organizations to release Native Americans from jail). If Retsel believes plaintiffs were using this evidence and testimony to mischaracterize Nick's beliefs, it was its prerogative to clarify his beliefs with him during its direct examination. Its failure to rehabilitate him is not a reason for a new trial. Thus, this court denies the motion to grant a new trial on this basis.

### D.    The Court Did Not Err in Allowing Witnesses to Testify About the "Rosebud" comment

Retsel next argues that this court erred by allowing Bettelyoun to testify that during his encounter with Nick, Nick said that Bettelyoun would be "a problem" if he was "from Rosebud." Docket 450 at 25-26. Retsel argues that

allowing Bettelyoun to make this claim unfairly prejudiced Retsel because Nick's purported utterance was uncorroborated by the hotel's security video of the encounter, but is strongly suggestive of Nick's racial animus. *Id.*

As Judge Piersol ruled in one of the court's pretrial orders on the parties' motions in limine, the "Rosebud" statement was an integral part of the encounter between Bettelyoun and Nick. Docket 229 at 19. And because Nick is an agent of Retsel, Bettelyoun's claim that Uhre made the comment is admissible as a statement of a party opponent under Fed. R. Evid. 801(d)(2)(D). Retsel had the opportunity to appropriately cross-examine Bettelyoun about this comment's absence from the hotel's security footage at trial, and did so. Docket 448-2 at 57. Impeachment of Bettelyoun was the proper way to present Retsel's credibility concerns to the jury.[2] The possibility that the jury nevertheless believed Bettelyoun's testimony is not a reason for a new trial. Thus, this court denies defendants' motion to grant a new trial on this basis.

### E.    The Court Did Not Err in Admitting Sherwyn's Testimony

Retsel next argues that this court prejudicially erred by admitting the expert testimony of David Sherwyn. Docket 450 at 26-28. Retsel argues that Sherwyn's opinions were "not grounded in any reliable methodology and improperly invaded the jury's role." *Id.* at 26. Retsel cites Sherwyn's testimony that Retsel's " 'logical purpose' was 'to greatly reduce the native population in

---

[2] The possibility that Nick made the comment is not as inherently untrustworthy and incredible as Retsel claims. The jury heard testimony that twenty seconds of video were missing from the security footage of the encounter between Bettelyoun and Nick. Docket 448-2 at 36. The jury was free to conclude that the comment was made during that missing period.

31

their hotel' and that Retsel's stated reasons were 'pretextual'[] " as examples of Sherwyn supplanting the jury's role by offering improper legal conclusions about Retsel's discriminatory intent. *Id.* Retsel also argues that Sherwyn used Retsel's aggregate guest registration data to improperly demonstrate Retsel's discrimination with a disparate impact analysis. *Id.* at 26-27. Retsel argues that this testimony entitles it to a new trial on the issue of liability because Sherwyn's alleged invasion of the jury's role "entirely explains the verdict." *Id.* at 27-28.

The Federal Rules of Evidence provide that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702(a). The Eighth Circuit has repeatedly observed that the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) calls for the liberal admission of expert testimony so long as it is useful to the finder of fact in deciding an issue of fact. *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008) (internal quotation omitted); *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014); *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011); *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006).

Expert opinion testimony "is not inadmissible simply because it embraces an ultimate issue to be decided by the trier of fact." *Thomas v. State*

32

*Farm Mut. Auto. Ins. Co.*, 712 F. Supp. 3d 1229, 1233 (E.D. Mo. 2024) (citing Fed. R. Evid. 704(a)). For example, the Eighth Circuit has held that expert opinion about whether a corporate defendant's behavior comports with an industry's practices and norms can assist the trier of fact in reaching an ultimate factual issue. *See Cedar Hill Hardware & Constr. Supply, Inc. v. Ins. Corp. of Hannover*, 563 F.3d 329, 340, 343-44 (8th Cir. 2009) (determining that expert testimony about industry-wide practices is relevant to a jury's determination of fact); *see also Wood v. Minn. Mining & Mfg.*, 112 F.3d 306, 310 (8th Cir. 1997). This is not the same thing as expert testimony about legal matters, which is not admissible. *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003).

Here, Sherwyn testified about the general practices of hotels and hotel industry standards. Contrary to how Retsel characterizes Sherwyn's testimony in its brief, Sherwyn never declared that Retsel's no-locals policy was pretextual. The relevant testimony Retsel takes issue with appears to be: "Q: Taking their actions together, what do you think the logical purpose was of Retsel's series of actions here? . . . A: The only thing I can conclude is that they . . . wanted to greatly reduce the Native population in their hotel." Docket 448-3 at 81. While Sherwyn opined that his analysis logically suggests that Retsel was trying to reduce the presence of Native Americans at the hotel, an expertise-informed opinion encompassing an ultimate *factual* issue is not the same thing as a legal conclusion about whether Retsel's actions constituted discrimination under federal law. Furthermore, Fed. R. Evid. 704(a) provides

33

that an expert's "opinion is not objectionable just because it embraces an ultimate issue."

Nor does this court agree that Sherwyn's statistical analysis was improper. Sherwyn's testimony that the Grand Gateway Hotel saw an 85% drop in guests from local reservations, combined with the multitude of other evidence that Retsel's agents had discriminatory intent, provided abundant basis for a jury to conclude that Retsel was intentionally discriminating on the basis of race. *See* Docket 448-3 at 81; *see also supra* part I.B. Thus, Sherwyn's statistical evidence was not improper.

Retsel also argues that Sherwyn should have reviewed Retsel's deposition or considered additional evidence offered by Retsel or Nick. Docket 450 at 27. But Retsel appropriately raised this concern in front of the jury during its cross-examination of Sherwyn. Docket 448-3 at 99-108. Thus, defendants' motion for the court to grant a new trial on the basis that Sherwyn's testimony was improper is denied.

## F.    The Court Did Not Err in Excluding Evidence of Retsel's Foreclosure

Retsel next argues that this court erred by excluding evidence of the impending foreclosure action against Retsel. Docket 450 at 28. Retsel claims that this evidence was crucial for the jury to "consider[ ] the defendant's financial condition" because the jury was instructed to do so when determining an amount of punitive damages to award plaintiff. *Id.* Because the jury did not know about the foreclosure action, Retsel argues that the jury had a

34

"profoundly misleading picture of Retsel's true financial position[,]" and thus a new trial is warranted on the issue of liability. *Id.*

Judge Piersol's order on Retsel's motion in limine permitted Retsel to offer evidence of its net worth and discuss its financial situation in general terms, but that it not specifically reference the foreclosure action. Docket 321 at 3-4. Nick testified without objection that "[he'd] lost it all." Docket 448-3 at 233. And in response to this jury question: "[y]ou said you lost it all. Is Grand Gateway no longer profitable?" Nick responded "I can't answer that question[.]" Defense counsel did not ask any follow-up questions. *Id.* at 241, 244. The defense was given the opportunity to present evidence to the jury that the Grand Gateway was not profitable, but did not.

Additionally, the jury award for punitive damages only totaled to $32,001. Docket 434. Retsel's motion does not explain why a punitive damages award totaling $32,001 is excessive or disproportionate. *See* Docket 450 at 28; *see also* Docket 434. Thus, defendant's motion for a new trial on this basis is denied.

### G.    The Court Did Not Err in Excluding Certain Evidence About Hermus Bettelyoun

Retsel next argues that this court erred when it excluded evidence "that Hermus Bettelyoun . . . had previously smeared fecal matter on a hotel bed." Docket 450 at 29. Retsel argues that this evidence was essential to its case because it explained Nick's motive and state of mind when refusing to rent rooms to plaintiffs. *Id.* Retsel claims that excluding this evidence "deprived

35

jurors of the context necessary to evaluate intent and credibility, and that exclusion materially affected the verdict and warrants a new trial on liability." *Id.*

Judge Piersol excluded this evidence under Fed. R. Evid. 403. Docket 321 at 6. His order reasoned that evidence as inflammatory as this is "extremely prejudicial and appears to have little relevance to this case." *Id.* As Judge Piersol noted, Hermus Bettelyoun is deceased, was not deposed regarding this incident, and is not a party in this action. *Id.* It would have been impossible for the jury to know whether this incident was intentional or accidental, or whether it was Hermus or one of his children who did what Retsel describes. Because this evidence is irrelevant and lacks foundation, but its unfair prejudice to plaintiffs and inflammatory nature is obvious, it was not error to exclude it and defendant's motion for a new trial on this basis is denied.

## H.    The Verdict Form Did Not Misstate the § 1981 Claims

Finally, Retsel argues that this court misstated plaintiffs' claims under 42 U.S.C. § 1981 in its verdict form. Docket 450 at 29-31. Retsel's argument is that questions 1 through 6 of the verdict form incorrectly titled plaintiffs' § 1981 claims "claim[s] of discrimination," when the form should have said that the claims were for discrimination in the making and enforcement of contracts. *Id.* Retsel made no objection to the verdict form when the jury instructions were settled. *See* Docket 448-3 at 4-6.

In reviewing a challenge to a court's jury instructions, "the pertinent inquiry is whether the instructions, *taken as a whole* and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *Horstmyer v. Black & Decker, Inc.*, 151 F.3d 765, 771 (8th Cir. 1998) (emphasis added) (internal quotation omitted). Retsel's motion concedes that the instructions accurately stated the elements of a § 1981 claim. Docket 450 at 30; Docket 427 at 11-13. The verdict form's language of "claim of discrimination" could not refer to any other instruction than the correctly explained instruction on plaintiffs' § 1981 claim. Thus, taken as a whole, the instructions did not mislead the jury. Retsel's motion for a new trial on this basis is denied.

After considering all of Retsel's reasons for its request for a new trial, the court finds that the evidence presented during the trial supports the verdict of the jury and a miscarriage of justice did not occur. Therefore, the motion for a new trial is denied.

## CONCLUSION

For the reasons explained above, it is

ORDERED that Retsel's Motion for Judgment as a Matter of Law (Docket 449) is DENIED. It is

FURTHER ORDERED that Retsel's Alternative Motion to Alter, Amend, or Remit the Judgment (Docket 449) is DENIED. It is

FURTHER ORDERED that Retsel's Further Alternative Motion for a New Trial (Docket 449) is DENIED.

Dated June 30, 2026.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE